UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

OVERSEAS LEASE GROUP, INC.,                          08 Civ. 01696

                    Plaintiff,

        - against -                                  **ANSWER, AFFIRMATIVE
                                                     DEFENSES AND
                                                     COUNTERCLAIMS**

KEY GOVERNMENT FINANCE, INC.,

                    Defendant.
-------------------------------------------------------------x

        Defendant Key Government Finance, Inc. ("Key"), by and through its attorneys, Moritt

Hock Hamroff & Horowitz LLP, as and for its Answer to the Complaint of Plaintiff Overseas

Lease Group, Inc. ("OLG") dated February 20, 2008 (the "Complaint") hereby alleges as

follows:

## AS TO THE PARTIES

        1.      Denies knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in paragraph "1" of the Complaint.

        2.      Admits the allegations contained in paragraph "2" of the Complaint, except states

that Key is a corporation organized and existing under the laws of the State of Colorado.

## AS TO JURISDICTION AND VENUE

        3.      Denies the allegations contained in paragraph "3" of the Complaint and further

states that the allegations contained in paragraph "3" call for a legal conclusion to which no

response is required.

        4.      Denies allegations contained in paragraph "4" of the Complaint and further states

that the allegations contained in paragraph "4" call for a legal conclusion to which no response is

required.

## AS TO STATEMENT OF FACTS
## COMMON TO ALL CAUSES OF ACTION

5.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "5" of the Complaint, except admits that Key is aware that OLG purchases vehicles for lease to the United States Department of Defense (the "DOD") for use in Afghanistan.

6.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "6" of the Complaint, except admits that Key is a financing company and denies the allegations contained in paragraph "6" to the extent that they allege any wrongdoing and interference by Key in OLG's contract or business relations with the Defense Department.

7.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "7" of the Complaint, except admits that Key is aware of OLG's contract with the Defense Department, avers that the DOD Contract was for a one year term with five option years, and respectfully refers the Court to the DOD Contract referenced in paragraph "7" for the additional terms, conditions and contents thereof.

8.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "8" of the Complaint.

9.      Admits the allegations contained in paragraph "9" of the Complaint to the extent that Key is not a party to OLG's DOD Contract but denies the balance of the allegations and avers that Key has an assignment of all monies due or to become due under the DOD Contract, as well as OLG's rights and interests thereunder.

10.     Admits the allegations contained in paragraph "10" of the Complaint to the extent the parties entered into the Assignment Agreement and respectfully refers the Court to the

Assignment Agreement referenced therein for the terms, conditions and contents thereof. A copy of the Assignment Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

11.    Denies the allegations contained in paragraph "11" of the Complaint.

12.    Admits the allegations contained in paragraph "12" of the Complaint and respectfully refers the Court to the Assignment Agreement referenced therein for the terms, conditions and contents thereof. Key further states that, by written agreements, including but not limited to, by written agreement dated May 18, 2006, OLG sold and assigned to Key "good and unencumbered title" to the vehicles leased by OLG to the DOD pursuant to the DOD Contract.

13.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "13" of the Complaint and respectfully refers the Court to the DOD Contract referenced therein for the terms, conditions and contents thereof.

14.    Denies the allegations contained in paragraph "14" of the Complaint, except admits that lease payments from DOD attributable to the lease revenue stream purchased by Key under the Assignment Agreement are deposited directly to the Key Account and further respectfully refers the Court to the Assignment Agreement and all documents executed in connection therewith for the terms, conditions and contents thereof.

15.    Admits that Key is aware of at least one other financing source and that Key services payments for the benefit of that source, and denies knowledge or information sufficient to form a belief as to the truth or falsity of the balance of the allegations contained in paragraph "15" of the Complaint.

16.    Denies the allegations contained in paragraph "16" of the Complaint.

17.     Admits that Key retained a consultant who has made contacts with the DOD, and denies the remaining allegations contained in paragraph "17" of the Complaint.

18.     Denies the allegations contained in paragraph "18" of the Complaint.

19.     Admits that Key has retained a consultant who has been in contact with the DOD, and denies the remaining allegations contained in paragraph "19" of the Complaint.

20.     Denies the allegations contained in paragraph "20" of the Complaint.

21.     Denies the allegations contained in paragraph "21" of the Complaint.

22.     Denies the allegations contained in paragraph "22" of the Complaint.

## AS TO COUNT I

23.     Key repeats and realleges its responses to paragraphs "1" through "22" of the Complaint as if more fully set forth herein.

24.     Denies the allegations contained in paragraph "24" of the Complaint.

25.     Denies the allegations contained in paragraph "25" of the Complaint.

26.     Denies the allegations contained in paragraph "26" of the Complaint.

27.     Denies the allegations contained in paragraph "27" of the Complaint.

28.     Denies the allegations contained in paragraph "28" of the Complaint and further states that the allegations contained in paragraph "28" call for a legal conclusion to which no response is required.

29.     Denies the allegations contained in paragraph "29" of the Complaint.

## AS TO COUNT II

30.     Key repeats and realleges its responses to paragraphs "1" through "29" of the Complaint as if more fully set forth herein.

31.     Denies the allegations contained in paragraph "31" of the Complaint.

32.    Denies the allegations contained in paragraph "32" of the Complaint.

## AS TO COUNT III

33.    Key repeats and realleges its responses to paragraphs "1" through "32" of the Complaint as if more fully set forth herein.

34.    Denies the allegations contained in paragraph "34" of the Complaint.

35.    Denies the allegations contained in paragraph "35" of the Complaint.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

36.    The Complaint fails to state a claim upon which relief may be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

37.    OLG's claims are barred, in whole or in part, by the doctrines of laches, estoppel or waiver, and to the extent that OLG consented to or acquiesced in any of the acts complained of in the Complaint.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

38.    OLG's claims are barred, in whole or in part, by the doctrine of unclean hands.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

39.    OLG's claims are barred, in whole or in part, by documentary evidence.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

40.    Any injury or damages alleged by OLG were in whole or in part the result of OLG's own culpable conduct.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

41.    Any injury or damages alleged by OLG were in whole or in part the result of OLG's breach of contract and/or its negligence, acts or omissions.

5

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE**

42.     The Complaint fails to set forth adequate and appropriate grounds for injunctive relief.

**AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE
AND FIRST COUNTERCLAIM**

43.     Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "42" as if more fully set forth herein.

44.     At the time that OLG presented the DOD Contract to Key for funding, OLG maintained an office and staff in Afghanistan and the Vehicles were arranged by OLG to be purchased from a dealer for delivery in Afghanistan.

45.     OLG was, and is, very familiar with the market for the Vehicles in Afghanistan and, as alleged in the Plaintiff's Complaint, OLG solely conducted all dealings with the DOD and jealously protected that arrangement.

46.     In contrast, Key has always been a Colorado corporation that, although it conducts financing activities in all 50 states and several countries, has never conducted business activities in Afghanistan, and is not familiar with that market.  Accordingly, Key reasonably relied upon OLG's expertise in the Afghanistan market and the material representations made by OLG in its efforts to induce Key to fund the transaction subject of the DOD Contract, and both parties were aware of that reliance.

47.     In an effort to induce Key's agreement to fund the transaction subject of the DOD Contract, OLG made the following material representations to Key, among others:

        a.      that the Vehicles consisting of "soft vehicles" had a fair market value in Afghanistan, at the time of the transaction, of $65,000.00 and a cost ranging between $73,740.00 and $95,688.00 per Vehicle, and that the Vehicles consisting of "armored vehicles" had a fair

6

market value in Afghanistan, at the time of the transaction, ranging between $282,000.00 and $329,328.00 per Vehicle (although the precise number of Vehicles to be leased to the DOD would be determined at a later date);

        b.     that, in the event that the DOD did not renew some or all of the Task Orders, the Vehicles would be returned to OLG and could readily be remarketed by OLG in the marketplace. It was implicit in that representation that the fair market value of the Vehicles at the time of the remarketing would be a reasonably depreciated value from the value as leased to the DOD.

48.     OLG's representation as to the fair market value of the Vehicles was a material inducement to Key in its decision to approve the transaction and Key approved the transaction for funding, in reliance upon those representations.

49.     In reliance upon OLG's representations, Key paid a total of $26,231,059.00 to OLG.

50.     Thereafter, on or about September 11, 2007, the DOD gave notice of non-renewal of Task Order #31 and indicated an intent to non-renew some or all of the other remaining Task Orders. As a part of its efforts to determine its alternatives to mitigate its resulting losses, Key obtained documents from OLG's files and retained an independent consultant in Afghanistan to, among other things, determine the market value for the Vehicles and to identify prospective buyers for the Vehicles.

51.     As a result of those efforts by Key, Key determined that OLG's material representations stated above were false in that:

     a.     OLG charged Key for the Vehicles consisting of "soft vehicles" that were leased to the DOD for between $73,740.00 and $95,688.00 each but OLG had, in actuality, paid only between $23,212.00 and $32,334.00 per each Vehicle;

     b.     OLG's lease pricing to the DOD for those same Vehicles, at approximately $95,000 per Vehicle, was far in excess of the market value pricing; and

     c.     At the time of the DOD's notice of non-renewal, only 2 years after the date that the Vehicles were first leased to the DOD, the Vehicles had a fair market value of only $25,000.00.

52.     By reason of the foregoing, Key's losses arising out of this transaction are far in excess of that which was estimated by Key as a "worst case scenario" at the time that the Assignment Agreement was entered into based upon the information provided and material representations made by OLG to Key.

53.     Had Key been  aware of the extent of its loss exposure at the time of the Assignment Agreement, it would not have entered into that Agreement.

54.     By reason of the foregoing, Key relied upon OLG's representations to its detriment and has suffered financial damages as a direct result thereof.

55.     Accordingly, Key requests rescission of the Assignment Agreement and a return of the full amount of the funding paid to OLG in reliance upon the stated material misrepresentation.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE
## AND SECOND COUNTERCLAIM

56.     Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "55" as if more fully set forth herein.

57.     Upon information and belief, OLG and the United States Department of Defense (the "DOD") entered into a certain contract, Contract No. W91B4M-06-D-0001 (the "DOD Contract") dated as of February 5, 2006, pursuant to which OLG leased to the DOD and the DOD leased from OLG, the property described therein and on certain "Task Orders" issued by the DOD consistent therewith (the "Vehicles").

58.     Pursuant to various Assignment of Proceeds Letters thereafter issued by OLG to Key in connection with the DOD Contract, OLG invoiced Key and Key funded the proceeds due under invoice for payment of the Vehicles leased by OLG to the DOD.

59.     By Assignment Agreement dated as of April 1, 2006 (the "Assignment Agreement") by and between OLG, as seller, and Key, as purchaser, OLG sold, assigned, transferred and set over unto Key all of OLG's "right, title and interest in and to (but none of its obligations under) the [DOD Contract]" and

> "all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by [the DOD], and a first priority lien in favor of Purchaser in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract, including (without limitation) the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement".

See Exhibit "A", attached hereto.

60.     Upon information and belief, in accordance with the terms of the DOD Contract, the DOD provided OLG with, among others, Task Order #31, pursuant to which OLG leased to the DOD and the DOD leased from OLG seventy (70) Vehicles identified therein (the "TO #31 Vehicles").

61.     Upon information and belief, the DOD's lease of the TO #31 Vehicles expired on November 30, 2007.

9

62.    Upon information and belief, the DOD elected not to renew its lease of the TO #31 Vehicles which expired on November 30, 2007 and returned said Vehicles to OLG on or about December 1, 2007 in accordance with the DOD Contract.

63.    Pursuant to a written agreement dated on or about May 18, 2006 (the "Title Agreement") between OLG, as seller, and Key, as buyer, OLG sold and assigned to Key "good and unencumbered title to the equipment described in the [DOD Contract] and the contract lease or service contract payments relating thereto". A copy of the Title Agreement is attached hereto as Exhibit "B" and incorporated herein by reference.

64.    Pursuant to the quoted terms of the Title Agreement, OLG sold and assigned to Key good and unencumbered title to the TO #31 Vehicles.

65.    Upon the expiration of TO # 31, Key contacted OLG to confirm that OLG would cooperate and deliver title to the TO #31 Vehicles in the event that Key found buyers through its own efforts, and OLG verbally agreed to do so. Relying upon OLG's agreement, Key undertook efforts to sell or remarket the TO #31 Vehicles.

66.    In or about February 2008, Key successfully located a prospective buyer for seven (7) of the TO #31 Vehicles.

67.    In or about February 2008, Key informed OLG that it had located a prospective buyer for seven (7) of the TO #31 Vehicles.

68.    Despite Key's demand therefor, and contrary to its prior verbal agreement, OLG has intentionally failed and refused to turn over the titles for the TO #31 Vehicles, including the seven (7) Vehicles for which Key had located a prospective buyer.

69.    OLG's failure and refusal to turn over the titles for the TO #31 Vehicles is without cause or justification.

70.    OLG's failure and refusal to turn over the titles for the TO #31 Vehicles is in breach of its verbal agreement and in derogation of Key's ownership rights under the Title Agreement.

71.    OLG's failure and refusal to turn over the titles for the TO #31 Vehicles is in derogation of Key's rights under the Title Agreement to remarket the TO #31 Vehicles.

72.    OLG's aforesaid conduct has interfered, and continues to interfere, with Key's contractual and business relations with the prospective buyer for the seven (7) Vehicles.

73.    OLG's aforesaid conduct has caused and will continue to cause financial damage to Key.

74.    By reason of the foregoing, Key has sustained damages in an amount to be determined at trial, but in no event less than $175,000.00.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE
## AND THIRD COUNTERCLAIM

75.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "74" as if more fully set forth herein.

76.    Pursuant to the terms of the Title Agreement, OLG agreed that it would "provide for the deinstallation and removal of the equipment in the event of early termination of the [DOD Contract] and will assist [Key] through a best efforts remarketing covenant".

77.    OLG's aforesaid conduct is in breach of its best efforts remarketing covenant to Key.

78.    By reason of the foregoing, Key has sustained damages in an amount to be determined at trial, but in no event less than $1,750,000.00.

11

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE
## AND FOURTH COUNTERCLAIM

79.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "78" as if more fully set forth herein.

80.    Pursuant to the Title Agreement, OLG sold to Key "good and unencumbered title" to the Vehicles leased to the DOD under the DOD Contract.

81.    Upon information and belief, Task Orders pertaining to leases of over 200 additional Vehicles to which OLG sold and assigned title to Key are due to expire in the upcoming months and the DOD has indicated that it is not likely to exercise its options to renew those Task Orders for part or all of their remaining terms.

82.    Key is entitled to the titles for the Vehicles and has requested those titles from OLG.  OLG has failed and refused to deliver the titles, and has asserted, in contravention of its contractual undertakings and as indicated in paragraphs 12 and 13 of the Complaint, that OLG is owner of the Vehicles and is not obligated to deliver the titles to Key.

83.    A justiciable controversy exists concerning Key's entitlement to title of the Vehicles and Key has no adequate remedy at law.  Unless this Court issues the declaration requested herein, Key stands to suffer direct and immediate material financial loss as a result of OLG's failure and refusals to deliver title.

84.    By reason of the foregoing, Key hereby requests a declaration from this Court that OLG is required, under its contracts, to turn over title of the Vehicles to Key.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE
## AND FIFTH COUNTERCLAIM

85.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "84" as if more fully set forth herein.

12

86.    Upon information and belief, upon the DOD's termination of the lease of the TO #31 Vehicles and its return of those Vehicles to OLG, OLG submitted a repair bill for the TO #31 Vehicles to the DOD in excess of $1 million.

87.    Upon information and belief, OLG deliberately concealed the repair bill from Key and Key obtained a copy of the repair bill from its outside consultant.

88.    Upon information and belief, the amount of the repair bill from OLG is woefully excessive and without cause or justification. In fact, upon Key's information and belief, the true cost of the repairs for the TO #31 Vehicles is actually a few hundred dollars per vehicle, and totaling no more than $10,000.00.

89.    Upon information and belief, the DOD has disputed, and continues to dispute, the amount of the repair bill. Upon information and belief, the DOD has seriously considered the option of purchasing some or all of the Vehicles.

90.    Upon information and belief, OLG has taken the position that the TO #31 Vehicles remain under lease by the DOD pursuant to the DOD Contract unless and until the full $1 million repair bill has been paid by the DOD.

91.    OLG's actions have unjustifiably and improperly prevented the DOD from purchasing the Vehicles, and interfered, and continue to interfere, with Key's rights to sell or remarket the TO #31 Vehicles.

92.    OLG's actions have caused and will continue to cause financial damage to Key.

93.    By reason of the foregoing, Key has sustained damages in an amount to be determined at trial, but in no event less than $1,750,000.00.

13

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE
## AND SIXTH COUNTERCLAIM

94.     Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "93" as if more fully set forth herein.

95.     Pursuant to Section 3(n) of the Assignment Agreement, OLG, as seller, among other things, represented and warranted to Key, as purchaser, that "Seller has done and shall do nothing and knows of no facts or circumstances which would (i) materially impair the validity or value of the Contract, any rights created thereby, the Property or this Agreement...".

96.     Pursuant to Section 8(e) of the Assignment Agreement, OLG, as seller, among other things, covenanted and agreed that "Seller will not, without Purchaser's consent, ... take any action which impairs the rights or interest of Purchaser with respect to the Contract".

97.     By reason of OLG's actions described in paragraphs 86-90 above, from December 2007 to date, Key has not received any lease payments attributable to the TO #31 Vehicles, to which lease payments Key is entitled pursuant to the DOD Contract and the Assignment Agreement.  Upon information and belief, the monthly lease payment for the TO #31 Vehicles is in an amount ranging from $1,545.00 to $2,316.00 per month per Vehicle (depending upon the Vehicle make).

98.     By reason of OLG's aforesaid actions, OLG has interfered with Key's entitlements and rights under the DOD Contract and the Assignment Agreement.

99.     OLG's actions are in breach of its representations, warranties and covenants to Key.

100.    By reason of OLG's breach, Key has suffered damages in an amount to be determined at trial, but in no event less than $512,168.00.

14

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE
## AND SEVENTH COUNTERCLAIM

101. Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "100" as if more fully set forth herein.

102. Pursuant to Section 7 of the Assignment Agreement, OLG, as seller, agreed to indemnify and save Key, as purchaser, "harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of action and judgments of any nature arising out of, or resulting from, Seller's breach of the covenants, representations and warranties contained in this Agreement".

103. By reason of the foregoing, Key is entitled to such costs and expenses, including attorneys' fees, as may be determined by this Court.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE
## AND EIGHTH COUNTERCLAIM

104. Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "103" as if more fully set forth herein.

105. Pursuant to Assignment of Proceeds letters, including but not limited to, letters dated May 30, 2006, May 31, 2006, June 14, 2006, and July 21, 2006, respectively, OLG invoiced Key and Key funded the proceeds due for payment of the Vehicles leased under the DOD Contract (the "Invoices").

106. Pursuant to the Invoices, Key paid funding proceeds in the total amount of $26,231,059.00.

107. In making payment of said funding proceeds, Key relied upon OLG with regard to OLG's representation to Key of the fair market value of the Vehicles, based upon OLG's

15

expertise and experience in the leasing of vehicles for use in connection with the United States military, and in Afghanistan in particular.

108.    Key relied upon OLG's representations as a material inducement for entering into the Assignment Agreement and contracts related thereto.

109.    Upon information and belief, OLG's representations were false and misleading.

110.    Upon information and belief, OLG substantially overcharged Key for the Vehicles. Specifically, upon information and belief, OLG purchased the Vehicles consisting of "soft vehicles" for the following amounts and then invoiced Key as follows:

| Vehicle | Amount paid by OLG | Amount invoiced to Key |
|---|---|---|
| Toyota Hilux | $24,005.00 | $75,036.00 |
| Mitsubishi Minibus | $19,847.00 | $64,992.00 |
| Mitsubishi Pajero | $23,212.00 | $73,740.00 |
| Toyota Land Cruiser | $32,334.04 | $95,688.00 |

111.    The amounts that OLG paid for the Vehicles consisting of "armored vehicles" is presently unknown to Key. However, upon information and belief, Key believes that OLG substantially overcharged Key for those Vehicles as well.

112.    By reason of the foregoing, Key relied upon OLG's representations to its detriment and has suffered financial damages as a direct result thereof.

113.    Pursuant to the Assignment Agreement and contracts related thereto, OLG owed Key a fiduciary duty of good faith and fair dealing.

114.    By virtue of the aforesaid, OLG breached its fiduciary duty of good faith and fair dealing.

115.    By virtue of the aforesaid, Key has been damaged in an amount to be determined at trial, but in no event less than $26,231,059.00.

16

## AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE
## AND NINTH COUNTERCLAIM

116.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "115" as if more fully set forth herein.

117.    Upon information and belief, upon the expiration of the lease for the TO #31 Vehicles on November 30, 2007, OLG made attempts to remarket the TO #31 Vehicles.

118.    In connection with OLG's attempts to remarket the TO #31 Vehicles, OLG presented Key with offers from prospective buyers to purchase all or some of the TO #31 Vehicles.

119.    Upon information and belief, the offers presented to Key by OLG were far below market value.

120.    Upon information and belief, OLG presented Key with offers from prospective buyers that were far below market value with the intention of then re-selling or re-leasing the Vehicles to other prospective buyers or lessees at a much higher price for OLG's own benefit.

121.    Upon the expiration of the leases for thirteen (13) Vehicles subject of Task Order Nos. 2, 5, 8, 10 and 12, OLG purchased those Vehicles from Key for the total sum of $185,762.00 (the "Additional Vehicles").

122.    OLG purchased the Additional Vehicles from Key for the total sum of $185,762.00, based upon OLG's representations to Key as to the fair market value of the Additional Vehicles.

123.    Upon information and belief, OLG then re-leased the Additional Vehicles for a substantial profit to OLG that was far in excess of the alleged fair market value represented to Key and paid by OLG to Key for the Additional Vehicles.

17

124.    By virtue of the aforesaid, OLG breached its fiduciary duty to Key of good faith and fair dealing under the Assignment Agreement and contracts related thereto.

125.    By virtue of the aforesaid, Key has been damaged in an amount to be determined at trial.

WHEREFORE, Defendant prays for judgment as follows:

A.    dismissing the Complaint in its entirety with prejudice;

B.    on its First Counterclaim, granting rescission of the Assignment Agreement and awarding a return of the full amount of funding paid by Defendant to Plaintiff;

C.    on its Second Counterclaim, awarding Defendant damages in an amount to be determined at trial, but in no event less than $175,000.00;

D.    on its Third Counterclaim, awarding Defendant damages in an amount to be determined at trial, but in no event less than $1,750,000.00;

E.    on its Fourth Counterclaim, declaring that Defendant is entitled to the titles to the Vehicles and requiring that Plaintiff immediately turn over said titles to Defendant;

F.    on its Fifth Counterclaim, awarding Defendant damages in an amount to be determined at trial, but in no event less than $1,750,000.00;

G.    on its Sixth Counterclaim, awarding Defendant damages in an amount to be determined at trial, but in no event less than $512,168.00;

H.    on its Seventh Counterclaim, awarding such costs and expenses, including attorneys' fees, as may be determined by this Court;

I.    on its Eighth Counterclaim, awarding damages in an amount to be determined at trial, but in no even less than $26,231,059.00;

J.    on its Ninth Counterclaim, awarding damages in an amount to be determined at

trial; and

K.    for such other and further relief as this Court may deem just and proper.

Dated: Garden City, New York
       March 19, 2008

MORITT HOCK HAMROFF & HOROWITZ LLP
Attorneys for Defendant

By: _____
     Marc L. Hamroff, Esq. (MH-9283)
     Terese L. Arenth, Esq. (TA-5167)
400 Garden City Plaza
Garden City, New York 11530
(516) 873-2000

F:\Key Equipment Finance\Overseas\Docs\Answer 3 19 08.doc

19

## ASSIGNMENT AGREEMENT

**THIS ASSIGNMENT AGREEMENT** (this "Agreement") is made as of April 1, 2006 by and between Overseas Lease Group, Inc., a Delaware corporation with its principal office at 31 Dehart Street, Morristown, NJ 07960-5211 ("Seller") and **KEY GOVERNMENT FINANCE, INC.**, with its principal office at 1000 South McCaslin Blvd. Superior, CO 80027, its successors and assigns ("Purchaser").

### INTRODUCTION:

Seller, and United States Department of Defense (the "User") have entered into that certain Contract (Contract No. W91B4M-06-D-0001), dated as of February 05, 2006 (the "Contract"), pursuant to which Seller has leased to the User, and the User has leased from Seller, the property described therein (the "Property"). Seller desires to sell, and Purchaser is willing to purchase, the Assigned Interest (as hereinafter defined).

**Section 1.    Assignment.** NOW, THEREFORE, in consideration of the covenants, warranties and representations hereinafter set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser agree as follows: FOR VALUE RECEIVED, including the payment by Purchaser of $460,502.46 due at closing (the "Purchase Price"). Seller does hereby sell, assign, transfer and set over unto Purchaser all of Seller's right, title and interest in and to (but none of its obligations under) the Assigned Interest.

**Section 2.    Assigned Interest.** As used herein, the term "Assigned Interest" shall mean the Contract and all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by User, and a first priority lien in favor of Purchaser in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract, including (without limitation) the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement. As used herein, the term "Contract" shall mean the Contract, together with all documents executed in connection with the Contract, including, without limitation, all documents listed on attached Schedule A.

**Section 3.    Representations and Warranties.** In order to induce Purchaser to enter into this Agreement and to accept the sale of the Assigned Interest, and security interest in the Property, Seller hereby represents and warrants to Purchaser that:

(a) the Contract was duly authorized and properly executed and delivered by the Seller and this Agreement was duly authorized and properly executed and delivered by Seller, and each is in full force and effect and represents a valid and enforceable obligation of Seller in accordance with its terms, subject to bankruptcy, insolvency or similar laws then in effect;

(b) the number and amount of the unpaid payments due under the Contract as of the date hereof are as stated in Exhibit 1 attached hereto;

(c) no security deposit or prepayment of payments has been paid to Seller by the User or any third party in connection with the Contract, and Seller has not granted, and will not grant, to the User any allowance, credit memo, adjustment, or enter into any settlement, modification or amendment of the Contract;

(d) attached hereto is a true, correct, and complete copy of the Contract, and the Contract is the sole and entire understanding and agreement between the User and Seller and there are no other agreements between them with respect to the Contract or the Property;

(e) all original counterparts of the Contract have been delivered to Purchaser;

(f) to the best of Seller's knowledge all of the Property has been accepted by the User in a condition satisfactory to the User in all respects and the Property is in possession of the User and, Seller has no knowledge of any casualty loss with respect to the Property;

(g) to the best of Seller's knowledge the Contract is free of any setoffs, counterclaims and defenses of any kind whatsoever;

(h) to the best of Seller's knowledge no event of default or event of non-appropriation has occurred and is continuing under the Contract, and no event has occurred which, with the lapse of time or the giving of notice, or both, would constitute an event of default or event of non-appropriation under the Contract;

(i) all representations and duties of Seller intended to induce the User to enter into the Contract, whether required by the Contract or otherwise, have been fulfilled and Seller is not in default with respect to any of its obligations under the Contract, nor has any event occurred and continued which with the passing of time or the giving of notice would constitute such a default by Seller;

(j) Seller has fully complied with all applicable federal and state laws, rules and regulations and has made all disclosures required by law in connection with the transactions contemplated by the Contract, prior to the consummation of the Contract;

(k) to the best of Seller's knowledge after due inquiry, all credit data submitted to Purchaser and all information set forth in the User's application for entry into the Contract is true and correct in all material respects;

(l)    Seller shall use proceeds hereof to pay supplier the purchase price of the Property and all taxes required to be paid in connection with the acquisition of the Property, and Seller is the sole owner of and has good and marketable title to the Property and Assigned Interest, free and clear of all liens and encumbrances of any nature whatsoever, other than the interest of the User under the Contract;

(m)    no prohibition exists, in the Contract or otherwise, and no consent of the User or any other party is required (other than consent which has already been provided), to the making of this Assignment;

(n)    Seller has done and shall do nothing and knows of no facts or circumstances which would (i) materially impair the validity or value of the Contract, any rights created thereby, the Property or this Agreement, or (ii) materially impair the ability of Seller to perform its obligations under the Contract or this Agreement;

(o)    all taxes due and payable by Seller as of the date hereof with respect to the Property and Assigned Interest have been, or will be paid;

(p)    this Assignment vest in Purchaser full right, title and interest and legal title of Seller in and to the Assigned Interest, free and clear of all claims, liens, security interests and encumbrances of any kind or character, except the right of User under the Contract, and the same shall be and remain free of all claims, liens, security interests and encumbrances arising through any act or omission of Seller or any person claiming by, through or under it;

(q)    the execution by Seller of this Agreement and of the Contract to which it is a party, and its participation in the transaction specified herein, is in its ordinary course of business and within the scope of its existing corporate authority and Seller has full power and authority to enter into, and has taken all necessary action to authorize the execution and delivery of the Contract and, this Agreement and to perform the terms and conditions hereof and thereof;

(r)    neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby will conflict with or result in a breach of any of the terms, conditions or provisions of the organizational documents of Seller, or of any law or regulation, order, writ, injunction or decree of any court or government instrumentality, or of any agreement or instrument to which Seller is a party or by which it or to which it or its assets is subject;

(s)    intentionally left blank

(t)    the Contract constitutes a separate instrument of lease, enforceable by Purchaser without regard to other equipment schedules executed pursuant to the Contract.

Seller's representations and warranties under this Section shall be continuing representations and warranties made as of the date of this Agreement and shall survive the assignment of the Assigned Interest to Purchaser.

**Section 4.    Intentionally left blank.**

**Section 5.    Duties of Seller at Closing.** Seller shall deliver to Purchaser, unless waived in writing by Purchaser: (a) all original counterparts of the Contract, duly executed by the User thereunder, and the completion, installation or acceptance certificate by whatever name executed by such User with respect to the Property leased under the Contract; (b) a duly executed notice of assignment; (c) such other documents and certificates as Purchaser may reasonably request; and (i) such documents and instruments (if any) as reasonably may be required by Purchaser to effect the grant of security interest by Seller to Purchaser in the Property and assignment by Seller to Purchaser of any warranties solely to the extent applicable to the Property.

**Section 6. Seller's Obligations Under the Contract.** Purchaser shall have all of the rights of the Seller under the Contract, but none of Seller's obligations thereunder. This Agreement (and the assignment of such rights) shall not relieve Seller of any of its obligations under the Contract and Seller shall continue to perform all such obligations. Purchaser shall not be obligated to assume, and by its acceptance of this assignment shall not be deemed to have assumed, any of Seller's obligations under the Contract.

**Section 7.    Indemnification.** Seller hereby agrees to indemnify and save Purchaser harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Seller's breach of the covenants, representations and warranties contained in this Agreement. Purchaser will indemnify and save Seller harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Purchaser's actions or failure to act in connection with the Assigned Interests. The indemnity set forth in this Section shall survive the expiration or earlier termination of this Agreement or the Contract with respect to acts or events occurring or alleged to have occurred prior to such expiration or early termination.

**Section 8.    Covenants and Agreements.** Seller hereby covenants and agrees with Purchaser as follows:

(a)    Purchaser may endorse Seller's name on any remittances received from the User with respect to the Contract and/or the Property.

(b) Seller shall pay or cause to be paid by the User all personal property taxes, including tangible and intangible personal property, license, privilege, documentary, sales and other like taxes or charges or taxes in lieu thereof, applicable to any of the transactions contemplated by this Agreement, and which have been imposed, assessed or accrued at or prior to the time of assignment against the Property, this Agreement, the Contract or Purchaser, except for taxes measured or imposed on the net income of Purchaser.

(c) Seller shall, from time to time at the request of Purchaser, execute and deliver such further acknowledgments, agreements and instruments of assignment, transfer and assurance, and do all such further acts and things as may be necessary or appropriate in the reasonable opinion of Purchaser to give effect to the provisions hereof and to more perfectly confirm the rights, titles and interests hereby assigned and transferred to Purchaser.

(d) Seller shall notify Purchaser promptly upon obtaining knowledge of any default in the performance of the User's obligation under the Contract, including, without limitation, the payment of sums due under the Contract.

(e) Seller will not, without Purchaser's prior written consent: solicit or accept collection of any installment payments due under the Contract; modify, amend or terminate the Contract; waive any of Purchaser's rights thereunder; or take any action which impairs the rights or interest of Purchaser with respect to the Contract.

(f) If any payments under the Contract are made to Seller after the effective date of this Agreement, Seller agrees to promptly transmit such payment(s) to Purchaser in the same form as they are received, except that Seller will endorse, to the order of Purchaser, checks so received which are made payable to it, or otherwise pay such amount to Purchaser.

(g) Seller shall allow Purchaser and its representatives free access and right of inspection at all times to any Equipment at its location, subject, however, to the rights of the User under the Contract.

(h) Seller irrevocably constitutes and appoints Purchaser and any present or future officer or agent of Purchaser, or its successors or assigns, as its lawful attorney with full power of substitution and re-substitution, and in the name of Seller or otherwise, to collect and to sue in any court for payments due or to become due under the Contract, to withdraw or settle any claims, suits or proceedings pertaining to or arising out of the Contract, upon such terms as Purchaser in its discretion may deem to be in its best interest, all without notice to or assent of Seller and, further, to take possession and to endorse in the name of Seller any instrument for the payment of money received on account of the payments due under the Contract.

**Section 9.    Miscellaneous.** This Agreement shall be governed by, and interpreted and enforced under, the internal laws of the State of Utah (without regard to the conflict of laws principles of such state). All references herein to any agreements shall be to such agreement as amended or modified to the date of reference. The words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement. All notices hereunder shall be in writing and hand delivered, sent by facsimile (with confirmation of receipt) or sent by overnight courier service or by certified mail, addressed to the parties at the address specified above, or to such other address as either party may specify hereunder; and shall be effective upon receipt.

**Section 10.    Entire Agreement; No Assignment.** This Agreement is the entire agreement between Purchaser and Seller with respect to the subject matter hereof and it may not be supplemented or amended except by a writing, which is signed by both parties. This Agreement shall inure to the benefit of and be binding on Seller and Purchaser, and their respective successors and assigns. Notwithstanding the foregoing, Seller may not assign it rights, or delegate its obligations, under this Agreement without the express prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder, in whole or in part, at any time.

**Section 11.    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all such counterparts shall constitute but one and the same instrument.

**Section 12.    Not an Extension of Credit.** This Agreement constitutes a sale of 100% ownership interest in the Assigned Interest and shall in no way be construed as an extension of credit by Purchaser to Seller. Seller waives and releases any right, title or interest that it may have (whether pursuant to a "cross-collateralization" provision or otherwise) in and to any of the Assigned Interest, and/or the Contract.

**Section 13.    Waiver of Jury Trial.** THE PARTIES HEREBY UNCONDITIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of the day and year first above written.

Seller: Overseas Lease Group, Inc.

By: _____

Name: EG BADOAH

Title: President

Purchaser: KEY GOVERNMENT FINANCE, INC.

By: _____

Name: _____

Title: _____

## EXHIBIT 1

### SPECIFICATION OF ASSIGNED SCHEDULE

Executed pursuant to that certain Assignment Agreement dated as of April 1, 2006 (the "Agreement"), by and between Overseas Lease Group, Inc. as Seller, and KEY GOVERNMENT FINANCE, INC. as Purchaser.

This Specification is dated and effective as of the date set forth below and incorporates the terms and conditions of the Agreement.

1.  User: United States Department of Defense, under Contract No. W91B4M-06-D-0001-P00001, including all Modifications and Delivery Orders issued under said Contract.

2.  Date of Contract: January 19, 2006

3.  Total Invoice Cost: $460,502.46. (See Assignment of Proceeds Letter for break-out of payment)

4.  Remaining payments due under the Contract: 59 monthly payments in arrears. 1-11 @ $13,896.00; 13-24 @ $13,248.00; 25-36 @ $9,480.00; 37-48 @ $5,910.00; 49-60 @ $5,310.00.

5.  Consideration: $460,502.46

Date of Execution: _27 April 2006_

**Seller:**

Overseas Lease Group, Inc.

By: _____

Name: _E G BADCOCK_

Title: _president_

**Purchaser:**

KEY GOVERNMENT FINANCE, INC.

By: _____

Name: _____

Title: _____

# Key Government Finance



May 18, 2006

Overseas Lease Group                                    **PROPRIETARY & CONFIDENTIAL**
31 DeHart Street
Morristown, NJ
Attn: George Badcock

Gentlemen:

In response to your request, Key Government Finance is pleased to submit this proposal to acquire from you the equipment and lease payments described herein. This letter will set forth financing criteria and other requirements of Key Government Finance. Any modifications to this proposal are subject to mutual written approval.

| | |
|---|---|
| *Seller:* | Overseas Lease Group |
| *Buyer:* | Key Government Finance, or its assigns. |
| *User:* | US Dept. of Defense – Camp Eggers |
| *User Contract:* | Contract No. W91B4M-06-D-0001 |
| *Structure:* | Seller will sell and assign to Buyer good and unencumbered title to the equipment described in the User Contract and the contract lease or service contract payments relating thereto. The closing will occur approximately 30 days after Buyer receives the unconditional acceptance by the User of the equipment. |
| *Equipment Cost:* | Tranche 5 - $2,517,763.95<br>Tranche 6 - $770,875.54<br>Tranche 7 - $1,437,198.85<br>Tranche 8 - $479,066.28<br>Tranche 9 - $1,010,133.22 |
| *Lease Rates:* | See Payment Section |
| *Equipment Description:* | As described in Tranche 5 thru 9 Spreadsheet |
| *Anticipated Acceptance Date:* | Tranche 5 – June 1, 2006<br>Tranche 6 – June 15, 2006<br>Tranche 7 – July 1, 2006<br>Tranche 8 – July 1, 2006<br>Tranche 9 – July 10, 2006 |
| *Equipment Location:* | Camp Eggers, Afghanistan |

# Key Government Finance



| | |
|---|---|
| *Maintenance:* | The equipment will remain under a Seller-sponsored maintenance program for the full duration of the User Contract. |
| *Seller Liaison:* | Seller will serve as Buyer's representative and agent with respect to issues involving the equipment, and will serve as a liaison between the User and Buyer for all service, warranty or other claims made by the User in connection with the equipment. |
| *Remarketing:* | Seller will provide for the deinstallation and removal of the equipment in the event of early termination of the User Contract and will assist Buyer through a best efforts remarketing covenant. |
| *Insurance:* | Seller will keep in force all-risk property and liability insurance policies naming Buyer and its assigns as loss payee and additional insured. |
| *Taxes:* | Seller will be responsible for payment of all applicable federal, state and local taxes for the duration of the User Contract. |
| *Right to Finance:* | Buyer will have the exclusive right to provide financing for all equipment ordered under the User Contract, including all amendments, modifications, and extensions, and by its execution and return of this letter or a telecopy hereof, Seller hereby grants Buyer such right. |
| *Termination Risks:* *(Only risks of Buyer)* | Termination for Convenience (FAR 52.249-2) Termination for Non-appropriation Termination for Non-renewal |
| *Termination Liabilities:* | See Vendor's Contract |
| *Conditions Precedent:* | Usual and customary for transactions of this type, including but not limited to: |

- ❖ Comprehensive due diligence,
- ❖ Buyer's satisfaction with all documents related to the transactions,
- ❖ Review and approval of transaction by Buyer's investment committee,
- ❖ Buyer's satisfaction with Seller's financial condition, no material adverse change in Seller's credit rating prior to funding,
- ❖ Essential use is acceptable

# Key Government Finance

*Indemnification:*

Seller will agree to indemnify Buyer and its assigns for standard losses, including any losses sustained by Buyer or its assigns due to any default by the Seller under the User Contract.

*Documentation:*

Counsel to Buyer will prepare all documentation evidencing the transactions contemplated by this letter, including, without limitation, a definitive purchase agreement, instrument of assignment, and bill of sale, which documentation must be in form and substance satisfactory to both parties. Counsel to Buyer will review and must be satisfied with the User Contract and all other documents between User and Seller.

The rates and other terms and conditions set forth herein will remain firm until 30 days from the date of this letter in the event this letter is executed by you and received by us no later than seven (7) days from the date hereof.

Please acknowledge your acceptance of the terms and conditions set forth herein by executing this letter in the space provided below and returning the same to my attention. By your execution and return of this letter or a telecopy hereof, you grant to Key Government Finance the exclusive right to finance equipment covered by the User Contract.

Sincerely,

**Key Government Finance**

Howard G. Ulep
Director, Federal Programs

Agreed and Accepted:

Overseas Lease Group

## **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK )
                       ) ss.:
COUNTY OF NASSAU )

        MICHELLE FALCONER, being duly sworn deposes and say:

        I am not a party to the action, am over 18 years of age and reside in Rockville Centre, New York.

        On the 19th day of March, 2008, I served true copies of the within ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS and RULE 7.1 STATEMENT via overnight mail, in a sealed Federal Express envelope, addressed to the last known address of the addressee(s) as indicated below.

        Said papers were deposited on said date in the custody of said overnight delivery service prior to the latest time designated for overnight delivery: to wit: 6:00 p.m.

TO:     PAUL BATISTA, P.C.
         26 Broadway - Suite 1900
         New York, New York  10004
         Attn:  Paul Batista, Esq.

                                  _____
                                      MICHELLE FALCONER

Sworn to before me this
19th day of March, 2008

_____
Notary Public

DAGMAR E. ROWINSKY
NOTARY PUBLIC, State of New York
No. 4789327
Qualified in Nassau County
Commission Expires 10-31-09