UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

OVERSEAS LEASE GROUP, INC.,                    08 Civ. 01696 (SAS)(THK)

                    Plaintiff,

        - against -

KEY GOVERNMENT FINANCE, INC.,

                    Defendant.
-------------------------------------------------------------x

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON ITS
FOURTH AMENDED COUNTERCLAIM
AND OTHER RELIEF**

                            MORITT HOCK HAMROFF & HOROWITZ LLP
                            Attorneys for Defendant
                            400 Garden City Plaza
                            Garden City, NY 11530
                            (516) 873-2000

On the Brief:  Terese L. Arenth, Esq. (TA-5167)
               Marc L. Hamroff, Esq. (MH-9283)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT FACTS ......................................................................................................... 3

ARGUMENT ..................................................................................................................... 7

POINT I     PARTIAL SUMMARY JUDGMENT IS APPROPRIATE
            AND WARRANTED .......................................................................... 7

POINT II    THE ASSIGNMENT AGREEMENT IS CLEAR AND UNAMBIGUOUS,
            WARRANTING ENFORCEMENT BY ITS TERMS ........................................ 7

POINT III   RULE 54(b) SHOULD BE GRANTED CONCERNING THE
            PARTIAL SUMMARY JUDGMENT AGAINST OLG ON THE
            FOURTH COUNTERCLAIM ................................................................. 9

CONCLUSION ................................................................................................................ 10

i

# TABLE OF AUTHORITIES

## Cases

Air Support International, Inc. v. Atlas Air, Inc., 54 F.Supp.2d 158 (E.D.N.Y. 1999)...................8

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505 (1986)........................................7

Battery Associates, Inc. v. J & B Battery Supply, Inc., 944 F.Supp. 171 (E.D.N.Y. 1996) ...........8

Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1 (1980)......................................................9

Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481 (2d Cir. 1999) ..........................8

Roco Carriers, Ltd. v. M/V Nurnberg Exp., 899 F.2d 1292 (2d Cir. 1990)...................................7

Sears, Roebuck & Co. v. Mackey, 351 U.S. 427 (1956)...............................................................10

## Statutes

Rule 42(b) of the Federal Rules of Civil Procedure ........................................................................1

Rule 54(b) of the Federal Rules of Civil Procedure ...................................................................1, 9

Rule 56 of the Federal Rules of Civil Procedure........................................................................1, 7

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted in support of the motion by Defendant Key Government Finance, Inc. ("Key"): (i) pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary judgment as to Key's Fourth Amended Counterclaim against Plaintiff, Overseas Lease Group, Inc. ("OLG"), which seeks a declaratory judgment declaring that Key, as OLG's assignee and lienholder,[1] has the right to recover possession and to dispose of the vehicles described below in an effort to mitigate its losses, whenever OLG would be or have been entitled to recover possession of such vehicles and to dispose of them; (ii) pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, severing and continuing Defendant's First, Second, Third, Fifth, Sixth, Seventh, Eighth and Ninth Counterclaims against Plaintiff; and (iii) pursuant to Rule 54(b), granting certification of the summary judgment on Defendant's Fourth Amended Counterclaim against Plaintiff.

Key's motion is fairly simple and straightforward. It is premised upon the clarification and declaration of the relative rights between Key and OLG to recover and dispose of certain vehicles when entitled to under OLG's contract with the United States Department of Defense ("DOD"), such as with the early termination of the lease of those vehicles by the DOD. Key financed OLG's leases to the DOD and, as OLG's assignee and lienholder of the subject vehicles, to effectively attempt to mitigate its losses under the financing of the OLG transaction, Key must be able to enforce its rights with respect to its collateral and pursue the rights and remedies of OLG as OLG's assignee without interference.

This motion has been necessitated by OLG's interference with Key's rights to enforce all of its rights and remedies to recover possession, and to dispose, of the vehicles described below

---

[1] Key's Fourth Amended Counterclaim seeks relief as either title owner or assignee/lienholder. For purposes of this motion only, Key is only seeking relief with respect to its rights as the assignee of OLG's rights and remedies and as lienholder.

1

as and when they come off lease, including OLG's failure and refusal to turn over and deliver to Key the titles, title certificates and all indicia of ownership of the vehicles so as to enable Key to convey title to buyers of the vehicles, in direct contravention of Key's rights as OLG's assignee pursuant to its written agreements. Key is in imminent danger of losing prospective buyers for 77 of the subject vehicles at $25,000 each, for a total proposed sale of $1,925,000. By precluding Key from consummating the sale of those vehicles, which depreciate with each passing day, Key will suffer direct and immediate material financial loss. In addition thereto, the location and nature of both the vehicles and Key's prospective buyers creates exigent circumstances for its ability to consummate the proposed sales. The vehicles consist of all-wheel drive, non-armored vehicles located in the war zone of Afghanistan. In this territory, these types of vehicles are scarce and at significant risk of damage or total loss as they sit unprotected in a field storage lot. The prospective buyer for 70 of those vehicles requires the vehicles in connection with a contract to provide necessary security services to the U.S. Embassy in this war zone, necessitating an expeditious resolution to Key's Fourth Amended Counterclaim so that it may complete the sale as soon as possible. Key has been constrained to seek this relief since OLG has asserted that Key cannot take any action to dispose (by re-lease or sale or otherwise) of the vehicles, claiming that only OLG can take such actions. An expeditious resolution of the issue concerning Key's rights with respect to the disposition of these 77 vehicles will also provide needed clarity with respect to Key's rights as to additional vehicles that remain under contract with the Department of Defense as and when they come off lease.

As will be shown below, there are no genuine issues of material fact to be tried with regard to Key's Fourth Amended Counterclaim, warranting entry of summary judgment in Key's favor on its claim.

2

## RELEVANT FACTS

### The Agreements

Key conducts financing activities in all 50 states and in several countries. OLG is in the business of purchasing vehicles, including trucks and armored trucks, and leasing vehicles primarily to the DOD for use in connection with United States military operations in Afghanistan. See Affidavit of David Karpel ("Karpel Aff."), sworn to May 1, 2008 at ¶ 4.

OLG and the DOD entered into a certain contract, Contract No. W91B4M-06-D-0001 (the "DOD Contract") dated as of February 5, 2006, pursuant to which OLG leased to the DOD and the DOD leased from OLG, the property described therein and on certain "Task Orders" issued by the DOD consistent therewith (the "Vehicles"). Karpel Aff., ¶ 5 and Exhibits "A" and "B".

Pursuant to various Assignment of Proceeds Letters thereafter issued by OLG to Key in connection with the DOD Contract, OLG invoiced Key and Key funded the proceeds due under invoice for payment of the Vehicles leased by OLG to the DOD. In total, Key paid funding proceeds in the sum of $26,231,059.00 to OLG. Karpel Aff., ¶ 6.

By Assignment Agreement dated as of April 1, 2006 (the "Assignment Agreement") by and between OLG, as seller, and Key, as purchaser, OLG indisputably sold, assigned, transferred and set over unto Key all of OLG's "right, title and interest in and to (but none of its obligations under) the [DOD Contract]" and

> "all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by [the DOD], and a first priority lien in favor of Purchaser in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract, including (without limitation) the right to initiate and conclude any and all proceedings,

3

legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement".
(Emphasis added).

Karpel Aff., ¶ 7 and Exhibit "C" at Sections 1 and 2.

Pursuant to Section 6 of the Assignment Agreement, Key "shall have all of the rights of
[OLG] under the [DOD] Contract, but none of [OLG's] obligations thereunder...". See Karpel
Aff., Exhibit "C" at Section 6.

In accordance with the terms of the DOD Contract, the DOD provided OLG with, among
others, Task Order #31, pursuant to which OLG leased to the DOD and the DOD leased from
OLG seventy (70) Vehicles identified therein (the "TO #31 Vehicles"). Key financed OLG's
lease of the Vehicles (as indicated in the Assignment of Proceeds letters) based on a 5 year
contract, although the DOD was only committed to the first year, with 4 option years in which it
had the right on a year-by-year basis to "non-renew" the transaction and return the Vehicles to
OLG (and, once OLG assigned the lease(s), to OLG's assignee -- here, Key). Karpel Aff., ¶ 9.

On or about September 11, 2007, the DOD gave notice of its non-renewal of its lease of
the TO #31 Vehicles, which expired on November 30, 2007, and returned said Vehicles to OLG
on or about December 1, 2007 in accordance with the DOD Contract. Several months thereafter,
the DOD indicated an intent to return and not exercise its option with respect to the majority of
the other remaining Task Orders covering non-armored vehicles. Karpel Aff., ¶ 10.

OLG (and hence Key) is entitled to possession of the Vehicles under TO #31 since the
DOD did not exercise its option to extend the term of the Contract under Sec. 52.217-9 of the
Contract (the relevant portions of which are annexed as Exhibit "D" to the Karpel Affidavit).[2]

---

[2]  As indicated by Key's counsel in the pre-motion conference, Key does not seek any finding that OLG or Key is
entitled to possession of any Vehicles under the DOD Contract (although Key believes it is entitled to such
possession). Key only seeks by this motion an order declaring that when, under the DOD Contract or applicable law,
the lessor OLG may recover possession of the Vehicles and dispose of them, that right belongs to Key as OLG's
assignee.

4

Attached as Exhibit "E" to the Karpel Affidavit is an email dated September 17, 2007 from

Sergeant Marlon T. McGee informing that all Vehicles regarding TO #31 will be turned in, with

responding emails from No Lemon (the field storage lot to which the Vehicles would be

surrendered) acknowledging the same.  Further, on March 31, 2008, Lt. Col. Branley Fishel

wrote to OLG that "as Task Order 31 has expired, [the Government] needs to return the vehicles

to OLG asap".  (See Karpel Affidavit, Exhibit "F").  There can be no dispute that these Vehicles

have already been returned, no option to renew has been exercised and Key, as assignee of all of

OLG's rights under the Assignment Agreement, should be free to dispose of the Vehicles as

secured party.

**OLG's Refusal and Failure to Permit Key to Dispose of its Collateral**

Upon the expiration of TO # 31, Key contacted OLG to confirm that OLG would

cooperate and deliver title to the TO #31 Vehicles in the event that Key found buyers through its

own efforts, and OLG verbally agreed to do so.  Relying upon OLG's agreement, Key undertook

efforts to sell or remarket the TO #31 Vehicles.  Karpel Aff., ¶ 12.

In or about February 2008, Key successfully located a prospective buyer for seven (7) of

the TO #31 Vehicles, for a total purchase price of $175,000.00.  Karpel Aff., ¶ 13.

In or about February 2008, Key informed OLG that it had located a prospective buyer for

seven (7) of the TO #31 Vehicles.  Karpel Aff., ¶ 14.  Most recently, this prospective buyer

obtained funding for the immediate purchase and delivery of four (4) of the Vehicles and has

agreed to purchase the remaining three (3) vehicles in June.  Key now has a prospective buyer

for an additional seventy (70) Toyota Land Cruisers, which are comprised in part from TO #31

and in part from Task Order #25 (which has also expired), at $25,000 each, for a total proposed

sale of $1,750,000.  Karpel Aff., ¶ 15.

5

Despite Key's demand therefor, and contrary to its verbal and written agreement, OLG has intentionally, and without cause or justification, failed and refused to turn over the titles for the Vehicles, including the Vehicles for which Key has located prospective buyers, precluding Key from consummating the sale of those vehicles. OLG's failure and refusal to turn over the titles for the Vehicles is in derogation of Key's rights to the Vehicles as OLG's assignee and lienholder under the Assignment Agreement and its rights to remarket those Vehicles as its collateral. Karpel Aff., ¶¶ 16-17.

In the absence of clarity with respect to Key's rights to recover and sell its collateral, including obtaining the titles from OLG and its cooperation in permitting Key to consummate the sale of its collateral, Key stands to lose its prospective buyers of the Vehicles, at a significant and material financial loss to Key. OLG would have the Court believe that Key has no remedy to dispose of the Vehicles on terminated contracts. There is nothing in the agreements that prevent Key from enforcing its rights against the Vehicles, as assignee and secured party. This will continue if future vehicles are returned by the DOD. Karpel Aff., ¶ 18.

In addition to TO #31, Task Orders pertaining to the leases of over 90 additional non-armored Vehicles are soon due to expire in the upcoming months and the DOD has indicated that it is not likely to exercise its options to renew those Task Orders for part or all of their remaining terms. Pursuant to the Assignment Agreement, it is undisputed that Key likewise holds a security interest in the more than 90 additional non-armored Vehicles subject of the other Task Orders that are soon due to expire. As with TO #31, OLG has failed and refused to permit Key to dispose of those Vehicles as well, and has taken the position that Key has no rights to protect, preserve and dispose of this collateral, all in direct contravention of its contractual obligations

6

and agreements and the <u>complete and absolute assignment</u> of all of OLG's rights.  Karpel Aff., ¶ 19.

## ARGUMENT

### POINT I

### PARTIAL SUMMARY JUDGMENT IS <br> APPROPRIATE AND WARRANTED

Summary judgment is appropriate if there is a demonstration that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c).  Material facts, for summary judgment purposes, are facts that might affect the outcome of the action under governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505 (1986).  Thus, summary judgment will lie where the dispute as to any material fact is not "genuine", <u>i.e.</u>, that the evidence is such that a reasonable jury could not return a verdict for the nonmoving party.  <u>Id.</u>  The burden is on the party opposing summary judgment to come forward with specific facts showing that there is a genuine issue for trial. <u>Roco Carriers, Ltd. v. M/V Nurnberg Exp.</u>, 899 F.2d 1292 (2d Cir. 1990).

In the instant case, as demonstrated below, there are no genuine issues of fact to be tried with respect to Key's Fourth Amended Counterclaim for a declaratory judgment as to Key's rights to recover possession and to dispose of the vehicles as OLG's assignee and lienholder, based upon the clear and unambiguous terms of the written agreements between Key and OLG.

### POINT II

### THE ASSIGNMENT AGREEMENT <br> IS CLEAR AND UNAMBIGUOUS, <br> WARRANTING ENFORCEMENT BY ITS TERMS

In its Complaint in this action, OLG has taken the untenable position that Key is not entitled to recover the Vehicles when they are "non-renewed" by the DOD or to otherwise

transfer the Vehicles to third-party purchasers to mitigate Key's loss when these Vehicles are

returned early. See Affirmation of Terese L. Arenth, dated May 1, 2008, Exhibit "1" at ¶¶ 12-13.

Based thereon, OLG has refused to deliver the titles to the Vehicles to Key and to permit Key to

consummate the sale of the Vehicles. Instead, OLG has commenced this Action alleging that

Key's attempt to recover and dispose of the Vehicles violates OLG's rights under the Assignment

Agreement. OLG's position, however, flies in the face of the clear and unambiguous terms of the

Assignment Agreement, pursuant to which OLG indisputably sold, assigned, transferred and set

over unto Key all of OLG's "right, title and interest in and to (but none of its obligations under)

the [DOD Contract]" and

> "all amounts due and to become due under the Contract, including (without limitation)
> payments, insurance proceeds, and all monies payable or recoverable following a default
> or non-appropriation by [the DOD], and a first priority lien in favor of Purchaser in and
> to the Property, together with all proceeds (cash and non-cash, including insurance
> proceeds) of the foregoing and all of Seller's rights and remedies under the Contract,
> including (without limitation) the right to initiate and conclude any and all proceedings,
> legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement".
> (Emphasis added).

See Karpel Affidavit, Exhibit "C" at Sections 1 and 2. Pursuant to Section 6 of the Assignment

Agreement, Key "shall have all of the rights of [OLG] under the [DOD] Contract, but none of

[OLG's] obligations thereunder...". See Exhibit "C" at Section 6.

"When an agreement's terms are clear and unambiguous, there is no need to resort to

other means of interpretation to determine their meaning." Battery Associates, Inc. v. J & B

Battery Supply, Inc., 944 F.Supp. 171, 175 (E.D.N.Y. 1996). Rather than rewrite an

unambiguous agreement, a court should enforce the plain meaning of that agreement. Id.

Language whose meaning is otherwise plain is not ambiguous merely because the parties urge

different interpretations in the litigation. Air Support International, Inc. v. Atlas Air, Inc., 54

F.Supp.2d 158, 165-66 (E.D.N.Y. 1999); accord Red Ball Interior Demolition Corp. v.

8

Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999)(if a contract is clear, courts must take care not to

alter or go beyond the express terms of the agreement, or to impose obligations on the parties

that are not mandated by the unambiguous terms of the agreement itself).

Taken together, Section 2 and Section 6 of the Assignment Agreement clearly entitle Key

to recover possession and dispose of the Vehicles as and when OLG would have been entitled to.

Upon the DOD's termination of the task order attributable to the lease and its return of the

collateral, Key must be entitled to exercise its rights and remedies under the Assignment

Agreement, which includes its right to take possession, and dispose, of the TO #31 Vehicles and

other Vehicles from time-to-time.  By application of the foregoing, OLG's position that Key is

not entitled to recover possession of or to dispose of the Vehicles, is inconsistent with the clear

and unambiguous terms of the Assignment Agreement, the plain meaning of which should be

enforced.

## POINT III

### RULE 54(b) SHOULD BE GRANTED CONCERNING
### THE PARTIAL SUMMARY JUDGMENT AGAINST
### OLG ON THE FOURTH AMENDED COUNTERCLAIM

In an action involving multiple claims for relief or multiple parties, Rule 54(b)

certification may be granted if two requirements are satisfied:

1)    The decision involving one or more of the claims and effecting one or
more of the parties must be a "final judgment"; and

2)    There must be no just reason for delay.

Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 7-8 (1980).

The first requirement is clearly fulfilled by any summary judgment against OLG on the

Fourth Amended Counterclaim for a declaratory judgment. The Supreme Court has explained

the "final judgment" requirement as follows:

9

> It must be a "judgment" in the sense that it is a decision upon a cognizable claim for relief, and it must be "final" in the sense that it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action.

Curtiss- Wright, 446 U.S. at 7, quoting, Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436 (1956). Such a summary judgment meets this definition by reaching an ultimate disposition on Key's counterclaim against OLG for a declaratory judgment. The exigent circumstances described above and in the Karpel Affidavit demonstrate that there is no just reason for delay of Key's entitlement to immediate entry of judgment against OLG on its Fourth Amended Counterclaim. Any other decision would leave uncertainty between Key and any prospective buyer of Vehicles as to Key's ability to convey good title to these Vehicles vis-a-vis OLG.

Accordingly, it is respectfully submitted that Key's motion for certification pursuant to Rule 54(b) be granted.

## CONCLUSION

Based upon the foregoing, it is respectfully requested that Defendant's motion be granted in its entirety.

Dated: Garden City, New York
       May 2, 2008

Respectfully submitted,

MORITT HOCK HAMROFF & HOROWITZ LLP
Attorneys for Defendant

By: _____
    Terese L. Arenth, Esq. (TA-5167)
    Marc L. Hamroff, Esq. (MH-9283)
    400 Garden City Plaza
    Garden City, NY 11530
    (516) 873-2000

F:\Key Equipment Finance\Overseas\Docs\SJ Memo Of Law.Doc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

OVERSEAS LEASE GROUP, INC.,                    08 Civ. 01696

                         Plaintiff,

         - against -

KEY GOVERNMENT FINANCE, INC.,

                         Defendant.
-------------------------------------------------------------x

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

         MARYANNE VOGEL, being duly sworn deposes and say:

         I am not a party to the action, am over 18 years of age and reside in Farmingdale, New York.

         On the 2nd day of May, 2008, I served true copies of the within DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FOURTH AMENDED COUNTERCLAIM AND OTHER RELIEF, via first class mail, in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

         PAUL BATISTA, P.C.
         26 Broadway - Suite 1900
         New York, New York 10004
         Attn: Paul Batista, Esq.

                                             MARYANNE VOGEL

Sworn to before me this
2nd day of May, 2008

         Notary Public

                    DAGMAR E. ROWINSKY
               NOTARY PUBLIC, State of New York
                          No. 4789327
                  Qualified in Nassau County
               Commission Expires 10-31-09

F:\Key Equipment Finance\Overseas\Docs\AOS Defendant's Memo or Law 5 2 08.doc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

OVERSEAS LEASE GROUP, INC.,                         08 Civ. 01696 (SAS)(THK)

                  Plaintiff,                    **NOTICE OF MOTION
                                                    FOR PARTIAL SUMMARY
      - against -                             JUDGMENT AND
                                                    OTHER RELIEF**

KEY GOVERNMENT FINANCE, INC.,

                  Defendant.
-------------------------------------------------------------x

       PLEASE TAKE NOTICE that upon the Summons and Complaint filed February 20,

2008, the Answer, Affirmative Defenses and Amended Counterclaims dated May 2, 2008, the

Affidavit of David Karpel, sworn to May 1, 2008, the Affirmation of Terese L. Arenth, dated

May 1, 2008, together with the exhibits annexed thereto, the attached Statement of Material Facts

pursuant to Local Civil Rule 56.1, and the accompanying Memorandum of Law, the Defendant,

Key Government Finance, Inc., will move this Court before the Honorable Shira A. Scheindlin,

at Courtroom 15C, United States Courthouse, 500 Pearl Street, New York, New York 10007, on

May 30, 2008, or as soon thereafter as counsel may be heard, for an Order: (i) pursuant to Rule

56 of the Federal Rules of Civil Procedure, granting partial summary judgment on Defendant's

Fourth Amended Counterclaim for declaratory relief against Plaintiff, declaring that Defendant,

as assignee, has all of Plaintiff's rights and remedies under Plaintiff's contract with the

Department of Defense (including the right to recover and dispose of the subject Vehicles) on the

grounds that there are no genuine issues of fact to be tried; (ii) pursuant to Rule 42(b) of the

Federal Rules of Civil Procedure, severing and continuing Defendant's First, Second, Third,

Fifth, Sixth, Seventh, Eighth and Ninth Counterclaims against Plaintiff; (iii) pursuant to Rule

54(b), granting certification of the summary judgment on Defendant's Fourth Amended

Counterclaim against Plaintiff; and (iv) for such other and further relief as this Court may deem

just and proper.

Dated: Garden City, New York
      May 2, 2008

                         Respectfully submitted,

                         MORITT HOCK HAMROFF & HOROWITZ LLP
                         Attorneys for Defendant

                         By: _____
                             Terese L. Arenth, Esq. (TA-5167)
                             Marc L. Hamroff, Esq. (MH-9283)
                         400 Garden City Plaza
                         Garden City, NY 11530
                         (516) 873-2000

To:    PAUL BATISTA, P.C.
       26 Broadway - Suite 1900
       New York, New York 10004
       Attn: Paul Batista, Esq.
       Attorneys for Plaintiff

F:\Key Equipment Finance\Overseas\Docs\NOM.Doc

**R.56 STATEMENT**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
OVERSEAS LEASE GROUP, INC.,                                    08 Civ. 01696 (SAS)(THK)

                          Plaintiff,

          - against -                                          **DEFENDANT'S STATEMENT
                                                               OF UNDISPUTED FACTS**
KEY GOVERNMENT FINANCE, INC.,

                          Defendant.
------------------------------------------------------------x

       Pursuant to Local Civil Rule 56.1, set forth below are the material facts as to which the

Defendant, Key Government Finance, Inc. ("Key"), contends that there are no genuine issues to

be tried:

       1.     Key conducts financing activities in all 50 states and in several countries.

(Affidavit of David Karpel ("Karpel Aff."), sworn to May 1, 2008, at ¶ 4).

       2.     OLG is in the business of purchasing vehicles, including trucks and armored

trucks, and leasing vehicles primarily to the United States Department of Defense (the "DOD")

for use in connection with United States military operations in Afghanistan. (Karpel Aff., ¶ 4).

       3.     OLG and the DOD entered into a certain contract, Contract No. W91B4M-06-D-

0001 (the "DOD Contract") dated as of February 5, 2006, pursuant to which OLG leased to the

DOD and the DOD leased from OLG, the property described therein and on certain "Task

Orders" issued by the DOD consistent therewith (the "Vehicles"). (Karpel Aff., ¶ 5 and Exhibits

"A" and "B").

       4.     Pursuant to various Assignment of Proceeds Letters thereafter issued by OLG to

Key in connection with the DOD Contract, OLG invoiced Key and Key funded the proceeds due

under invoice for payment of the Vehicles leased by OLG to the DOD. In total, Key paid

funding proceeds in the sum of $26,231,059.00 to OLG. (Karpel Aff., ¶ 6).

       5.     By Assignment Agreement dated as of April 1, 2006 (the "Assignment

Agreement") by and between OLG, as seller, and Key, as purchaser, OLG sold, assigned,

transferred and set over unto Key all of OLG's "right, title and interest in and to (but none of its

obligations under) the [DOD Contract]" and

> "all amounts due and to become due under the Contract, including (without limitation)
> payments, insurance proceeds, and all monies payable or recoverable following a default
> or non-appropriation by [the DOD], and a first priority lien in favor of Purchaser in and
> to the Property, together with all proceeds (cash and non-cash, including insurance
> proceeds) of the foregoing and all of Seller's rights and remedies under the Contract,
> including (without limitation) the right to initiate and conclude any and all proceedings,
> legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement".

(Karpel Aff., ¶ 7 and Exhibit "C").

       6.     Pursuant to Section 6 of the Assignment Agreement, Key "shall have all of the

rights of [OLG] under the [DOD] Contract, but none of [OLG's] obligations thereunder...".

(Karpel Aff., Exhibit "C" at Section 6).

       7.     In accordance with the terms of the DOD Contract, the DOD provided OLG with,

among others, Task Order #31, pursuant to which OLG leased to the DOD and the DOD leased

from OLG seventy (70) Vehicles identified therein (the "TO #31 Vehicles"). (Karpel Aff., ¶ 9).

       8.     Key financed OLG's lease of the Vehicles (as indicated in the Assignment of

Proceeds letters) based on a 5 year contract, although the DOD was only committed to the first

year, with 4 option years in which it had the right on a year-by-year basis to "non-renew" the

transaction and return the Vehicles to OLG (and, once OLG assigned the lease(s), to OLG's

assignee -- here, Key). (Karpel Aff., ¶ 9).

9.      On or about September 11, 2007, the DOD gave notice of its non-renewal of its lease of the TO #31 Vehicles, which expired on November 30, 2007, and returned said Vehicles to OLG on or about December 1, 2007 in accordance with the DOD Contract. Several months thereafter, the DOD indicated an intent to non-renew some or all of the other remaining Task Orders covering non-armored vehicles. (Karpel Aff., ¶ 10).

10.     OLG (and hence Key) is entitled to possession of the Vehicles under TO #31 since the DOD did not exercise its option to extend the term of the DOD Contract under Sec. 52.217-9 thereof. (Karpel Aff., ¶ 11 and Exhibit "D").

11.     By email dated September 17, 2007 from Sergeant Marlon T. McGee, the DOD informed OLG that all Vehicles regarding TO #31 will be turned in, with responding emails from No Lemon (the field storage lot to which the Vehicles would be surrendered) acknowledging the same. (Karpel Aff., Exhibit "E").

12.     On March 31, 2008, Lt. Col. Branley Fishel wrote to OLG that "as Task Order 31 has expired, [the Government] needs to return the vehicles to OLG asap". (Karpel Aff., Exhibit "F").

13.     There is no dispute that the Vehicles have already been returned, no option to renew has been exercised and Key, as assignee of all of OLG's rights under the Assignment Agreement, should be free to dispose of the Vehicles as secured party. (Karpel Aff., ¶ 11).

14.     Upon the expiration of TO # 31, Key contacted OLG to confirm that OLG would cooperate and deliver title to the TO #31 Vehicles in the event that Key found buyers through its own efforts, and OLG verbally agreed to do so. Relying upon OLG's agreement, Key undertook efforts to sell or remarket the TO #31 Vehicles. (Karpel Aff., ¶ 12).

3

15.    In or about February 2008, Key successfully located a prospective buyer for seven (7) of the TO #31 Vehicles, for a total purchase price of $175,000.00. (Karpel Aff., ¶ 13).

16.    In or about February 2008, Key informed OLG that it had located a prospective buyer for seven (7) of the TO #31 Vehicles. (Karpel Aff., ¶ 14).

17.    Most recently, Key's prospective buyer has obtained funding for the immediate purchase of four (4) of the Vehicles, and has agreed to purchase the remaining three (3) vehicles in June. (Karpel Aff., ¶ 15).

18.    Key now has a prospective buyer for an additional seventy (70) Toyota Land Cruisers, which are comprised in part from TO #31 and in part from Task Order #25 (which has also expired), at $25,000 each, for a total proposed sale of $1,750,000. (Karpel Aff., ¶ 15).

19.    Despite Key's demand therefor, and contrary to its verbal and written agreement, OLG has intentionally, and without cause or justification, failed and refused to turn over the titles for the Vehicles, including the Vehicles for which Key has located prospective buyers. (Karpel Aff., ¶ 16).

20.    The vehicles consist of all-wheel drive, non-armored vehicles located in the war zone of Afghanistan. In this territory, these types of vehicles are scarce and at significant risk of damage or total loss as they sit unprotected in a field storage lot. (Karpel Aff., ¶ 2).

21.    Key's prospective buyer for 70 of the Vehicles requires the vehicles in connection with a contract to provide necessary security services to the U.S. Embassy in this war zone. (Karpel Aff., ¶ 2).

22.    There is nothing in the subject agreements that prevent Key from enforcing its rights against the Vehicles, as OLG's assignee and secured party. (Karpel Aff., ¶ 18 and Exhibit "C").

4

23.    In addition to TO #31, Task Orders pertaining to the leases of over 90 additional non-armored Vehicles are soon due to expire in the upcoming months and the DOD has indicated that it is not likely to exercise its options to renew those Task Orders for part or all of their remaining terms. (Karpel Aff., ¶ 19).

24.    Pursuant to the Assignment Agreement, it is undisputed that Key likewise holds a security interest in the more than 90 additional non-armored Vehicles subject of the other Task Orders that are soon due to expire.  (Karpel Aff., ¶ 19).

25.    As with TO #31, OLG has failed and refused to permit Key to dispose of the Vehicles referenced in paragraph 24 above as well, and has taken the position that Key has no rights to protect, preserve and dispose of this collateral. (Karpel Aff., ¶ 19).

26.    OLG's actions as described in paragraph 25 above are in direct contravention of its contractual obligations and agreements and the complete and absolute assignment of all of OLG's rights to Key.  (Karpel Aff., ¶ 19).

Dated: Garden City, New York
       May 2, 2008

Respectfully submitted,

MORITT HOCK HAMROFF & HOROWITZ LLP
Attorneys for Defendant

By: _____
     Terese L. Arenth, Esq. (TA-5167)
     Marc L. Hamroff, Esq. (MH-9283)
     400 Garden City Plaza
     Garden City, NY  11530
     (516) 873-2000

F:\Key Equipment Finance\Overseas\Docs\Undisputed Facts.Doc

5

**KARPEL AFFIDAVIT**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

OVERSEAS LEASE GROUP, INC.,

                    Plaintiff,

        - against -

KEY GOVERNMENT FINANCE, INC.,

                    Defendant.
----------------------------------------------------------------x

08 Civ. 01696 (SAS)(THK)

**AFFIDAVIT IN SUPPORT
OF MOTION FOR PARTIAL
SUMMARY JUDGMENT
AND OTHER RELIEF**

STATE OF COLORADO     )
                      ) ss.:
COUNTY OF BOULDER     )

    DAVID KARPEL, being duly sworn, deposes and says:

    1.    I am a Senior Workout Officer for Key Equipment Finance, Inc., a Michigan

corporation and wholly owned subsidiary of Key Bank National Association. The Defendant,

Key Government Finance, Inc. ("Key"), is a Colorado corporation and a wholly owned subsidiary

of Key Equipment Finance, Inc..  I am charged with the administration of the financial

transactions hereafter described and fully familiar with the facts and circumstances as set forth

herein, based upon my personal knowledge or from my review of books and records maintained

by Key in the ordinary course of its business.  I submit this Affidavit in support of Key's

application to the Court: (i) pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting

summary judgment as to Key's Fourth Amended Counterclaim against Plaintiff, Overseas Lease

Group, Inc. ("OLG"), which seeks a declaratory judgment declaring that Key, as OLG's assignee

and lienholder,[1] has the right to recover possession and to dispose of the vehicles described

---

[1] Key's Fourth Amended Counterclaim seeks relief as either title owner or assignee/lienholder. For purposes of this
motion only, Key is only seeking relief with respect to its rights as a lienholder and assignee.

below whenever OLG would be or have been entitled to recover possession of such vehicles and

to dispose of them; (ii) pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, severing

and continuing Defendant's First, Second, Third, Fifth, Sixth, Seventh, Eighth and Ninth

Counterclaims against Plaintiff; and (iii) pursuant to Rule 54(b), granting certification of the

summary judgment on Defendant's Fourth Amended Counterclaim against Plaintiff.

   2.  This motion has been necessitated by OLG's interference with Key's rights to

enforce all of its rights and remedies to recover possession of and to dispose of the vehicles

described below as and when they come off lease, including OLG's failure and refusal to turn

over and deliver to Key the titles, title certificates and all indicia of ownership of the vehicles so

as to enable Key to convey title to prospective buyers of the vehicles, in direct contravention of

Key's rights as OLG's assignee pursuant to its written agreements. Key is in imminent danger of

losing prospective buyers for 77 of the subject vehicles at $25,000 each, for a total proposed sale

of $1,925,000. By precluding Key from consummating the sale of those vehicles, which

depreciate with each passing day, Key will suffer direct and immediate material financial loss. In

addition thereto, the location and nature of both the vehicles and Key's prospective buyer creates

exigent circumstances for its ability to consummate the proposed sales. The vehicles consist of

all-wheel drive, non-armored vehicles located in the war zone of Afghanistan. In this territory,

these types of vehicles are scarce and at significant risk of damage or total loss as they sit

unprotected in a field storage lot. The prospective buyer for 70 of these vehicles requires the

vehicles in connection with a contract to provide necessary security services to the U.S. Embassy

in this war zone, necessitating an expeditious resolution to Key's Fourth Amended Counterclaim

so that it may complete the sale as soon as possible. Key has been constrained to seek this relief

since OLG has asserted that Key cannot take any action to dispose (by re-lease or sale or

otherwise) of the vehicles, claiming that only OLG can take such actions. An expeditious resolution of the issue concerning Key's rights with respect to the disposition of these 70 vehicles will also provide needed clarity with respect to Key's rights as to additional vehicles that remain under contract with the Department of Defense as and when they come off lease.

3.    As will be shown below, there are no genuine issues of material fact to be tried as to Key's right to possess and dispose of the vehicles, as OLG's assignee and as lienholder, based upon the clear and unambiguous language of the written agreements between Key and OLG.

**The Agreements**

4.    Key conducts financing activities in all 50 states and in several countries. OLG is in the business of purchasing vehicles, including trucks and armored trucks, and leasing vehicles primarily to the United States Department of Defense (the "DOD") for use in connection with United States military operations in Afghanistan.

5.    OLG and the DOD entered into a certain contract, Contract No. W91B4M-06-D-0001 (the "DOD Contract") dated as of February 5, 2006, pursuant to which OLG leased to the DOD and the DOD leased from OLG, the property described therein and on certain "Task Orders" issued by the DOD consistent therewith (the "Vehicles"). Copies of relevant excerpts from the DOD Contract are annexed hereto as Exhibits "A" and "B" and incorporated herein by reference.

6.    Pursuant to various Assignment of Proceeds Letters thereafter issued by OLG to Key in connection with the DOD Contract, OLG invoiced Key and Key funded the proceeds due under invoice for payment of the Vehicles leased by OLG to the DOD. In total, Key paid funding proceeds in the sum of $26,231,059.00 to OLG.

7.    By Assignment Agreement dated as of April 1, 2006 (the "Assignment

Agreement") by and between OLG, as seller, and Key, as purchaser, OLG indisputably sold,

assigned, transferred and set over unto Key all of OLG's "right, title and interest in and to (but

none of its obligations under) the [DOD Contract]" and

> "all amounts due and to become due under the Contract, including (without limitation)
> payments, insurance proceeds, and all monies payable or recoverable following a default
> or non-appropriation by [the DOD], <u>and a first priority lien in favor of Purchaser in and to
> the Property</u>, together with all proceeds (cash and non-cash, including insurance
> proceeds) of the foregoing and <u>all of Seller's rights and remedies under the Contract</u>,
> including (without limitation) the right to initiate and conclude any and all proceedings,
> legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement".
> (Emphasis added).

A copy of the Assignment Agreement is annexed hereto as Exhibit "C" and incorporated herein

by reference. <u>See</u> Sections 1 and 2 thereof.

8.    Pursuant to Section 6 of the Assignment Agreement, Key "shall have all of the

rights of [OLG] under the [DOD] Contract, but none of [OLG's] obligations thereunder...". <u>See</u>

Exhibit "C" at Section 6.

9.    In accordance with the terms of the DOD Contract, the DOD provided OLG with,

among others, Task Order #31, pursuant to which OLG leased to the DOD and the DOD leased

from OLG seventy (70) Vehicles identified therein (the "TO #31 Vehicles"). Key financed

OLG's lease of the Vehicles (as indicated in the Assignment of Proceeds letters) based on a 5

year contract, although the DOD was only committed to the first year, with 4 option years in

which it had the right on a year-by-year basis to "non-renew" the transaction and return the

Vehicles to OLG (and, once OLG assigned the lease(s), to OLG's assignee -- here, Key).

10.    On or about September 11, 2007, the DOD gave notice of its non-renewal of its

lease of the TO #31 Vehicles, which expired on November 30, 2007, and returned said Vehicles

4

to OLG on or about December 1, 2007 in accordance with the DOD Contract. Several months thereafter, the DOD indicated an intent to return and not exercise its option with respect to the majority of the other remaining Task Orders covering non-armored vehicles.

11.    OLG (and hence Key) is entitled to possession of the Vehicles under TO #31 since the DOD did not exercise its option to extend the term of the DOD Contract under Sec. 52.217-9 thereof (the relevant portions of which are annexed as Exhibit "D" hereto). Attached as Exhibit "E" is an email dated September 17, 2007 from Sergeant Marlon T. McGee informing that all Vehicles regarding TO #31 will be turned in, with responding emails from No Lemon (the field storage lot to which the Vehicles would be surrendered) acknowledging the same. Further, on March 31, 2008, Lt. Col. Branley Fishel wrote to OLG that "as Task Order 31 has expired, [the Government] needs to return the vehicles to OLG asap". (See Exhibit "F" hereto). There is no dispute that these Vehicles have already been returned, no option to renew has been exercised and Key, as assignee of all of OLG's rights under the Assignment Agreement, should be free to dispose of the Vehicles as secured party.[2]

## OLG's Refusal and Failure to Permit Key to Dispose of its Collateral

12.    Upon the expiration of TO # 31, Key contacted OLG to confirm that OLG would cooperate and deliver title to the TO #31 Vehicles in the event that Key found buyers through its own efforts, and OLG verbally agreed to do so. Relying upon OLG's agreement, Key undertook efforts to sell or remarket the TO #31 Vehicles.

---

[2]  As indicated by Key's counsel in the pre-motion conference, Key does not seek any finding that OLG or Key is entitled to possession of any Vehicles under the DOD Contract (although Key believes it is entitled to such possession). Key only seeks by this motion an order declaring that when, under the DOD Contract or applicable law, the lessor OLG may recover possession of the Vehicles and dispose of them, that right belongs to Key as OLG's assignee.

13.    In or about February 2008, Key successfully located a prospective buyer for seven (7) of the TO #31 Vehicles, for a total purchase price of $175,000.00.

14.    In or about February 2008, Key informed OLG that it had located a prospective buyer for seven (7) of the TO #31 Vehicles.

15.    Most recently, this prospective buyer obtained funding for the immediate purchase and delivery of four (4) of the Vehicles, and has agreed to purchase the remaining three (3) vehicles in June. Key now has a prospective buyer for an additional seventy (70) Toyota Land Cruisers, which are comprised in part from TO #31 and in part from Task Order #25 (which has also expired), at $25,000 each, for a total proposed sale of $1,750,000.

16.    Despite Key's demand therefor, and contrary to its verbal and written agreement, OLG has intentionally, and without cause or justification, failed and refused to turn over the titles for the Vehicles, including the Vehicles for which Key has located prospective buyers, thereby precluding Key from consummating the sale of those Vehicles. Rather, OLG commenced this lawsuit against Key.

17.    OLG's failure and refusal to turn over the titles for the Vehicles is in derogation of Key's rights to the Vehicles as OLG's assignee and lienholder under the Assignment Agreement and its rights to remarket those Vehicles as its collateral.

18.    In the absence of clarity with respect to Key's rights to recover and sell its collateral, including obtaining the titles from OLG and its cooperation in permitting Key to consummate the sale of its collateral, Key stands to lose its prospective buyers of the Vehicles, at a significant and material financial loss to Key. OLG would have the Court believe that Key has no remedy to dispose of the Vehicles on terminated contracts. There is nothing in the agreements

6

that prevent Key from enforcing its rights against the Vehicles, as assignee and secured party. This will continue if future vehicles are returned by the DOD.

19.    In addition to TO #31, Task Orders pertaining to the leases of more than 90 additional non-armored Vehicles are soon due to expire in the upcoming months and the DOD has indicated that it is not likely to exercise its options to renew those Task Orders for part or all of their remaining terms.  Pursuant to the Assignment Agreement, it is undisputed that Key likewise holds a security interest in the more than 90 additional non-armored Vehicles subject of the other Task Orders that are soon due to expire.  As with TO #31, OLG has failed and refused to permit Key to dispose of those Vehicles as well, and has taken the position that Key has no rights to protect, preserve and dispose of this collateral, all in direct contravention of its contractual obligations and agreements and the complete and absolute assignment of all of OLG's rights.

20.    OLG's aforesaid conduct has interfered, and continues to interfere, with Key's contractual and business relations with the prospective buyers for the seventy-seven (77) Vehicles.  This has caused, and will continue to cause, significant financial damage to Key, particularly as more and more of the Task Orders expire and the Vehicles depreciate with each passing day.

7

WHEREFORE, it is respectfully requested that the Court grant Defendant's motion in its

entirety.

DAVID KARPEL

Sworn to before me this
_5_ day of May, 2008

Notary Public

F:\Key Equipment Finance\Overseas\Docs\Collection\Affidavit.Doc

**EXHIBIT A**

**SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS**
*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, AND 30*

| | |
|---|---|
| 1. REQUISITION NUMBER | PAGE 1 OF    131 |

| 2. CONTRACT NO. | 3. AWARD/EFFECTIVE DATE | 4. ORDER NUMBER | 5. SOLICITATION NUMBER | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|
| W91B4M-06-D-0001-P00001 | 19-Jan-2006 | | W91B4M-06-R-0023 | 13-Dec-2005 |

| 7. FOR SOLICITATION INFORMATION CALL: | a. NAME | LESLIE G WESTCOTT | b. TELEPHONE NUMBER (No Collect Calls) DSN 318-237-3403 | 8. OFFER DUE DATE/LOCAL TIME 11:00 AM 31 Dec 2005 |

9. ISSUED BY   CODE  W91B4M

PURCHASING & CONTRACTING
CONTRACTING OFFICE
WAZIR AKBAR KHAN AREA, SREET #10
CAMP EGGERS
AFGHANISTAN

TEL: 318-237-3229
FAX:

10. THIS ACQUISITION IS
[X] UNRESTRICTED
[ ] SET ASIDE:      % FOR
[ ] SMALL BUSINESS
[ ] HUBZONE SMALL BUSINESS
[ ] 8(A)
NAICS:
SIZE STANDARD:

11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED
[ ] SEE SCHEDULE

12. DISCOUNT TERMS

13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)
13b. RATING

14. METHOD OF SOLICITATION
[ ] RFQ   [ ] IFB   [X] RFP

15. DELIVER TO   CODE

SEE SCHEDULE

16. ADMINISTERED BY   CODE

SEE ITEM 9

| 17a. CONTRACTOR/ OFFEROR   CODE  3R2A7 | 18a. PAYMENT WILL BE MADE BY   CODE  HQ0302 |
|---|---|
| OVERSEAS LEASE GROUP, INC<br>GEORGE BADCOCK<br>110 EAST BROWARD BLVD<br>SUITE 1700<br>FT. LAUDERDALE FL 33301<br><br>TEL: 1-800-331-0599    FACILITY CODE | DFAS ROME<br>DFAS-BVA/RO 325 BROOKS ROAD<br>ROME NY 13441-4527<br>UNITED STATES |

[ ] 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a. UNLESS BLOCK BELOW IS CHECKED  [ ] SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/ SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | SEE SCHEDULE | | | | |

25. ACCOUNTING AND APPROPRIATION DATA

26. TOTAL AWARD AMOUNT (For Govt. Use Only)
**$14,752,020.60**

[ ] 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1. 52.212-4. FAR 52.212-3. 52.212-5 ARE ATTACHED.   ADDENDA [ ] ARE [ ] ARE NOT ATTACHED

[ ] 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED.   ADDENDA [ ] ARE [ ] ARE NOT ATTACHED

28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN    0    COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN.

29. AWARD OF CONTRACT: REFERENCE
[X] OFFER DATED    . YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:   SEE SCHEDULE

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER) | 31c. DATE SIGNED |
|---|---|---|
| *(signature)* | *(signature)* | 05-Feb-2006 |

| 30b. NAME AND TITLE OF SIGNER (TYPE OR PRINT)<br>E. George Badcock<br>President | 30c. DATE SIGNED<br>9-Feb-06 | 31b. NAME OF CONTRACTING OFFICER (TYPE OR PRINT)<br>DAVID KAO / CONTRACTING OFFICER<br>TEL: 318-237-1018    EMAIL: david.kao@cfc-a.centcom.mil |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV 4/2002)
Prescribed by GSA
FAR (48 CFR) 53.212

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative--

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) The facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under paragraph (a) of this clause, the Government is entitled--

(1) To pursue the same remedies as in a breach of the contract; and

(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

(End of clause)


52.208-4    VEHICLE LEASE PAYMENTS (APR 1984)

(a) Upon the submission of proper invoices or vouchers, the Government shall pay rent for each vehicle at the rate(s) specified in this contract.

(b) Rent shall accrue from the beginning of this contract, or from the date each vehicle is delivered to the Government, whichever is later, and shall continue until the expiration of the contract term or the termination of this contract. However, rent shall accrue only for the period that each vehicle is in the possession of the Government.

(c) Rent shall not accrue for any vehicle that the Contracting Officer determines does not comply with the Condition of Leased Vehicles clause of this contract or otherwise does not comply with the requirements of this contract, until the vehicle is replaced or the defects are corrected.

(d) Rent shall not accrue for any vehicle during any period when the vehicle is unavailable or unusable as a result of the Contractor's failure to render services for the operation and maintenance of the vehicle as prescribed by this contract.

(e) Rent stated in monthly terms shall be prorated on the basis of 1/30th of the monthly rate for each day the vehicle is in the Government's possession. If this contract contains a mileage provision, the Government shall pay rent as provided in the Schedule.

## 52.212-4 ADDENDUM

### ADDENDUM 52.212-4 -- Contract Terms and Conditions -- Commercial Items.

As prescribed in 12.301 ( b )  ( 3 ) , insert the following clause:

### Contract Terms and Conditions -- Commercial Items  ( Sep 2005)

(a) *Inspection/Acceptance.* The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. The Government must exercise its post-acceptance rights --

(1) Within a reasonable time after the defect was discovered or should have been discovered; and

(2) Before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(b) *Assignment.* The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C.3727) . However, when a third party makes payment ( *e.g.,* use of the Governmentwide commercial purchase card) , the Contractor may not assign its rights to receive payment under this contract.

(c) *Changes.* Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(d) *Disputes.* This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613) . Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(e) *Definitions.* The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) *Excusable delays.* The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

(g) *Invoice.*

(1) The Contractor shall submit an original invoice and three copies (or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include --

(i) Name and address of the Contractor;

( ii)   Invoice date and number;

( iii)   Contract number, contract line item number and, if applicable, the order number;

( iv)   Description, quantity, unit of measure, unit price and extended price of the items delivered;

( v)   Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

( vi)   Terms of any discount for prompt payment offered;

( vii)   Name and address of official to whom payment is to be sent;

( viii)   Name, title, and phone number of person to notify in event of defective invoice; and

( ix)   Taxpayer Identification Number  ( TIN)  . The Contractor shall include its TIN on the invoice only if required elsewhere in this contract.

( x)   Electronic funds transfer  ( EFT)   banking information.

   ( A)   The Contractor shall include EFT banking information on the invoice only if required elsewhere in this contract.

   ( B)   If EFT banking information is not required to be on the invoice, in order for the invoice to be a proper invoice, the Contractor shall have submitted correct EFT banking information in accordance with the applicable solicitation provision, contract clause  ( e.g., 52.232-33, Payment by Electronic Funds Transfer—Central Contractor Registration, or 52.232-34, Payment by Electronic Funds Transfer—Other Than Central Contractor Registration)  , or applicable agency procedures.

   ( C)   EFT banking information is not required if the Government waived the requirement to pay by EFT.

( 2)   Invoices will be handled in accordance with the Prompt Payment Act  ( 31 U.S.C. 3903)  and Office of Management and Budget  ( OMB)   prompt payment regulations at 5 CFR part 1315.

( h)   *Patent indemnity.* The Contractor shall indemnify the Government and its officers, employees and agents against liability, including costs, for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark or copyright, arising out of the performance of this contract, provided the Contractor is reasonably notified of such claims and proceedings.

( i)   *Payment.*

   ( 1)   Items accepted. Payment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract.

(2) Prompt Payment. The Government will make payment in accordance with the Prompt Payment Act (31 U.S.C. 3903) and prompt payment regulations at 5 CFR Part 1315.

(1) Electronic Funds Transfer (EFT). If the Government makes payment by EFT, see 52.212-5 (b) for the appropriate EFT clause.

Discount. In connection with any discount offered for early payment, time shall be computed from the date of the invoice. For the purpose of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or the specified payment date if an electronic funds transfer payment is made.

(5) Overpayments. If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall immediately notify the Contracting Officer and request instructions for disposition of the overpayment.

(j) *Risk of loss.* Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until, and shall pass to the Government upon:

(1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or

(2) Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

(k) *Taxes.* The contract price includes all applicable Federal, State, and local taxes and duties.

(l) *Termination for the Government_ s convenience.* The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor_ s records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) *Termination for cause.* The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for

any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

( n)  *Title.* Title to items furnished under this contract shall not pass to the Government upon acceptance, regardless of when or where the Government takes physical possession.

( o)  *Warranty.* The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract.

( p)  *Limitation of liability.* Except as otherwise provided by an express warranty, the Contractor will not be liable to the Government for consequential damages resulting from any defect or deficiencies in accepted items.

( q)  *Other compliances.* The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract.

( r)  *Compliance with laws unique to Government contracts.* The Contractor agrees to comply with 31 U.S.C. 1352 relating to limitations on the use of appropriated funds to influence certain Federal contracts; 18 U.S.C. 431 relating to officials not to benefit; 40 U.S.C. 3701, *et seq.*, Contract Work Hours and Safety Standards Act; 41 U.S.C. 51-58, Anti-Kickback Act of 1986; 41 U.S.C. 265 and 10 U.S.C. 2409 relating to whistleblower protections; 49 U.S.C. 40118, Fly American; and 41 U.S.C. 423 relating to procurement integrity.

( s)  *Order of precedence.* Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order:

> ( 1)  The schedule of supplies/services.
>
> ( 2)  The Assignments, Disputes, Payments, Invoice, Other Compliances, and Compliance with Laws Unique to Government Contracts paragraphs of this clause.
>
> ( 3)  The clause at 52.212-5.
>
> ( 4)  Addenda to this solicitation or contract, including any license agreements for computer software.
>
> ( 5)  Solicitation provisions if this is a solicitation.
>
> ( 6)  Other paragraphs of this clause.
>
> ( 7)  The Standard Form 1449.
>
> ( 8)  Other documents, exhibits, and attachments.
>
> The specification.

( t)  *Central Contractor Registration  (CCR)* .

> ( 1)  Unless exempted by an addendum to this contract, the Contractor is responsible during performance and through final payment of any contract for the accuracy and completeness of the data within the CCR database, and for any liability resulting from the Government_ s reliance on inaccurate or incomplete data. To remain registered in the

CCR database after the initial registration, the Contractor is required to review and update on an annual basis from the date of initial registration or subsequent updates its information in the CCR database to ensure it is current, accurate and complete. Updating information in the CCR does not alter the terms and conditions of this contract and is not a substitute for a properly executed contractual document.

(2)

(i)  If a Contractor has legally changed its business name, , doing business as, name, or division name (whichever is shown on the contract) , or has transferred the assets used in performing the contract, but has not completed the necessary requirements regarding novation and change-of-name agreements in Subpart 42.12, the Contractor shall provide the responsible Contracting Officer a minimum of one business day, s written notification of its intention to:

(A)  Change the name in the CCR database;

(B)  Comply with the requirements of Subpart 42.12 of the FAR;

(C)  Agree in writing to the timeline and procedures specified by the responsible Contracting Officer. The Contractor must provide with the notification sufficient documentation to support the legally changed name.

(ii)  If the Contractor fails to comply with the requirements of paragraph (i) (2) (i) of this clause, or fails to perform the agreement at paragraph (i) (2) (i) (C) of this clause, and, in the absence of a properly executed novation or change-of-name agreement, the CCR information that shows the Contractor to be other than the Contractor indicated in the contract will be considered to be incorrect information within the meaning of the , Suspension of Payment, paragraph of the electronic funds transfer (EFT) clause of this contract.

The Contractor shall not change the name or address for EFT payments or manual payments, as appropriate, in the CCR record to reflect an assignee for the purpose of assignment of claims (see FAR Subpart 32.8, Assignment of Claims) . Assignees shall be separately registered in the CCR database. Information provided to the Contractor, s CCR record that indicates payments, including those made by EFT, to an ultimate recipient other than that Contractor will be considered to be incorrect information within the meaning of the , Suspension of payment, paragraph of the EFT clause of this contract.

Offerors and Contractors may obtain information on registration and annual confirmation requirements via the Internet at http://www.ccr.gov or by calling 1-888-227-2423, or 269-961-5757.

W91B4M-06-D-0001
P00001
Page 94 of 131

( End of Clause)

CLAUSES INCORPORATED BY FULL TEXT

52.212-5    CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR
EXECUTIVE ORDERS--COMMERCIAL ITEMS (JAN 2005)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are
incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to
acquisitions of commercial items:

(1) 52.233-3, Protest After Award (AUG 1996) (31 U.S.C. 3553).

(2) 52.233-4, Applicable Law for Breach of Contract Claim (OCT 2004) (Pub. L. 108-77, 108-78).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated
as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to
acquisitions of commercial items: (Contracting Officer check as appropriate.)

_X_ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (JUL 1995), with Alternate I (OCT 1995)
(41 U.S.C. 253g and 10 U.S.C. 2402).

___ (2) 52.219-3, Notice of HUBZone Small Business Set-Aside (Jan 1999) (U.S.C. 657a).

___ (3) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (Jan 1999) (if the
offeror elects to waive the preference, it shall so indicate in its offer) (U.S.C. 657a).

___(4) (i) 52.219-5, Very Small Business Set-Aside (JUNE 2003) (Pub. L. 103-403, section 304, Small Business
Reauthorization and Amendments Act of 1994).

___(ii) Alternate I (MAR 1999) to 52.219-5.

___(iii) Alternate II to (JUNE 2003) 52.219-5.

___ (5)(i) 52.219-6, Notice of Total Small Business Set-Aside (JUNE 2003) (15 U.S.C. 644).

___ (ii) Alternate I (OCT 1995) of 52.219-6.

___ (iii) Alternate II (MAR 2004) of 52.219-6.

___ (6)(i) 52.219-7, Notice of Partial Small Business Set-Aside (JUNE 2003) (15 U.S.C. 644).

___ (ii) Alternate I (OCT 1995) of 52.219-7.

___ (iii) Alternate II (MAR 2004) of 52.219-7.

___ (7) 52.219-8, Utilization of Small Business Concerns (MAY 2004) (15 U.S.C. 637 (d)(2) and (3)).

___ (8)(i) 52.219-9, Small Business Subcontracting Plan (JAN 2002) (15 U.S.C. 637(d)(4)).

___ (ii) Alternate I (OCT 2001) of 52.219-9.

___(iii) Alternate II (OCT 2001) of 52.219-9.

___ (9) 52.219-14, Limitations on Subcontracting (DEC 1996) (15 U.S.C. 637(a)(14)).

___ (10)(i) 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (JUNE 2003) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323) (if the offeror elects to waive the adjustment, it shall so indicate in its offer).

___ (ii) Alternate I (JUNE 2003) of 52.219-23.

___ (11) 52.219-25, Small Disadvantaged Business Participation Program--Disadvantaged Status and Reporting (OCT 1999) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

___ (12) 52.219-26, Small Disadvantaged Business Participation Program--Incentive Subcontracting (OCT 2000) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

___ (13) 52.219-27, Notice of Total Service-Disabled Veteran-Owned Small Business Set-Aside (May 2004).

___ (14) 52.222-3, Convict Labor (JUNE 2003) (E.O. 11755).

___ (15) 52.222-19, Child Labor--Cooperation with Authorities and Remedies (Jun 2004) (E.O. 13126).

___ (16) 52.222-21, Prohibition of Segregated Facilities (FEB 1999).

___ (17) 52.222-26, Equal Opportunity (APR 2002) (E.O. 11246).

___ (18) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (DEC 2001) (38 U.S.C. 4212).

___ (19) 52.222-36, Affirmative Action for Workers with Disabilities (JUN 1998) (29 U.S.C. 793).

___ (20) 52.222-37, Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (DEC 2001) (38 U.S.C. 4212).

___ (21) 52.222-39, Notification of Employee Rights Concerning Payment of Union Dues or Fees (DEC 2004) (E.O. 13201).

___ (22)(i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA-Designated Products (AUG 2000) (42 U.S.C. 6962(c)(3)(A)(ii)).

___ (ii) Alternate I (AUG 2000) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)).

___ (23) 52.225-1, Buy American Act--Supplies (JUNE 2003) (41 U.S.C. 10a-10d).

___ (24)(i) 52.225-3, Buy American Act--Free Trade Agreements--Israeli Trade Act (Jan 2005) (41 U.S.C. 10a-10d, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, Pub. L. 108-77, 108-78, 108-286).

___ (ii) Alternate I (JAN 2004) of 52.225-3.

___ (iii) Alternate II (JAN 2004) of 52.225-3.

___ (25) 52.225-5, Trade Agreements (Jan 2005) (19 U.S.C. 2501, et seq., 19 U.S.C. 3301 note).

_X_ (26) 52.225-13, Restrictions on Certain Foreign Purchases (OCT 2003) (E.o.s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of Treasury).

___ (27) 52.225-15, Sanctioned European Union Country End Products (FEB 2000) (E.O. 12849).

___ (28) 52.225-16, Sanctioned European Union Country Services (FEB 2000) (E.O. 12849).

___ (29) 52.232-29, Terms for Financing of Purchases of Commercial Items (FEB 2002) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

___ (30) 52.232-30, Installment Payments for Commercial Items (OCT 1995) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

___ (31) 52.232-33, Payment by Electronic Funds Transfer--Central Contractor Registration (OCT 2003) (31 U.S.C. 3332).

___ (32) 52.232-34, Payment by Electronic Funds Transfer--Other than Central Contractor Registration (MAY 1999) (31 U.S.C. 3332).

___ (33) 52.232-36, Payment by Third Party (MAY 1999) (31 U.S.C. 3332).

___ (34) 52.239-1, Privacy or Security Safeguards (AUG 1996) (5 U.S.C. 552a).

___ (35)(i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (APR 2003) (46 U.S.C. Appx 1241 and 10 U.S.C. 2631).

___ (ii) Alternate I (APR 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items: [Contracting Officer check as appropriate.]

___ (1) 52.222-41, Service Contract Act of 1965, as Amended (MAY 1989) (41 U.S.C. 351, et seq.).

___ (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (MAY 1989) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

___ (3) 52.222-43, Fair Labor Standards Act and Service Contract Act--Price Adjustment (Multiple Year and Option Contracts) (MAY 1989) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

___ (4) 52.222-44, Fair Labor Standards Act and Service Contract Act--Price Adjustment (February 2002) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

___ (5) 52.222-47, SCA Minimum Wages and Fringe Benefits Applicable to Successor Contract Pursuant to Predecessor Contractor Collective Bargaining Agreements (CBA) (May 1989) (41 U.S.C. 351, et seq.).

(d) Comptroller General Examination of Record. The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records--Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) (1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in paragraphs (i) through (vi) of this paragraph in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause--

(i) 52.219-8, Utilization of Small Business Concerns (May 2004) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $500,000 ($1,000,000 for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(ii) 52.222-26, Equal Opportunity (April 2002) (E.O. 11246).

(iii) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (December 2001) (38 U.S.C. 4212).

(iv) 52.222-36, Affirmative Action for Workers with Disabilities (June 1998) (29 U.S.C. 793).

(v) 52.222-39, Notification of Employee Rights Concerning Payment of Union Dues or Fees (DEC 2004) (E.O. 13201).

(vi) 52.222-41, Service Contract Act of 1965, as Amended (May 1989), flow down required for all subcontracts subject to the Service Contract Act of 1965 (41 U.S.C. 351, et seq.).

(vii) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (April 2003) (46 U.S.C. Appx 1241 and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the contractor May include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of clause)


52.216-18    ORDERING. (OCT 1995)

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or

task orders by the individuals or activities designated in the Schedule. Such orders may be issued from 1 April 2006 through 31 March 2011.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

(End of clause)

52.216-19    ORDER LIMITATIONS. (OCT 1995)

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than 1 EA, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

(b) Maximum order. The Contractor is not obligated to honor:

(1) Any order for a single item in excess of 90EA;

(2) Any order for a combination of items in excess of 90EA; or

(3) A series of orders from the same ordering office within 30 days that together call for quantities exceeding the limitation in subparagraph (1) or (2) above.

(c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) above.

(d) Notwithstanding paragraphs (b) and (c) above, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within 10 days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

(End of clause)

52.216-22    INDEFINITE QUANTITY. (OCT 1995)

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum". The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum". The Government has established the following minimum and maximum quantity for the life of the contract:

(i)    Minimum: 50 vehicles
(ii)   Maximum: 2,000 vehicles

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after 31 March 2011.

(End of clause)


TASK ORDER PROCEDURES
(a) The Government intends to award multiple IDIQ contracts. The top three highest rated proposals offering the best value may receive individual contracts. However, if only one or two proposals offers the best value, the Government will only award to one or two proposals.

(b) If more than one contract is awarded the task orders will be competed among these two or three contracts and will be given to the contractor who has the lowest price and/or can deliver within the specified delivery time.

(c ) The contractor agrees to locally have available a minimum of 10 vehicles at the subcontractor, No-Lemon's location. If the contractor receives a task order for the maximum quantity, 90EA, the contractor agrees to supply the quantity within 2 weeks with no increase in price regardless if the vehicles were purchased by the local market or directly from their distributor.


CLAUSES INCORPORATED BY FULL TEXT


52.217-8    OPTION TO EXTEND SERVICES (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within 30 days.

(End of clause)


52.217-9    OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within 30 days the period of time within which the Contracting Officer may exercise the option; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 10 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

(End of clause)

52.229-6    TAXES--FOREIGN FIXED-PRICE CONTRACTS (JUN 2003)

(a) To the extent that this contract provides for furnishing supplies or performing services outside the United States and its outlying areas, this clause applies in lieu of any Federal, State, and local taxes clause of the contract.

(b) Definitions. As used in this clause--

"Contract date," means the date set for bid opening or, if this is a negotiated contract or a modification, the effective date of this contract or modification.

Country concerned means any country, other than the United States and its outlying areas, in which expenditures under this contract are made.

"Tax" and "taxes," include fees and charges for doing business that are levied by the government of the country concerned or by its political subdivisions.

"All applicable taxes and duties," means all taxes and duties, in effect on the contract date, that the taxing authority is imposing and collecting on the transactions or property covered by this contract, pursuant to written ruling or regulation in effect on the contract date.

"After-imposed tax," means any new or increased tax or duty, or tax that was exempted or excluded on the contract date but whose exemption was later revoked or reduced during the contract period, other than excepted tax, on the transactions or property covered by this contract that the Contractor is required to pay or bear as the result of legislative, judicial, or administrative action taking effect after the contract date.

"After-relieved tax," means any amount of tax or duty, other than an excepted tax, that would otherwise have been payable on the transactions or property covered by this contract, but which the Contractor is not required to pay or bear, or for which the Contractor obtains a refund, as the result of legislative, judicial, or administrative action taking effect after the contract date.

"Excepted tax," means social security or other employment taxes, net income and franchise taxes, excess profits taxes, capital stock taxes, transportation taxes, unemployment compensation taxes, and property taxes. "Excepted tax" does not include gross income taxes levied on or measured by sales or receipts from sales, property taxes assessed on completed supplies covered by this contract, or any tax assessed on the Contractor's possession of, interest in, or use of property, title to which is in the U.S. Government.

(c) Unless otherwise provided in this contract, the contract price includes all applicable taxes and duties, except taxes and duties that the Government of the United States and the government of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States.

(d) The contract price shall be increased by the amount of any after-imposed tax or of any tax or duty specifically excluded from the contract price by a provision of this contract that the Contractor is required to pay or bear, including any interest or penalty, if the Contractor states in writing that the contract price does not include any contingency for such tax and if liability for such tax, interest, or penalty was not incurred through the Contractor's fault, negligence, or failure to follow instructions of the Contracting Officer or to comply with the provisions of paragraph (i) below.

(e) The contract price shall be decreased by the amount of any after-relieved tax, including any interest or penalty. The Government of the United States shall be entitled to interest received by the Contractor incident to a refund of taxes to the extent that such interest was earned after the Contractor was paid by the Government of the United States for such taxes. The Government of the United States shall be entitled to repayment of any penalty refunded to the Contractor to the extent that the penalty was paid by the Government.

(f) The contract price shall be decreased by the amount of any tax or duty, other than an excepted tax, that was included in the contract and that the Contractor is required to pay or bear, or does not obtain a refund of, through the Contractor's fault, negligence, or failure to follow instructions of the Contracting Officer or to comply with the provisions of paragraph (i) below.

(g) No adjustment shall be made in the contract price under this clause unless the amount of the adjustment exceeds $250.

(h) If the Contractor obtains a reduction in tax liability under the United States Internal Revenue Code (Title 26, U.S. Code) because of the payment of any tax or duty that either was included in the contract price or was the basis of an increase in the contract price, the amount of the reduction shall be paid or credited to the Government of the United States as the Contracting Officer directs.

(i) The Contractor shall take all reasonable action to obtain exemption from or refund of any taxes or duties, including interest or penalty, from which the United States Government, the Contractor, any subcontractor, or the transactions or property covered by this contract are exempt under the laws of the country concerned or its political subdivisions or which the governments of the United States and of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States.

(j) The Contractor shall promptly notify the Contracting Officer of all matters relating to taxes or duties that reasonably may be expected to result in either an increase or decrease in the contract price and shall take appropriate action as the Contracting Officer directs. The contract price shall be equitably adjusted to cover the costs of action taken by the Contractor at the direction of the Contracting Officer, including any interest, penalty, and reasonable attorneys' fees.

(End of clause)

52.232-23   ASSIGNMENT OF CLAIMS (JAN 1986) - ALTERNATE I (APR 1984)

(a) The Contractor, under the Assignment of Claims Act, as amended, 31 U.S.C. 3727, 41 U.S.C. 15 (hereafter referred to as "the Act"), may assign its rights to be paid amounts due or to become due as a result of the performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency. The assignee under such an assignment may thereafter further assign or reassign its right under the original assignment to any type of financing institution described in the preceding sentence. Unless otherwise stated in this contract, payments to an assignee of any amounts due or to become due under this contract shall not, to the extent specified in the Act, be subject to reduction or setoff.

(b) Any assignment or reassignment authorized under the Act and this clause shall cover all unpaid amounts payable under this contract, and shall not be made to more than one party, except that an assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in the financing of this contract.

(c) The Contractor shall not furnish or disclose to any assignee under this contract any classified document (including this contract) or information related to work under this contract until the Contracting Officer authorizes such action in writing.

(End of clause)

52.246-4    INSPECTION OF SERVICES--FIXED-PRICE (AUG 1996)

(a) Definitions. "Services," as used in this clause, includes services performed, workmanship, and material furnished or utilized in the performance of services.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

(c) The Government has the right to inspect and test all services called for by the contract, to the extent practicable at all times and places during the term of the contract. The Government shall perform inspections and tests in a manner that will not unduly delay the work.

(d) If the Government performs inspections or tests on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties.

(e) If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by reperformance, the Government may (1) require the Contractor to take necessary action to ensure that future performance conforms to contract requirements and (2) reduce the contract price to reflect the reduced value of the services performed.

(f) If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may (1) by contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service or (2) terminate the contract for default.

(End of clause)

52.246-20    WARRANTY OF SERVICES (MAY 2001)

(a)  Definition.

"Acceptance," as used in this clause, means the act of an authorized representative of the Government by which the Government assumes for itself, or as an agent of another, ownership of existing and identified supplies, or approves specific services, as partial or complete performance of the contract.

(b) Notwithstanding inspection and acceptance by the Government or any provision concerning the conclusiveness thereof, the Contractor warrants that all services performed under this contract will, at the time of acceptance, be free from defects in workmanship and conform to the requirements of this contract. The Contracting Officer shall give written notice of any defect or nonconformance to the Contractor immediately upon discovery. This notice shall state either (1) that the Contractor shall correct or reperform any defective or nonconforming services, or (2) that the Government does not require correction or reperformance.

(c) If the Contractor is required to correct or reperform, it shall be at no cost to the Government, and any services corrected or reperformed by the Contractor shall be subject to this clause to the same extent as work initially performed. If the Contractor fails or refuses to correct or reperform, the Contracting Officer may, by contract or

otherwise, correct or replace with similar services and charge to the Contractor the cost occasioned to the Government thereby, or make an equitable adjustment in the contract price.

(d) If the Government does not require correction or reperformance, the Contracting Officer shall make an equitable adjustment in the contract price.

(End of clause)


52.252-2    CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

http://farsite.hill.af.mil/

(End of clause)


252.201-7000    CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991)

(a) "Definition. Contracting officer's representative" means an individual designated in accordance with subsection 201.602-2 of the Defense Federal Acquisition Regulation Supplement and authorized in writing by the contracting officer to perform specific technical or administrative functions.

(b) If the Contracting Officer designates a contracting officer's representative (COR), the Contractor will receive a copy of the written designation. It will specify the extent of the COR's authority to act on behalf of the contracting officer. The COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract.

(End of clause)


252.212-7001    CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS APPLICABLE TO DEFENSE ACQUISITIONS OF COMMERCIAL ITEMS (JAN 2005)

(a) The Contractor agrees to comply with the following Federal Acquisition Regulation (FAR) clause which, if checked, is included in this contract by reference to implement a provision of law applicable to acquisitions of commercial items or components.

  __X_ 52.203-3 Gratuities (APR 1984) (10 U.S.C. 2207).

(b) The Contractor agrees to comply with any clause that is checked on the following list of Defense FAR Supplement clauses which, if checked, is included in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items or components.

  ____252.205-7000 Provision of Information to Cooperative Agreement Holders (DEC 1991) (10 U.S.C. 2416).

_____ 252.219-7003 Small, Small Disadvantaged and Women-Owned Small Business Subcontracting Plan (DoD Contracts) (APR 1996) (15 U.S.C. 637).

_____ 252.219-7004 Small, Small Disadvantaged and Women-Owned Small Business Subcontracting Plan (Test Program) (JUN 1997) (15 U.S.C. 637 note).

_____ 252.225-7001 Buy American Act and Balance of Payment Program (APR 2003) (41 U.S.C. 10a-10d, E.O. 10582).

_____ 252.225-7012 Preference for Certain Domestic Commodities (JUN 2004) (10.U.S.C. 2533a).

_____ 252.225-7014 Preference for Domestic Specialty Metals (APR 2003) (10 U.S.C. 2533a).

_____ 252.225-7015 Preference for Domestic Hand or Measuring Tools (APR 2003) (10 U.S.C. 2533a).

_____ 252.225-7016 Restriction on Acquisition of Ball and Roller Bearings (MAY 2004) (_____Alternate I) (APR 2003) (10 U.S.C. 2534 and Section 8099 of Public Law 104-61 and similar sections in subsequent DoD appropriations acts).

_____ 252.225-7021 Trade Agreements (JAN 2005) (19 U.S.C. 2501-2518 and 19 U.S.C. 3301 note).

_____ 252.225-7027 Restriction on Contingent Fees for Foreign Military Sales (APR 2003) (22 U.S.C. 2779).

_____ 252.225-7028 Exclusionary Policies and Practices of Foreign Governments (APR 2003) (22 U.S.C. 2755).

_____ 252.225-7036 Buy American Act--North American Free Trade Agreement Implementation Act--Balance of Payment Program (JAN 2005) (_____Alternate I) (JAN 2005) (41 U.S.C. 10a-10d and 19 U.S.C. 3301 note).

_____ 252.225-7038 Restriction on Acquisition of Air Circuit Breakers (APR 2003) (10 U.S.C. 2534(a)(3)).

_____ 252.226-7001 Utilization of Indian Organizations, Indian-Owned Economic Enterprises, and Native Hawaiian Small Business Concerns (SEP 2004) (Section 8021 of Public Law 107-248 and similar sections in subsequent DoD appropriations acts).

_____ 252.227-7015 Technical Data--Commercial Items (NOV 1995) (10 U.S.C. 2320).

_____ 252.227-7037 Validation of Restrictive Markings on Technical Data (SEP 1999) (10 U.S.C. 2321).

_____ 252.232-7003 Electronic Submission of Payment Requests (JAN 2004) (10 U.S.C. 2227).

_____ 252.243-7002 Requests for Equitable Adjustment (MAR 1998) (10 U.S.C. 2410).

_____ 252.247-7023 Transportation of Supplies by Sea (MAY 2002) (_____Alternate I) (MAR 2000) (_____Alternate II) (MAR 2000) (_____Alternate III) (May 2002).

_____ 252.247-7024 Notification of Transportation of Supplies by Sea (MAR 2000) (10 U.S.C. 2631).

(c) In addition to the clauses listed in paragraph (e) of the Contract Terms and Conditions Required to Implement Statutes or Executive Orders--Commercial Items clause of this contract (Federal Acquisition Regulation 52.212-5), the Contractor shall include the terms of the following clauses, if applicable, in subcontracts for commercial items or commercial components, awarded at any tier under this contract:

252.225-7014 Preference for Domestic Specialty Metals, Alternate I (APR 2003) (10 U.S.C. 2533a).

**EXHIBIT B**

W91B4M-06-D-0001
0002
Page 4 of 14

FOB: Destination

STATEMENT OF WORK

# STATEMENT OF WORK (SOW)

## FOR

## INDEFINATE DELIVERY INDEFINATE QUANTITY (IDIQ) CAMP EGGERS AND CAMP PHOENIX VEHICLE LEASE



**REVISED: 18 December 2005**

W91B4M-06-D-0001
0002
Page 5 of 14

## SECTION 1, DESCRIPTION OF SERVICE.

**1.1 Scope of Work.** The requirement is for vehicle leases for Camp Eggers and Camp Phoenix.    The contractor(s) must provide vehicles within two weeks from receiving the task order.  The vehicles must be fully mission capable in accordance with Section 2, Vehicle Condition and Acceptance of the SOW.  The contractor(s) will only be responsible for scheduled routine maintenance and maintain vehicles under warranty.  The collision repairs and unscheduled maintenance will be performed with a separate contract and possibly under a different contractor(s).  The contractor(s) shall only deliver vehicles called out from the standardized vehicle lease price list.  The negotiated price list will be incorporated into the contract.

## SECTION 2, VEHICLE CONDITION AND ACCEPTANCE.

2.1  Vehicle Condition. All vehicles delivered will be safe and serviceable in accordance with manufacturer's specifications.

2.1.1  Fluids, including fuel, full at initial delivery and after maintenance service.

2.1.2  Have serviceable seatbelts for the driver and passengers.

2.1.3  Have serviceable lights (interior and exterior), windshield wipers, horn, parking brake.

2.1.4  Have tires with a minimum of 5mm tread depth, including spare and vehicle jack to replace it.

2.1.5  Have window glass and mirrors, rear and side view, with no visible cracks

2.1.6  Manufacturer's Operator's Manual in glove compartment.

2.1.7  Heating and air conditioning.

2.1.8  Both the exterior and the interior of the vehicles must be clean and free of excessive soil, rust, and damage.

2.1.9  Left hand steering wheel (must be originally from the manufacture).

**2.2  Vehicle Acceptance.**
 The government will only be liable for future damages caused by negligence of U.S. personnel.  A joint contractor/government inspection shall be performed on all vehicles and equipment before acceptance. The inspection shall be documented on Attachment A, "Vehicle Inspection, Initial Delivery" checklist with photos (if applicable) and both parties will retain a copy.  A copy of the warranty will be provided upon delivery of the vehicle. All discrepancies must be fixed prior to final acceptance. If the contractor(s) fails to replace the vehicle or correct the defects as required by the Contracting Officer, the Government may:

2.2.1  By contract or otherwise, correct the defect or arrange for the lease of a similar vehicle and shall charge or set off against the contractor(s) any excess costs occasioned thereby; or

2.2.2  Terminate the contract.

## SECTION 3, SCHEDULED MAINTENANCE.

3.1  The contractor(s) is responsible for scheduled maintenance and unscheduled maintenance for those parts covered under the manufacturer's warranty.  The contractor(s) shall perform scheduled maintenance at a facility he designates at least every 90 days.  He will provide all parts, labor, and expertise necessary to complete required maintenance tasks.  Parts include those items that must be replaced due to fair wear

and tear such as windshield wipers, tires, headlamps, filters, fluids, and lubricants. The contractor(s) is responsible for maintaining the schedule and notifying the COR a minimum of 1 week in advance of scheduled maintenance of the leased vehicle. Scheduled maintenance will be documented and signed by a site representative, a copy will be turned into the COR.

3.2  When performing the vehicle inspection and diagnostic checks, the mechanic must repair or service the vehicle to a safe and serviceable condition if it is part of routine maintenance. If it is not part of routine maintenance, the contractor(s) must stop all work and contact the COR. The COR will coordinate with the contractor(s) who performs unscheduled maintenance. Before accepting the serviced vehicle, the fuel tank must be full. The cost of the scheduled maintenance will be included in the vehicle lease cost and therefore, the contractor(s) will not bill the Government for it separately. The inspection and service must include, at the minimum, the Attachment B, "Vehicle Maintenance Checklist".

3.3  If a vehicle repair is more than 72 hours, the leasing agent will replace the disabled vehicle with a like vehicle at no additional cost to the Government.

## SECTION 4, QUALITY CONTROL PLAN.

4.1 Quality Control. The contractor(s) shall employ his commercial quality control procedures in the performance of the requirements of this contract to ensure the vehicles are maintained in accordance with the manufacture's service schedule and best industry practices.

4.2 Quality Assurance. The government will periodically evaluate the contractor(s)' performance by appointing a representative(s) to monitor the performance. The Quality Assurance Personnel (QAP) will evaluate the contractor(s)' performance through monthly and random on-site inspections of the contractor(s)' quality control program and an analysis of the compliance with the Service Delivery Schedule as contained in this SOW. The government may inspect each task as completed or increase the number of quality control inspections if called for by repeated failures discovered during quality control inspections or repeated customer complaints. Likewise, the government may decrease the number of quality control inspections if performance dictates.

4.3  Government Remedies. The contracting officer shall follow FAR 52.212.4, Contract Terms and Conditions-Commercial Items (October 2003), for contractor(s)' failure to perform satisfactory services or failure to correct non-conforming services.

## SECTION 5, SERVICE DELIVERY SUMMARY (SDS).

### 5.1 Performance Objective
The SDS cites the key performance objectives (services) and the associated thresholds that must be attained, over which the Government will exercise surveillance. The absence of any contract requirement from the SDS shall not detract from its enforceability nor limit the rights or remedies of the Government under any other provision of the contract.

| Performance Objective | SOW Reference | Performance Threshold | Method of Surveillance |
|---|---|---|---|
| 1. Service the vehicles to safe and serviceable conditions IAW manufacturer's specifications and Attachment B | 3 | No more than 5% of the vehicles repaired experience repeat maintenance for the same repair action. | 90 Day Inspection and 5 valid customer complaints |

| 2. Provide accurate documentation, as requested, on services performed to the COR | 7.1 | 95% of the time. | Random Inspections |
|---|---|---|---|
| 3. Deliver requested vehicles within two weeks | 1.2.1 | No more than 5% of the delivery is late (longer than two weeks) within one month. | Monthly Inspections |
| 4. Quality Control Plan | 4 | No more than 5% vehicles returned for defect within one month. | Monthly Inspections |

## SECTION 6, RETURNING, REIMBURSEMENT AND REPLACEMENT.

**6.1 Returning.** Any damages the U.S. Government is responsible for will be repaired to the condition received before returning the vehicle back to the leasing agent at a fair and reasonable price. The U.S. Government is only liable for damages and repairs if the vehicle was in the possession of a government personnel. The Government is not responsible for damages accepted on the "Initial Delivery and Acceptance Inspection Checklist" (Attachment A), as these damages existed before the U.S. Government received the vehicle. A joint contractor/government inspection shall be performed on the vehicle. The inspection shall be documented on Attachment C, "Vehicle Inspection, Returned to Leasing Agent" checklist with photos (if applicable) and both parties will retain a copy.

**6.2 Reimbursement.** If a vehicle has been damaged in the Government's possession and the cost of vehicle maintenance and/or collision repair is 75% or more than the actual value of the vehicle, the contractor(s) will be reimbursed the actual value of the vehicle minus depreciation. The vehicle's actual value may be determined by the Kelly Blue Book via www.kbb.com or based on the purchase receipt minus depreciation, whichever is the lowest. The Government will consider the Afghanistan conditions when depreciating the value of the vehicle. The contractor(s) will be required to provide the Government the original purchased invoice for the damaged vehicle. Once reimbursed, the damaged vehicle will be the property of the U.S. Government. The damage may be caused by act of terrorism, war, or an accident, but, not through normal wear and tear.

**6.3 Replacement.** Vehicles will be replaced or the price will be reduced for the following reasons:

**6.3.1 KM Exceeds Tier Category.**

**6.3.1.1** For tier 1, if the vehicle's KM exceeds the tiers threshold of 20,000KM and therefore is equal to a tier 2 characteristics, the vehicle will be replaced with another tier 1, of the same model, or the price will be reduced to tier 2 price. If the vehicle is reduced to a tier 2 and the vehicle exceeds its threshold of 40,000KM the vehicle shall be replaced with a tier 1 vehicle.

**6.3.1.2** For tier 2, if the vehicle's KM exceeds the tiers threshold of 40,000KM, the vehicle will be replaced with another tier 2 vehicle, of the same model.

**6.3.2 A Vehicle is a "Lemon".** If a leased vehicle is a "lemon", the Government is entitled to a replacement vehicle and refund of the unfixable vehicle maintenance repair cost, if incurred. For a vehicle to be classified as a "lemon" the car must (1) have substantial defect covered by the warranty within 1 year and/ or (2) not be fixed after a reasonable number of repair attempts. A "substantial defect" is a problem that impairs the vehicle's use, value, or safety, such as faulty brakes or steering. Substantial defects do not include operator's abuse nor minor defects, such as loose radio knobs and door handles. The leasing agent is given reasonable number of attempts to repair the vehicle at no charge to the Government before being required to replace the defective vehicle with a serviceable vehicle of the same

type. If the defect is a serious safety defect (for example, involving brakes or steering), it must be repaired after one attempt or be replaced. If the defect is not a serious safety defect, it must be fixed after two attempts. If the vehicle is in the shop for more than 30 days in a one-year period to fix two substantial defects it is classified as a "lemon" and it will be replaced with same vehicle type at no additional cost to the Government.

## SECTION 7, GOVERNMENT FURNISHED ITEMS AND SERVICES.

**7.1 Fuel.** The government is responsible for supplying the fuel used in the vehicles after delivery. (The contractor(s) is responsible to fill the fuel tank before initial delivery and after every scheduled maintenance.)

## SECTION 8, CONTRACTOR(S) FURNISHED ITEMS AND SERVICES.

**8.1 Records.** The contractor(s) shall maintain records of transactions with the U.S. Government and, upon request, make such records available to properly designated contract representatives within a reasonable period of time.

**8.2 Point of Contact.** The contractor(s) will provide points of contact within his company to coordinate with the Contracting Officer Representative (COR) on issues concerning rental vehicles. Name (s), business address, cell phone numbers, e-mail address, and hours of operation are the minimum information requirements. Arrangements for contacting the contractor's points of contact after normal business hours should also be made available.

**8.3 Invoicing.** The contractor(s) will invoice monthly for the vehicle lease. The invoice will be submitted to the COR no later than the last day of the month.

**8.4 Custom Taxes.** The contractor(s) will be responsible for paying customs tax since the U.S. Government is only leasing the vehicle. The exemption from custom's tax only applies if the U.S. Government was buying the vehicle.

## 9. GENERAL.

While under the Government's possession, the Government will be allowed to make minor physical adjustments to the lease vehicle for safety and security. Before the vehicle is returned back to the contractor the Government is responsible for repairing damages caused by such modifications.

W91B4M-06-D-0001
0002
Page 9 of 14

ATTACHMENT A

# VEHICLE INSPECTION
## INITIAL DELIVERY and ACCEPTANCE

| Contract Number: | | | Date Received: |
|---|---|---|---|
| Company Name: | | | Period of Performance: |
| Frame (VIIN) Number: | | | KM: |
| | | | Condition: |
| Vehicle Type: | YR: | Color: | Warranty Exp Date: |

| INSPECTION: INTERIOR AND EXTERIOR (annotate all acceptable damages) | Government Accepts | Comments |
|---|---|---|
| 1. Top of vehicle | | |
| 2. Front of vehicle | | |
| 3. Rear of vehicle | | |
| 4. Right side of vehicle | | |
| 5. Left side of vehicle | | |
| 6. Engine | | |
| 7. Interior | | |

**The undersigned parties have acknowledged and accepted the above damages (if any). After the undersigned date, the U.S. Government is only liable for future damages and repairs in accordance with Statement Of Work (SOW) para 6.1, Returning. In accordance with the SOW, the following applies:**

### SECTION 2, VEHICLE CONDITION AND ACCEPTANCE.

2.1 Vehicle Condition. All vehicles delivered will be safe and serviceable in accordance with manufacturer's specifications.

2.1.1 Fluids, including fuel, full at initial delivery and after maintenance service.

2.1.2 Have serviceable seatbelts for the driver and passengers.

2.1.3 Have serviceable lights (interior and exterior), windshield wipers, horn, parking brake.

2.1.4 Have tires with a minimum of 5mm tread depth, including spare and vehicle jack to replace it.

2.1.5 Have window glass and mirrors, rear and side view, with no visible cracks

2.1.6 Manufacturer's Operator's Manual in glove compartment.

2.1.7 Heating and air conditioning.

2.1.8 Both the exterior and the interior of the vehicles must be clean and free of excessive soil, rust, and damage.

2.1.9 Left hand steering wheel (must be originally from the manufacture).

**2.2 Vehicle Acceptance.**
The government will only be liable for future damages caused by negligence of U.S. personnel. A joint contractor/government inspection shall be performed on all vehicles and equipment before acceptance. The inspection shall be documented on Attachment A, "Vehicle Inspection, Initial Delivery" checklist with photos (if applicable) and both parties will retain a copy. A copy of the warranty will be provided upon delivery of the vehicle. All discrepancies must be fixed prior to final acceptance. If the contractor(s) fails to replace the vehicle or correct the defects as required by the Contracting Officer, the Government may:

2.2.1 By contract or otherwise, correct the defect or arrange for the lease of a similar vehicle and shall charge or set off against the Contractor(s) any excess costs occasioned thereby; or

2.2.2 Terminate the contract.

**6.1 Returning.** Any damages the U.S. Government is responsible for will be repaired to the condition received before returning the vehicle back to the leasing agent at a fair and reasonable price. The U.S. Government is only liable for damages and repairs if the vehicle was in the possession of a government personnel. The Government is not responsible for damages accepted on the "Initial Delivery and Acceptance Inspection Checklist" (Attachment A), as these damages existed before the U.S. Government received the vehicle. A joint contractor/government inspection shall be performed on the vehicle. The inspection shall be documented on Attachment C, "Vehicle Inspection, Returned to Leasing Agent" checklist with photos (if applicable) and both parties will retain a copy.

**Government's Signature/Date:**_____/_____    **Contractor's Signature/Date:** _____/_____

W91B4M-06-D-0001
0002
Page 11 of 14

ATTACHMENT B

# VEHICLE MAINTENANCE CHECKLIST
## SCHEDULED (every 90 Days)

| Contract Number: | Serviced KM/Date: |
|---|---|
| Company Name: | Next Service KM/Date: |
| Frame (VIIN) Number: | |
| Vehicle Type          YR          Color | |

| INSPECT AND SERVICE | YES | NO | Comments |
|---|---|---|---|
| 1. All lights, including clearance lights, front turning signals, parking lights, high beams, and low beams | | | |
| 2. Fluid leaks – oil, fuel, air, water, A/C refrigerant, coolant, hydraulic, brake and any other fluids | | | |
| 3. Radiator level and if required, fill to the top of the line | | | |
| 4. Change oil and refill new oil to correct level | | | |
| 5. Change oil, fuel, and air filters | | | |
| 6. Windshield wiper fluids are full and replace worn wipers | | | |
| 7. Battery fluid full | | | |
| 8. Battery connectors have no corrosion and are tightly connected | | | |
| 9. All belts and hoses, replace if there is a crack or leaks | | | |
| 10. Bare or exposed wires are safely covered | | | |
| 11. Brake and transmission fluids and, if required, properly fill full | | | |
| 12. Wheels and tires, to include rotation; replace if worn | | | |
| 13. Starting and charging systems | | | |
| 14. Steering linkage components | | | |
| 15. U-joints and driveline | | | |
| 16. Suspension system | | | |

| | | | |
|---|---|---|---|
| 17. Brake and parking system | | | |
| 18. Winterization (effective December - March) | | | |

**In accordance with the Statement of Work:**

**SECTION 3, SCHEDULED MAINTENANCE.**

3.1 The contractor(s) is responsible for scheduled maintenance and unscheduled maintenance for those parts covered under the manufacturer's warranty. The contractor(s) shall perform scheduled maintenance at a facility he designates at least every 90 days. He will provide all parts, labor, and expertise necessary to complete required maintenance tasks. Parts include those items that must be replaced due to fair wear and tear such as windshield wipers, tires, headlamps, filters, fluids, and lubricants. The contractor(s) is responsible for maintaining the schedule and notifying the COR a minimum of 1 week in advance of scheduled maintenance of the leased vehicle. Scheduled maintenance will be documented and signed by a site representative, a copy will be turned into the COR.

3.2 When performing the vehicle inspection and diagnostic checks, the mechanic must repair or service the vehicle to a safe and serviceable condition if it is part of routine maintenance. If it is not part of routine maintenance, the contractor(s) must stop all work and contact the COR. The COR will coordinate with the contractor(s) who performs unscheduled maintenance. Before accepting the serviced vehicle, the fuel tank must be full. The cost of the scheduled maintenance will be included in the vehicle lease cost and therefore, the contractor(s) will not bill the Government for it separately. The inspection and service must include, at the minimum, the Attachment B, "Vehicle Maintenance Checklist".

3.3 If a vehicle repair is more than 72 hours, the leasing agent will replace the disabled vehicle with a like vehicle at no additional cost to the Government.

**6.3.2 A Vehicle is a "Lemon".** If a leased vehicle is a "lemon", the Government is entitled to a replacement vehicle and refund of the unfixable vehicle maintenance repair cost, if incurred. For a vehicle to be classified as a "lemon" the car must (1) have substantial defect covered by the warranty within 1 year and/ or (2) not be fixed after a reasonable number of repair attempts. A "substantial defect" is a problem that impairs the vehicle's use, value, or safety, such as faulty brakes or steering. Substantial defects do not include operator's abuse nor minor defects, such as loose radio knobs and door handles. The leasing agent is given reasonable number of attempts to repair the vehicle at no charge to the Government before being required to replace the defective vehicle with a serviceable vehicle of the same type. If the defect is a serious safety defect (for example, involving brakes or steering), it must be repaired after one attempt or be replaced. If the defect is not a serious safety defect, it must be fixed after two attempts. If the vehicle is in the shop for more than 30 days in a one-year period to fix two substantial defects it is classified as a "lemon" and it will be replaced with same vehicle type at no additional cost to the Government.

Government Signature/Date:_____/_____ Contractor's Signature/Date_____/_____



W91B4M-06-D-0001
0002
Page 13 of 14

ATTACHMENT C

# VEHICLE INSPECTION
# RETURNED TO LEASING AGENT

| Contract Number: | | Date Received: | |
|---|---|---|---|
| Company Name: | | Period of Performance: | |
| Frame (VIN) Number: | | KM: | |
| | | Condition: | |
| Vehicle Type:          YR:          Color: | | Warranty Exp Date: | |

| INSPECTION: INTERIOR AND EXTERIOR (annotate all damages not recorded on the Initial Delivery Inspection Checklist) | Contractor Accepts | Comments |
|---|---|---|
| 1. Top of vehicle | | |
| 2. Front of vehicle | | |
| 3. Rear of vehicle | | |
| 4. Right side of vehicle | | |
| 5. Left side of vehicle | | |
| 6. Engine | | |
| 7. Interior | | |

The undersigned parties have acknowledged and accepted the above damages (if any). The following applies in accordance with the Statement of Work:

## SECTION 6, RETURNING, REIMBURSEMENT AND REPLACEMENT.

**6.1 Returning.** Any damages the U.S. Government is responsible for will be repaired to the condition received before returning the vehicle back to the leasing agent at a fair and reasonable price. The U.S. Government is only liable for damages and repairs if the vehicle was in the possession of a government personnel. The Government is not responsible for damages accepted on the "Initial Delivery and Acceptance Inspection Checklist" (Attachment A), as these damages existed before the U.S. Government received the vehicle. A joint contractor/government inspection shall be performed on the vehicle. The inspection shall be documented on Attachment C, "Vehicle Inspection, Returned to Leasing Agent" checklist with photos (if applicable) and both parties will retain a copy.

**6.2 Reimbursement.** If a vehicle has been damaged in the Government's possession and the cost of vehicle maintenance and/or collision repair is 75% or more than the actual value of the vehicle, the contractor(s) will be reimbursed the actual value of the vehicle minus depreciation. The vehicle's actual value may be determined by the Kelly Blue Book via www.kbb.com or based on the purchase receipt minus depreciation, whichever is the lowest. The Government will consider the Afghanistan conditions when depreciating the value of the vehicle. The contractor(s) will be required to provide the Government the original purchased invoice for the damaged vehicle. Once reimbursed, the damaged vehicle will be the property of the U.S. Government. The damage may be caused by act of terrorism, war, or an accident, but, not through normal wear and tear.

**6.3 Replacement.** Vehicles will be replaced or the price will be reduced for the following reasons:

**6.3.1 KM Exceeds Tier Category.**

**6.3.1.1** For tier 1, if the vehicle's KM exceeds the tiers threshold of 20,000KM and therefore is equal to a tier 2 characteristics, the vehicle will be replaced with another tier 1, of the same model, or the price will be reduced to tier 2 price. If the vehicle is reduced to a tier 2 and the vehicle exceeds its threshold of 40,000KM the vehicle shall be replaced with a tier 1 vehicle.

**6.3.1.2** For tier 2, if the vehicle's KM exceeds the tiers threshold of 40,000KM, the vehicle will be replaced with another tier 2 vehicle, of the same model.

**6.3.2 A Vehicle is a "Lemon".** If a leased vehicle is a "lemon", the Government is entitled to a replacement vehicle and refund of the unfixable vehicle maintenance repair cost, if incurred. For a vehicle to be classified as a "lemon" the car must (1) have substantial defect covered by the warranty within 1 year and/ or (2) not be fixed after a reasonable number of repair attempts. A "substantial defect" is a problem that impairs the vehicle's use, value, or safety, such as faulty brakes or steering. Substantial defects do not include operator's abuse nor minor defects, such as loose radio knobs and door handles. The leasing agent is given reasonable number of attempts to repair the vehicle at no charge to the Government before being required to replace the defective vehicle with a serviceable vehicle of the same type. If the defect is a serious safety defect (for example, involving brakes or steering), it must be repaired after one attempt or be replaced. If the defect is not a serious safety defect, it must be fixed after two attempts. If the vehicle is in the shop for more than 30 days in a one-year period to fix two substantial defects it is classified as a "lemon" and it will be replaced with same vehicle type at no additional cost to the Government.

Government's Signature/ Date:_____/_____ Contractor's Signature/ Date:_____/_____

**EXHIBIT C**

## ASSIGNMENT AGREEMENT

**THIS ASSIGNMENT AGREEMENT** (this "Agreement") is made as of April 1, 2006 by and between Overseas Lease Group, Inc., a Delaware corporation with its principal office at 31 Dehart Street, Morristown, NJ 07960-5211 ("Seller") and **KEY GOVERNMENT FINANCE, INC.,** with its principal office at 1000 South McCaslin Blvd. Superior, CO 80027, its successors and assigns ("Purchaser").

### INTRODUCTION:

Seller, and United States Department of Defense (the "User") have entered into that certain Contract (Contract No. W91B4M-06-D-0001), dated as of February 05, 2006 (the "Contract"), pursuant to which Seller has leased to the User, and the User has leased from Seller, the property described therein (the "Property"). Seller desires to sell, and Purchaser is willing to purchase, the Assigned Interest (as hereinafter defined).

**Section 1.    Assignment. NOW, THEREFORE,** in consideration of the covenants, warranties and representations hereinafter set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser agree as follows: FOR VALUE RECEIVED, including the payment by Purchaser of $460,502.46 due at closing (the "Purchase Price"). Seller does hereby sell, assign, transfer and set over unto Purchaser all of Seller's right, title and interest in and to (but none of its obligations under) the Assigned Interest.

**Section 2.    Assigned Interest.** As used herein, the term "Assigned Interest" shall mean the Contract and all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by User, and a first priority lien in favor of Purchaser in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract, including (without limitation) the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement. As used herein, the term "Contract" shall mean the Contract, together with all documents executed in connection with the Contract, including, without limitation, all documents listed on attached Schedule A.

**Section 3.    Representations and Warranties.** In order to induce Purchaser to enter into this Agreement and to accept the sale of the Assigned Interest, and security interest in the Property, Seller hereby represents and warrants to Purchaser that:

(a)    the Contract was duly authorized and properly executed and delivered by the Seller and this Agreement was duly authorized and properly executed and delivered by Seller, and each is in full force and effect and represents a valid and enforceable obligation of Seller in accordance with its terms, subject to bankruptcy, insolvency or similar laws then in effect;

(b)    the number and amount of the unpaid payments due under the Contract as of the date hereof are as stated in Exhibit 1 attached hereto;

(c)    no security deposit or prepayment of payments has been paid to Seller by the User or any third party in connection with the Contract, and Seller has not granted, and will not grant, to the User any allowance, credit memo, adjustment, or enter into any settlement, modification or amendment of the Contract;

(d)    attached hereto is a true, correct, and complete copy of the Contract, and the Contract is the sole and entire understanding and agreement between the User and Seller and there are no other agreements between them with respect to the Contract or the Property;

(e)    all original counterparts of the Contract have been delivered to Purchaser;

(f)    to the best of Seller's knowledge all of the Property has been accepted by the User in a condition satisfactory to the User in all respects and the Property is in possession of the User and, Seller has no knowledge of any casualty loss with respect to the Property;

(g)    to the best of Seller's knowledge the Contract is free of any setoffs, counterclaims and defenses of any kind whatsoever;

(h)    to the best of Seller's knowledge no event of default or event of non-appropriation has occurred and is continuing under the Contract , and no event has occurred which, with the lapse of time or the giving of notice, or both, would constitute an event of default or event of non-appropriation under the Contract;

(i)    all representations and duties of Seller intended to induce the User to enter into the Contract, whether required by the Contract or otherwise, have been fulfilled and Seller is not in default with respect to any of its obligations under the Contract, nor has any event occurred and continued which with the passing of time or the giving of notice would constitute such a default by Seller;

(j)    Seller has fully complied with all applicable federal and state laws, rules and regulations and has made all disclosures required by law in connection with the transactions contemplated by the Contract, prior to the consummation of the Contract;

(k)    to the best of Seller's knowledge after due inquiry, all credit data submitted to Purchaser and all information set forth in the User's application for entry into the Contract is true and correct in all material respects;

(l)  Seller shall use proceeds hereof to pay supplier the purchase price  the Property and all taxes required to be paid in connection with the acquisition of the Property, and Seller is the sole owner of and has good and marketable title to the Property and Assigned Interest, free and clear of all liens and encumbrances of any nature whatsoever, other than the interest of the User under the Contract;

(m)  no prohibition exists, in the Contract or otherwise, and no consent of the User or any other party is required (other than consent which has already been provided), to the making of this Assignment;

(n)  Seller has done and shall do nothing and knows of no facts or circumstances which would (i) materially impair the validity or value of the Contract, any rights created thereby, the Property or this Agreement, or (ii) materially impair the ability of Seller to perform its obligations under the Contract or this Agreement;

(o)  all taxes due and payable by Seller as of the date hereof with respect to the Property and Assigned Interest have been, or will be paid;

(p)  this Assignment vest in Purchaser full right, title and interest and legal title of Seller in and to the Assigned Interest, free and clear of all claims, liens, security interests and encumbrances of any kind or character, except the right of User under the Contract, and the same shall be and remain free of all claims, liens, security interests and encumbrances arising through any act or omission of Seller or any person claiming by, through or under it;

(q)  the execution by Seller of this Agreement and of the Contract to which it is a party, and its participation in the transaction specified herein, is in its ordinary course of business and within the scope of its existing corporate authority and Seller has full power and authority to enter into, and has taken all necessary action to authorize the execution and delivery of the Contract and, this Agreement and to perform the terms and conditions hereof and thereof;

(r)  neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby will conflict with or result in a breach of any of the terms, conditions or provisions of the organizational documents of Seller, or of any law or regulation, order, writ, injunction or decree of any court or government instrumentality, or of any agreement or instrument to which Seller is a party or by which it or to which it or its assets is subject;

(s)  intentionally left blank

(t)  the Contract constitutes a separate instrument of lease, enforceable by Purchaser without regard to other equipment schedules executed pursuant to the Contract.

Seller's representations and warranties under this Section shall be continuing representations and warranties made as of the date of this Agreement and shall survive the assignment of the Assigned Interest to Purchaser.

**Section 4.    Intentionally left blank.**

**Section 5.    Duties of Seller at Closing.** Seller shall deliver to Purchaser, unless waived in writing by Purchaser: (a) all original counterparts of the Contract, duly executed by the User thereunder, and the completion, installation or acceptance certificate by whatever name executed by such User with respect to the Property leased under the Contract; (b) a duly executed notice of assignment; (c) such other documents and certificates as Purchaser may reasonably request; and (i) such documents and instruments (if any) as reasonably may be required by Purchaser to effect the grant of security interest by Seller to Purchaser in the Property and assignment by Seller to Purchaser of any warranties solely to the extent applicable to the Property.

**Section 6. Seller's Obligations Under the Contract.** Purchaser shall have all of the rights of the Seller under the Contract, but none of Seller's obligations thereunder. This Agreement (and the assignment of such rights) shall not relieve Seller of any of its obligations under the Contract and Seller shall continue to perform all such obligations. Purchaser shall not be obligated to assume, and by its acceptance of this assignment shall not be deemed to have assumed, any of Seller's obligations under the Contract.

**Section 7.    Indemnification.** Seller hereby agrees to indemnify and save Purchaser harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Seller's breach of the covenants, representations and warranties contained in this Agreement. Purchaser will indemnify and save Seller harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Purchaser's actions or failure to act in connection with the Assigned Interests. The indemnity set forth in this Section shall survive the expiration or earlier termination of this Agreement or the Contract with respect to acts or events occurring or alleged to have occurred prior to such expiration or early termination.

**Section 8.    Covenants and Agreements.** Seller hereby covenants and agrees with Purchaser as follows:

(a)  Purchaser may endorse Seller's name on any remittances received from the User with respect to the Contract and/or the Property.

(b) Seller shall pay or cause to be paid by the User all personal property ...es, including tangible and intangible personal property, license, privilege, documentary, sales and other like taxes or charges or taxes in lieu thereof, applicable to any of the transactions contemplated by this Agreement, and which have been imposed, assessed or accrued at or prior to the time of assignment against the Property, this Agreement, the Contract or Purchaser, except for taxes measured or imposed on the net income of Purchaser.

(c) Seller shall, from time to time at the request of Purchaser, execute and deliver such further acknowledgments, agreements and instruments of assignment, transfer and assurance, and do all such further acts and things as may be necessary or appropriate in the reasonable opinion of Purchaser to give effect to the provisions hereof and to more perfectly confirm the rights, titles and interests hereby assigned and transferred to Purchaser.

(d) Seller shall notify Purchaser promptly upon obtaining knowledge of any default in the performance of the User's obligation under the Contract, including, without limitation, the payment of sums due under the Contract.

(e) Seller will not, without Purchaser's prior written consent: solicit or accept collection of any installment payments due under the Contract; modify, amend or terminate the Contract; waive any of Purchaser's rights thereunder; or take any action which impairs the rights or interest of Purchaser with respect to the Contract.

(f) If any payments under the Contract are made to Seller after the effective date of this Agreement, Seller agrees to promptly transmit such payment(s) to Purchaser in the same form as they are received, except that Seller will endorse, to the order of Purchaser, checks so received which are made payable to it, or otherwise pay such amount to Purchaser.

(g) Seller shall allow Purchaser and its representatives free access and right of inspection at all times to any Equipment at its location, subject, however, to the rights of the User under the Contract.

(h) Seller irrevocably constitutes and appoints Purchaser and any present or future officer or agent of Purchaser, or its successors or assigns, as its lawful attorney with full power of substitution and re-substitution, and in the name of Seller or otherwise, to collect and to sue in any court for payments due or to become due under the Contract, to withdraw or settle any claims, suits or proceedings pertaining to or arising out of the Contract, upon such terms as Purchaser in its discretion may deem to be in its best interest, all without notice to or assent of Seller and, further, to take possession and to endorse in the name of Seller any instrument for the payment of money received on account of the payments due under the Contract.

**Section 9.    Miscellaneous.** This Agreement shall be governed by, and interpreted and enforced under, the internal laws of the State of Utah (without regard to the conflict of laws principles of such state). All references herein to any agreements shall be to such agreement as amended or modified to the date of reference. The words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement. All notices hereunder shall be in writing and hand delivered, sent by facsimile (with confirmation of receipt) or sent by overnight courier service or by certified mail, addressed to the parties at the address specified above, or to such other address as either party may specify hereunder; and shall be effective upon receipt.

**Section 10.    Entire Agreement; No Assignment.** This Agreement is the entire agreement between Purchaser and Seller with respect to the subject matter hereof and it may not be supplemented or amended except by a writing, which is signed by both parties. This Agreement shall inure to the benefit of and be binding on Seller and Purchaser, and their respective successors and assigns. Notwithstanding the foregoing, Seller may not assign it rights, or delegate its obligations, under this Agreement without the express prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder, in whole or in part, at any time.

**Section 11.    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all such counterparts shall constitute but one and the same instrument.

**Section 12.    Not an Extension of Credit.** This Agreement constitutes a sale of 100% ownership interest in the Assigned Interest and shall in no way be construed as an extension of credit by Purchaser to Seller. Seller waives and releases any right, title or interest that it may have (whether pursuant to a "cross-collateralization" provision or otherwise) in and to any of the Assigned Interest, and/or the Contract.

**Section 13.    Waiver of Jury Trial.** THE PARTIES HEREBY UNCONDITIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

**IN WITNESS WHEREOF,** the parties have executed this Assignment Agreement as of the day and year first above written.

Seller: Overseas Lease Group, Inc.

By: _____

Name: EG BADCOCK

Title: President

Purchaser: KEY GOVERNMENT FINANCE, INC.

By: _____

Name: _____

Title: _____

**EXHIBIT 1**

SPECIFICATION OF ASSIGNED SCHEDULE

Executed pursuant to that certain Assignment Agreement dated as of April 1, 2006 (the "Agreement"), by and between Overseas Lease Group, Inc. as Seller, and KEY GOVERNMENT FINANCE, INC. as Purchaser.

This Specification is dated and effective as of the date set forth below and incorporates the terms and conditions of the Agreement.

1.   User: United States Department of Defense, under Contract No. W91B4M-06-D-0001-P00001, including all Modifications and Delivery Orders issued under said Contract.

2.   Date of Contract: January 19, 2006

3.   Total Invoice Cost: $460,502.46.  (See Assignment of Proceeds Letter for break-out of payment)

4.   Remaining payments due under the Contract: 59 monthly payments in arrears. 1-11 @ $13,896.00; 13-24 @ $13,248.00; 25-36 @ $9,480.00; 37-48 @ $5,910.00; 49-60 @ $5,310.00.

5.   Consideration:  $460,502.46

Date of Execution: _27 April 2006_

**Seller:**

Overseas Lease Group, Inc.

By: _____

Name: _E G BADCOCK_

Title: _president_

**Purchaser:**

KEY GOVERNMENT FINANCE, INC.

By: _____

Name: _____

Title: _____

**EXHIBIT D**

(i)     Minimum: 50 vehicles
(ii)    Maximum: 2,000 vehicles

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after 31 March 2011.

(End of clause)

TASK ORDER PROCEDURES
(a) The Government intends to award multiple IDIQ contracts. The top three highest rated proposals offering the best value may receive individual contracts. However, if only one or two proposals offers the best value, the Government will only award to one or two proposals.

(b) If more than one contract is awarded the task orders will be competed among these two or three contracts and will be given to the contractor who has the lowest price and/or can deliver within the specified delivery time.

(c) The contractor agrees to locally have available a minimum of 10 vehicles at the subcontractor, No-Lemon's location. If the contractor receives a task order for the maximum quantity, 90EA, the contractor agrees to supply the quantity within 2 weeks with no increase in price regardless if the vehicles were purchased by the local market or directly from their distributor.

CLAUSES INCORPORATED BY FULL TEXT

52.217-8     OPTION TO EXTEND SERVICES (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within 30 days.

(End of clause)

52.217-9     OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within 30 days the period of time within which the Contracting Officer may exercise the option; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 10 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

(End of clause)

52.229-6    TAXES--FOREIGN FIXED-PRICE CONTRACTS (JUN 2003)

(a) To the extent that this contract provides for furnishing supplies or performing services outside the United States and its outlying areas, this clause applies in lieu of any Federal, State, and local taxes clause of the contract.

(b) Definitions. As used in this clause--

"Contract date," means the date set for bid opening or, if this is a negotiated contract or a modification, the effective date of this contract or modification.

Country concerned means any country, other than the United States and its outlying areas, in which expenditures under this contract are made.

"Tax" and "taxes," include fees and charges for doing business that are levied by the government of the country concerned or by its political subdivisions.

"All applicable taxes and duties," means all taxes and duties, in effect on the contract date, that the taxing authority is imposing and collecting on the transactions or property covered by this contract, pursuant to written ruling or regulation in effect on the contract date.

"After-imposed tax," means any new or increased tax or duty, or tax that was exempted or excluded on the contract date but whose exemption was later revoked or reduced during the contract period, other than excepted tax, on the transactions or property covered by this contract that the Contractor is required to pay or bear as the result of legislative, judicial, or administrative action taking effect after the contract date.

"After-relieved tax," means any amount of tax or duty, other than an excepted tax, that would otherwise have been payable on the transactions or property covered by this contract, but which the Contractor is not required to pay or bear, or for which the Contractor obtains a refund, as the result of legislative, judicial, or administrative action taking effect after the contract date.

"Excepted tax," means social security or other employment taxes, net income and franchise taxes, excess profits taxes, capital stock taxes, transportation taxes, unemployment compensation taxes, and property taxes. "Excepted tax" does not include gross income taxes levied on or measured by sales or receipts from sales, property taxes assessed on completed supplies covered by this contract, or any tax assessed on the Contractor's possession of, interest in, or use of property, title to which is in the U.S. Government.

(c) Unless otherwise provided in this contract, the contract price includes all applicable taxes and duties, except taxes and duties that the Government of the United States and the government of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States.

(d) The contract price shall be increased by the amount of any after-imposed tax or of any tax or duty specifically excluded from the contract price by a provision of this contract that the Contractor is required to pay or bear, including any interest or penalty, if the Contractor states in writing that the contract price does not include any contingency for such tax and if liability for such tax, interest, or penalty was not incurred through the Contractor's fault, negligence, or failure to follow instructions of the Contracting Officer or to comply with the provisions of paragraph (i) below.

**EXHIBIT E**

## Overseas Lease Group

**From:** Peter Klawitter [pklawitter@contrack.com]
**Sent:** Monday, September 17, 2007 8:47 AM
**To:** 'Corporate Fleet Lease'; 'Doug Schoffstall'
**Cc:** 'Mark Badcock'
**Subject:** FW: Vehicle Turn In

FYI below from NO LEMON/ FERLO.


--reply--
Best regards

Peter Klawitter
IT Consultant
CONTRACK International, Inc.
Kabul - Afghanistan
Mobile: +93(0)799 80 22 99

This email, together with any attachments, is intended for the named recipient(s) only and may contain privileged and confidential
information. If received in error, please inform the sender as quickly as possible and delete this email and any copies from your
computer network. If not an intended recipient of this email, you must not copy, distribute or rely on it, and any form of
disclosure, modification, distribution and/or publication of this email is prohibited. Unless stated otherwise, this email represents
only the views of the sender and not the views of CONTRACK International, Inc.

**From:** Ferlo Elizalde [mailto:ferloelizalde@gmail.com]
**Sent:** Monday, 17 September, 2007 10:34
**To:** McGee, Marlon T USA SSG USA CJTF82 Base Ops
**Cc:** Sena, Allen USA SSG USA CSTC-A CJ4/IPBO; Wilson, Deander L USA CW3 USA CSTC-A; Hall, Kelley A USA SFC
USA CSTC-A; Johnson, Kenneth L USA SGT USA CJTF82 Base Ops S4 NCOIC; Machin, Megan USA 2LT USA CJTF82
Base Ops; Samir Omeragic; Searles, Kevin E USA SSgt USAF CSTC-A; Peter Klawitter - IT Consultant; Little, Rebecca
A USA CAPT USAF CSTC-A KRCC; Rene Larsen; Cruz, Austin S USA CPT USA CJTF82 Base Ops
**Subject:** Re: Vehicle Turn In

Date:   September 17, 2007
Time:   10:30 AM

Sir:

Good day...

Thanks for the info, dont worry I have sufficient space for all the turn in vehicle.

Thanks.

On 9/17/07, **McGee, Marlon T USA SSG USA CJTF82 Base Ops**
<marlon.mcgee@afghan.swa.army.mil> wrote:

All,

This is to inform you of Task Order 31 turn in.  We will start today.  As the vehicles leave Camp Eggers I will be
sending you emails periodically to inform you. Any questions or concerns don't hesitate to call.

TLC272  JTGCB09J365002343

TLC273  JTGCB09J965002394

MP242  JMYLNV76W6J001217

MP252  JMYLNV76W6J002434

Marlon T. McGee, SSG, USA
Base Ops TMP NCOIC
Camp Eggers, Kabul
DSN 318-237-1108
CELL 0799-133-074


--
FERLO ELIZALDE
Customer Service Manager

No Lemon Commercial
District 9th near Custom House
On the Road to Jalalabad
Kabul - Afghanistan.
+93(0)798189610/ mobile
kabserman@no-lemon.com / email
www.no-lemon.com /website

This email, together with any attachments, is intended for the named recipient(s) only and may contain
privileged and confidential information. If received in error, please inform the sender as quickly as possible
and delete this email and any copies from your computer network. If not an intended recipient of this email,
you must not copy, distribute or rely on it, and any form of disclosure, modification, distribution and/or
publication of this email is prohibited. Unless stated otherwise, this email represents only the views of the
sender and not the views of Contrack International Inc.

**EXHIBIT F**



**Ron K**
Garland/NE/KCL/KeyCorp
720-304-1263
CO-18-SP-0103
03/31/2008 10:50 AM

To    Dave Karpel/USA/KEF/KeyCorp@KeyCorp
cc    Jonathan Braun/RM/KCL/KeyCorp@KeyCorp
bcc
Subject    Fw: OLG Contract Task Order 31

History:    🔁 This message has been forwarded.

---

Rondall (Ron) K. Garland
Vice President
KEF Portfolio Management and Workouts
Key Equipment Finance Inc.
1000 South McCaslin Blvd., Suite 110
Superior, CO   80027
(720) 304-1263  (phone)
(720) 304-1342  (fax)
ron_k_garland@key.com (email)
----- Forwarded by Ron K Garland/NE/KCL/KeyCorp on 03/31/2008 10:48 AM -----



"George Badcock "
<gb@overseasleasegroup .co
m>
03/31/2008 10:40 AM

To    <Ron_K_Garland@Key.com>
cc
Subject    FW: OLG Contract Task Order 31

Ron, This letter is a result of actions by the DOD. The DOD sent our contract renewal today with major changes. We have extended the contract as is for 30 days while issues are worked out.
    I am sending the emails under separate cover.

    In light of the above, and despite the fact of the litigation I think we should meet in NY on Wednesday and Thursday  to work out the best way to deal with this latest development.

    We did have a long conversation with the Colonel and I will share that with you at the meeting or verbally. Your choice

    Regards

George Badcock

**From:** Fishel, Bradley J. USA LtCol USAF Contracting [mailto:bradley.j.fishel@afghan.swa.army.mil]
**Sent:** Monday, March 31, 2008 11:15 AM
**To:** George Badcock
**Subject:** OLG Contract Task Order 31

Mr. Badcock,

This e-mail is to confirm our discussions of earlier today.

Due to operational circumstances involving increased insurgent activity in and around the Camp Eggers and Camp Phoenix areas of Kabul, Afghanistan, we are no longer able to travel in soft skin vehicles. As such, the Combined Security Transition Command - Afghanistan (CSTC-A) requires the return of 90%+ of all soft skinned vehicles to OLG. As Task Order 31 has expired, CSTC-A needs to return the vehicles to OLG asap.

This will allow for the appropriate planning/budgeting to occur for up-armored vehicles and will stop the accrual of additional costs to the Govt for vehicles that are not being utilized due to battle conditions. The Government is returning these vehicles and requires final billing to cover the unpaid portion of the Task Order.

Thank you for your attention in this matter.

Lt Col Brad Fishel

BRADLEY J. FISHEL, Lt Col, USAF
Chief, Kabul Regional Contracting Center
DSN 318 237-1018
Cell 070-095-949

**ARENTH AFFIRMATION**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

OVERSEAS LEASE GROUP, INC.,                              08 Civ. 01696 (SAS)(THK)

                              Plaintiff,                 **AFFIRMATION IN SUPPORT**
                                                         **OF MOTION FOR PARTIAL**
             - against -                                 **SUMMARY JUDGMENT**
                                                         **AND OTHER RELIEF**

KEY GOVERNMENT FINANCE, INC.,

                              Defendant.
------------------------------------------------------------------x

        TERESE L. ARENTH, an attorney duly admitted to practice law before the Courts of the

State of New York, under penalties of perjury does hereby affirm as follows:

        1.      I am a member of the firm of Moritt Hock Hamroff & Horowitz LLP, attorneys

for the Defendant, Key Government Finance, Inc. ("Key"). I am fully familiar with the facts and

circumstances set forth herein.

        2.      Key's motion is fairly simple and straightforward. It is premised upon the

clarification and declaration of the relative rights between Key and Plaintiff, Overseas Lease

Group, Inc. ("OLG"), to recover and dispose of certain vehicles when entitled to under the OLG's

contract with the United States Department of Defense ("DOD"), such as with the early

termination of the lease of those vehicles by the DOD. Key financed OLG's leases to the DOD

and, as OLG's assignee and lienholder, Key must be able to enforce its rights with respect to its

collateral and pursue the rights and remedies of OLG as OLG's assignee without interference.

        3.      Based thereon, I submit this Affirmation in support of Key's application to the

Court: (i) pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary

judgment as to Key's Fourth Amended Counterclaim against OLG, which seeks a declaratory

judgment declaring that Key, as OLG's assignee and lienholder,[1] has the right to recover

possession and to dispose of the vehicles described below, whenever OLG would be or have

been entitled to recover possession of such vehicles and to dispose of them; (ii) pursuant to Rule

42(b) of the Federal Rules of Civil Procedure, severing and continuing Defendant's First, Second,

Third, Fifth, Sixth, Seventh, Eighth and Ninth Counterclaims against Plaintiff; and (iii) pursuant

to Rule 54(b), granting certification of the summary judgment on Defendant's Fourth Amended

Counterclaim against Plaintiff.

      4.     This motion has been necessitated by OLG's interference with Key's rights to

enforce all of its rights and remedies to recover possession of and to dispose of certain vehicles

as and when they come off lease, including OLG's failure and refusal to turn over and deliver to

Key the titles, title certificates and all indicia of ownership of the vehicles so as to enable Key to

convey title to buyers of the vehicles, in direct contravention of Key's rights as OLG's assignee

pursuant to its written agreements. Key is in imminent danger of losing prospective buyers for

77 of the subject vehicles, at $25,000 each, for a total proposed sale of $1,925,000. By

precluding Key from consummating the sale of those vehicles, which depreciate with each

passing day, Key will suffer direct and immediate material financial loss. In addition thereto, the

location and nature of both the vehicles and Key's prospective buyers creates exigent

circumstances for its ability to consummate the proposed sales. The vehicles consist of all-wheel

drive, non-armored vehicles located in the war zone of Afghanistan. In this territory, these types

of vehicles are scarce and at significant risk of damage or total loss as they sit unprotected in a

field storage lot. The prospective buyer of the 70 Vehicles requires the vehicles in connection

---

[1] Key's Fourth Amended Counterclaim seeks relief as either title owner or assignee/lienholder. For purposes of this motion only, Key is only seeking relief with respect to its rights as the assignee of OLG's rights and remedies and as a lienholder.

with a contract to provide necessary security services to the U.S. Embassy in this war zone, necessitating an expeditious resolution to Key's Fourth Amended Counterclaim so that it may complete the sale as soon as possible. Key has been constrained to seek this relief since OLG has asserted that Key cannot take any action to dispose (by re-lease or sale or otherwise) of the vehicles, claiming that only OLG can take such actions.

5.      It is also imperative that Key quickly obtain such relief from the Court as Task Orders pertaining to the leases of more than 90 additional non-armored vehicles are soon due to expire in the upcoming months and the DOD has indicated that it is not likely to exercise its options to renew those Task Orders for part or all of their remaining terms, which will cause Key even more significant damage if it cannot effectively market and consummate the sale thereof.

6.      Thus, an expeditious resolution of the issue concerning Key's rights with respect to the disposition of the 77 vehicles at issue will also provide much-needed clarity with respect to Key's rights as to additional vehicles that remain under contract with the Department of Defense as and when they come off lease.[2]

7.      As discussed in the accompanying Affidavit of David Karpel (the "Karpel Affidavit") and the accompanying Memorandum of Law, there are no genuine issues of material fact to be tried as to Key's rights to possess and dispose of the vehicles, as OLG's assignee and lienholder, based upon the clear and unambiguous language of the written agreements between Key and OLG.

---

[2] As indicated by Key's counsel in the pre-motion conference, Key does not seek any finding that OLG or Key is entitled to possession of any Vehicles under the DOD Contract (although Key believes it is entitled to such possession). Key only seeks by this motion an order declaring that when, under the DOD Contract or applicable law, the lessor OLG may recover possession of the Vehicles and dispose of them, that right belongs to Key as OLG's assignee.

3

8.    In that regard, as discussed at length in the Karpel Affidavit, pursuant to written agreements, Key funded OLG's purchase and lease of certain vehicles to the United States Department of Defense (the "DOD") pursuant to various "Task Orders" issued by the DOD in connection with its contract with OLG. In total, Key paid funding proceeds to OLG in the amount of $26,231,059.00. Pursuant to a written Assignment Agreement between OLG, as seller, and Key, as purchaser, OLG sold, assigned, transferred and set over unto Key all of OLG's "right, title and interest in and to (but none of its obligations under)" OLG's contract with the DOD for the lease of the vehicles, including all lease payments due under OLG's contract with the DOD, and granting Key a first priority lien in the vehicles leased thereunder. Karpel Affidavit, ¶¶ 5-7 and Exhibit "C" annexed thereto at Sections 1 and 2. Pursuant to Section 6 of the Assignment Agreement, Key "shall have all of the rights of [OLG] under the [DOD] Contract, but none of [OLG's] obligations thereunder...". See Karpel Affidavit, Exhibit "C" at Section 6.

9.    As also detailed in the Karpel Affidavit, the DOD has elected to non-renew the lease of all the vehicles that are subject of Task Order #31, which lease expired on November 30, 2007. In or about February 2008, Key located a prospective buyer for seven (7) of those vehicles, for a prospective purchase price of $175,000.00, and most recently, that prospective buyer obtained funding for the immediate purchase and delivery of four (4) of those vehicles and has agreed to purchase the remaining three (3) vehicles in June. Key has located a second prospective purchaser who is willing to buy an additional seventy (70) Toyota Land Cruisers, which are comprised in part from TO #31 and in part from Task Order #25 (which has also expired), at $25,000 each, for a total proposed sale of $1,750,000. Key's efforts to sell the vehicles, however, have been thwarted by OLG's unjustified failure and refusal to turn over the

4

titles to those vehicles to Key, in direct contravention of Key's contractual rights as OLG's assignee and lienholder.  Instead, in its Complaint, OLG has taken the untenable position that Key has no right to dispose of the Vehicles and that Key is not entitled to recover the Vehicles at the end of their lease term or to re-sell or otherwise transfer the Vehicles to third-party purchasers to mitigate Key's loss when these Vehicles are returned early.  (See ¶¶ 12-13 of the Complaint, annexed hereto as Exhibit "1"; a copy of Key's Answer with Amended Counterclaims is annexed hereto as Exhibit "2").

10.    Based upon the clear and unambiguous language of the written agreements between Key and OLG, there are simply no genuine issues of fact to be tried, warranting entry of partial summary judgment in Key's favor and against OLG on Key's Fourth Amended Counterclaim for a declaratory judgment, declaring that: Key, as OLG's assignee and lienholder, has the right to recover possession and to dispose of the vehicles described in the Karpel Affidavit, whenever OLG would be or have been entitled to recover possession of such vehicles and to dispose of them.

11.    Accordingly, it is respectfully requested that Defendant's motion be granted in its entirety.

Dated: Garden City, New York
       May 1, 2008

                                             TERESE L. ARENTH

F:\Key Equipment Finance\Overseas\Docs\Arenth SJ Affirmation.Doc

5

**EXHIBIT 1**

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

OVERSEAS LEASE GROUP, INC.

### SUMMONS IN A CIVIL ACTION

V.

KEY GOVERNMENT FINANCE, INC.

CASE NUMBER: **08** **CV** **01696**

TO: (Name and address of Defendant)

Key Government Finance, Inc.
1000 S. McCaslin Boulevard
Superior, Colorado 80027

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

PAUL BATISTA, P.C.
26 Broadway — Suite 1900
New York, New York 10004

an answer to the complaint which is served on you with this summons, within _____30_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

(By) DEPUTY CLERK

DATE    February 20, 2008

JUDGE SCHEINDLIN          08 CV 01696

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

OVERSEAS LEASE
GROUP, INC.,                                    :

                              Plaintiff,         :        08 Civ.

          - against -                            :

KEY GOVERNMENT
FINANCE, INC.,

                              Defendant.

-------------------------------------------------------------------- x



         Plaintiff Overseas Lease Group, Inc., by and through its attorney, Paul

Batista, P.C., for its complaint against defendant Key Government Finance, Inc.,

respectfully alleges as follows:

### Parties

         1.     Plaintiff Overseas Lease Group, Inc. ("OLG") is a corporation

organized and existing under the laws of the State of Delaware.

         2.     Upon information and belief, defendant Key Government

Finance, Inc. ("Key") is a corporation organized and existing under the laws of the

State of Ohio with its principal office located at 1000 South McCaslin Boulevard,

Superior, Colorado 80027. Key regularly does business, and transacts business, in

the State of New York.

### Jurisdiction and Venue

         3.     This Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. §§ 1337 and 1367.

4.    Personal jurisdiction and venue in this District are proper, pursuant to 28 U.S.C. § 1391(b), because defendant is found in, has agents in, or transacts its business and affairs in the State of New York.

### Statement of Facts
### Common To All Causes of Action

A.    **The Business Relation
Between Plaintiff and the
U.S. Department of Defense**

5.    Plaintiff OLG is in the business of purchasing vehicles, including trucks and armored trucks, and leasing the vehicles primarily to the United States Department of Defense (the "Defense Department" or "DOD") for use in connection with United States military and antiterrorist activity in Afghanistan. To facilitate its relationship with DOD, plaintiff maintains an office and staff in Kabul, Afghanistan.

6.    Plaintiff OLG, which was awarded its contract by the DOD as a result of competitive bidding, has developed extensive business relationships with DOD personnel in the United States and Afghanistan. As explained in greater detail in the balance of this Complaint, defendant Key, which is a financing company, has interfered, and continues to interfere, in plaintiff's long-standing contract and business relations with the Defense Department. Moreover, as this Complaint will also describe, defendant Key has no reason, privilege or right to engage in the acts of interference which it continues to conduct and which jeopardize plaintiff's on-going business with the DOD.

7.    The underlying contract between the Defense Department and plaintiff was entered into on February 5, 2006 as contract number W91 B4M-06-

2

D-0001 (the "DOD Contract").  In effect, the DOD contract provides for the leasing by plaintiff for a five year term of vehicles owned by plaintiff to the Defense Department.  The DOD Contract involves and will involve over its five-year term several hundred armored and "soft" vehicles and substantially in excess of $25 million.

8.      The relationship between DOD and plaintiff has been developed and maintained since approximately late 2005 and early 2006 and continues to the present as an excellent and productive relationship.

9.      Defendant Key is not a party to OLG's DOD Contract, directly or indirectly, and has no contractual or business relationship with the Defense Department as it relates to OLG's DOD Contract.

**B.    The Assignment Agreement**
**Between Plaintiff and Defendant**

10.     Plaintiff OLG and defendant Key entered into an Assignment Agreement dated April 1, 2006 ("Assignment Agreement") under which plaintiff assigned to defendant "all amounts due and to become due under the [DOD Contract]..."  The Assignment Agreement, which is a non-recourse agreement, explicitly provided that Key purchased the lease payment streams of revenue from the Defense Department under the DOD Contract.  Subsequent correspondence from defendant limited the amount of such purchases to $25 million of lease payments.

11.     Plaintiff is not and never has been in default or breach of the Assignment Agreement.

3

12.    The Assignment Agreement does not transfer from OLG to Key any ownership or equity interest in the vehicles which are the subject of the DOD Contract. The Assignment Agreement provides that Key has a lien only on the OLG-owned vehicles covered by that agreement.

13.    Moreover, the underlying DOD Contract provides that the vehicles remain at all times the property of the plaintiff, which is the only entity entitled to recover the vehicles at the end of their lease term and to re-sell or otherwise transfer the vehicles to third-party purchasers, not to Key.

14.    Defendant has no role under the Assignment Agreement in the negotiating, purchasing, pricing, sale, re-lease or other transfer of the vehicles. Defendant's role is limited solely to the purchase of the first $25 million of the lease payment stream of revenue under the DOD Contract between OLG and the Defense Department. At Key's request, made immediately after the outset of the OGL-Key relationship, OLG's subsidiary established and maintains all of the monthly billing under the DOD Contract and resolves billing issues, if any, with DOD. Pursuant to a contract executed by and among OGL, Key, and the Defense Department, lease payments from DOD attributable to the lease revenue stream purchased by Key under the Assignment Agreement are deposited directly to the Key account number 329681039569 (the "Key Account").

15.    Plaintiff OLG has other financing sources, one of which has purchased separate lease payment streams under the same DOD Contract which are distinct from the payment streams purchased by Key. The payments purchased by the other financing source are directed to the Key Account.

4

### C.    Defendant's Acts of Interference

16.    Until recently, only plaintiff OLG has had contact with the Defense Department regarding the DOD Contract, the vehicles, and on-going business.    Among other things, plaintiff at all times has negotiated and dealt directly and exclusively with DOD personnel, including officers and enlisted personnel in the United States Armed forces, on an array of issues such as lease renewals for vehicles, lease extensions, the pricing of the leases, the billing of DOD for lease payments under the DOD Contract, the addition of vehicles, arrangements for inspection and repair of the vehicles, and the recovery and disposition of the vehicles as they come off-lease.

17.    In violation of the existing and future contract and business relations between OLG and the Defense Department, defendant Key has made direct contacts with DOD in Afghanistan and the United States regarding the DOD Contract and the vehicles.

18.    Since on or about January 1, 2008, defendant Key has, among other things, (1) contacted DOD officials in Afghanistan through defendant's local hirees who falsely represent themselves to be agents of OLG to obtain information regarding OLG's contract and business, without OLG's knowledge or consent and (2) asserted that Key has "sold" at least seven (7) of the vehicles owned by plaintiff to third parties, notwithstanding Key's full knowledge that those seven (7) vehicles are still under lease/contract with DOD and that those leases/contracts may be renewed by DOD pursuant to on-going negotiations between OLG and DOD.

19.    Moreover, defendant Key has retained an alleged "security" firm in Afghanistan and gained unauthorized and illegitimate access to a DOD

5

base in Afghanistan and OLG's contracting officer at DOD, seeking information with respect to OLG's contract and its business operations.

20.    Defendant also continues as of the date of the filing of this Complaint, and, unless restrained, will continue, to interfere in future orders by the DOD from plaintiff for many additional vehicles during the balance of the DOD Contract – that is, until 2011.

21.    Plaintiff has constantly and repeatedly demanded that defendant Key cease and desist completely from the acts identified in ¶¶ 16, 17, 18, 19, and 20 of this Complaint and in all other conduct by which defendant directly or indirectly has contacted the Defense Department or purports to act as legal owner of the vehicles.

22.    Defendant continues to engage in the contacts with DOD and other acts of interference.

### Count I
(For Temporary, Preliminary
and Permanent Injunction
Relief)

23.    Plaintiff repeats and realleges each and every allegation of ¶¶ 1-22, supra.

24.    Defendant Key's conduct as identified in this Complaint constitutes interference in OLG's existing and on-going business and contract relations with the Defense Department, including the DOD Contract.

25.    Defendant Key has no right or privilege to engage in the acts of interference, including the contacts and communications Key and its agents have initiated with DOD personnel.

26.    Unless restrained, defendant Key will continue to engage in the acts identified in this Complaint and in future acts constituting interference.

27.    Plaintiff OLG is not and has never been in default of any provision of the DOD Contract or the Assignment Agreement.

28.    Plaintiff has no adequate remedy at law.

29.    Defendant's conduct has already caused irreparable injury to plaintiff since DOD, in the period since the acts of interference began in January 2008, has raised questions concerning Key's contacts with DOD.    The acts identified in this Complaint will, unless restrained, adversely affect plaintiff's current dealings with DOD and its negotiations with DOD for the lease of hundreds of additional vehicles by the DOD from OLG.

## Count II
### (For Interference in Contract)

30.    Plaintiff repeats and realleges each and every allegation of ¶¶ 1-29, supra.

31.    Defendant's conduct has already inflicted substantial, but difficult to calculate, financial damage on plaintiff in its past, current, and future relations with DOD.

32.    By reason of the foregoing, plaintiff Overseas Lease has sustained damage in an amount to be calculated at trial but believed to exceed $30 million.

7

**Count III**
(For Breach of Contract)

33. Plaintiff repeats and realleges each and every allegation of ¶¶ 1-31, *supra*.

34. Defendant's conduct has constituted a material breach of the Assignment Agreement. By its conduct, Key has violated, *inter alia*, ¶7 of the Assignment Agreement by interfering with lease payment renewals through its actions or failures to act to cooperate with buyout pricing.

35. By reason of the foregoing, plaintiff has been injured in an amount to be determined at trial but believed to exceed $30 million.

WHEREFORE, plaintiff Overseas Lease Group, Inc. requests judgment:

(1) On Count I, entering temporary, preliminary, and permanent injunctive relief enjoining and restraining defendant Key from, among other things,

(A) contacting, directly or indirectly, any representative, officer or agent of the United States Department of Defense or of the United States military services with respect to plaintiff, the vehicles, and the DOD Contract;

(B) selling, or attempting to sell, or claiming to sell any vehicle covered by the DOD Contract;

(C) seizing, taking or disabling the movement of any vehicle covered by the DOD Contract; and

(D) (i) altering any arrangements, functions or procedures associated with the Key Account, (ii) failing to segregate and treat separately

8

proceeds paid to OGL by DOD into the Key Account for the benefit of OGL for repairs, damage, or destruction of vehicles, and (iii) interfering with any payments from DOD belonging to other financing sources which have contracts with OLG for separate and distinct revenue streams from DOD.

(2)    On Count II, damages in an amount to be determined at trial but believed to exceed $30 million.

(3)    On Count III, damages in an amount to be calculated at trial but believed to exceed $30 million.

(4)    Such other of further relief as the Court deems just and proper.

Dated:    New York, New York
          February 20, 2008

PAUL BATISTA, P.C.

By _____

PAUL BATISTA (PB8717)
Attorney for Plaintiff
Overseas Lease Group, Inc.
26 Broadway – Suite 1900
New York, New York 10004
(212) 980-0070 (Tel)
(212) 344-7677 (Fax)

9

JS 44C/SDNY
REV. 12/2005

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**

OVERSEAS LEASE GROUP, INC.

**DEFENDANTS**

KEY GOVERNMENT FINANCE, INC.

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER**

PAUL BATISTA, P.C.
26 Broadway N.Y.N.Y 10004
212 980 0070

**ATTORNEYS (IF KNOWN)**

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

Action for Breach of Contract

Has this or a similar case been previously filed in SDNY at any time? No [X]  Yes? [ ]  Judge Previously Assigned

If yes, was this case Vol.[ ]  Invol.[ ]  Dismissed. No [ ]  Yes [ ]  If yes, give date  N/A  & Case No.

**(PLACE AN [x] IN ONE BOX ONLY)**                    **NATURE OF SUIT**

**ACTIONS UNDER STATUTES**

### TORTS

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL. VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[X] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**

[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**

[ ] 610 AGRICULTURE
[ ] 620 FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**

[ ] 861 MIA (1395FF)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC (405(g))
[ ] 863 DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES
[ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**

[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE/ICC RATES/ETC
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 891 AGRICULTURE ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES
[ ] 890 OTHER STATUTORY ACTIONS

### ACTIONS UNDER STATUTES

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**CIVIL RIGHTS**

[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**

[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ N/A  OTHER _____

Check YES only if demanded in complaint
JURY DEMAND: [ ] YES [X] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:  N/A

JUDGE _____  DOCKET NUMBER _____

NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

(SEE REVERSE)

**(PLACE AN x IN ONE BOX ONLY)**    ORIGIN

[X] 1 Original Proceeding  [ ] 2a. Removed from State Court  [ ] 2b. Removed from State Court AND at least one party is a pro se litigant  [ ] 3 Remanded from Appellate Court  [ ] 4 Reinstated or Reopened  [ ] 5 Transferred from (Specify District)  [ ] 6 Multidistrict Litigation  [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

**(PLACE AN x IN ONE BOX ONLY)**    BASIS OF JURISDICTION

[ ] 1 U.S. PLAINTIFF  [ ] 2 U.S. DEFENDANT  [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)  [X] 4 DIVERSITY

*IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1332, 1441)*

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 | [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 | [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 | [ ]5 |
| CITIZEN OF ANOTHER STATE | [X]2 | [X]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 | [ ]4 | FOREIGN NATION | [ ]6 | [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

1719 Stat Route 10
Suite 235
PARSIPPANY, N. J. 07054

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

1000 South McCarlin Blvd.
Superior, CO 80027

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:  THIS ACTION SHOULD BE ASSIGNED TO:  [ ] WHITE PLAINS  [X] FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION.)

DATE 2/20/08  SIGNATURE OF ATTORNEY OF RECORD  Pd B X, X

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[X] YES (DATE ADMITTED Mo. 3 Yr. 75)
Attorney Bar Code # PB 8717

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

OVERSEAS LEASE GROUP, INC.,                                        08 Civ. 01696

                                    Plaintiff,

                    - against -                                    **ANSWER, AFFIRMATIVE**
                                                                   **DEFENSES AND AMENDED**
KEY GOVERNMENT FINANCE, INC.,                                      **COUNTERCLAIMS**

                                    Defendant.
-----------------------------------------------------------x

   Defendant Key Government Finance, Inc. ("Key"), by and through its attorneys, Moritt

Hock Hamroff & Horowitz LLP, as and for its Answer to the Complaint of Plaintiff Overseas

Lease Group, Inc. ("OLG") dated February 20, 2008 (the "Complaint") hereby alleges as

follows:

AS TO THE PARTIES

   1.  Denies knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in paragraph "1" of the Complaint.

   2.  Admits the allegations contained in paragraph "2" of the Complaint, except states

that Key is a corporation organized and existing under the laws of the State of Colorado.

AS TO JURISDICTION AND VENUE

   3.  Denies the allegations contained in paragraph "3" of the Complaint and further

states that the allegations contained in paragraph "3" call for a legal conclusion to which no

response is required.

   4.  Denies allegations contained in paragraph "4" of the Complaint and further states

that the allegations contained in paragraph "4" call for a legal conclusion to which no response is

required.

## AS TO STATEMENT OF FACTS
## <u>COMMON TO ALL CAUSES OF ACTION</u>

5.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "5" of the Complaint, except admits that Key is aware that OLG purchases vehicles for lease to the United States Department of Defense (the "DOD") for use in Afghanistan.

6.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "6" of the Complaint, except admits that Key is a financing company and denies the allegations contained in paragraph "6" to the extent that they allege any wrongdoing and interference by Key in OLG's contract or business relations with the Defense Department.

7.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "7" of the Complaint, except admits that Key is aware of OLG's contract with the Defense Department, avers that the DOD Contract was for a one year term with five option years, and respectfully refers the Court to the DOD Contract referenced in paragraph "7" for the additional terms, conditions and contents thereof.

8.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "8" of the Complaint.

9.    Admits the allegations contained in paragraph "9" of the Complaint to the extent that Key is not a party to OLG's DOD Contract but denies the balance of the allegations and avers that Key has an assignment of all monies due or to become due under the DOD Contract, as well as OLG's rights and interests thereunder.

10.    Admits the allegations contained in paragraph "10" of the Complaint to the extent the parties entered into the Assignment Agreement and respectfully refers the Court to the

2

Assignment Agreement referenced therein for the terms, conditions and contents thereof. A copy of the Assignment Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

      11.     Denies the allegations contained in paragraph "11" of the Complaint.

      12.     Admits the allegations contained in paragraph "12" of the Complaint and respectfully refers the Court to the Assignment Agreement referenced therein for the terms, conditions and contents thereof. Key further states that, by written agreements, including but not limited to, by written agreement dated May 18, 2006, OLG sold and assigned to Key "good and unencumbered title" to the vehicles leased by OLG to the DOD pursuant to the DOD Contract.

      13.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph "13" of the Complaint and respectfully refers the Court to the DOD Contract referenced therein for the terms, conditions and contents thereof.

      14.     Denies the allegations contained in paragraph "14" of the Complaint, except admits that lease payments from DOD attributable to the lease revenue stream purchased by Key under the Assignment Agreement are deposited directly to the Key Account and further respectfully refers the Court to the Assignment Agreement and all documents executed in connection therewith for the terms, conditions and contents thereof.

      15.     Admits that Key is aware of at least one other financing source and that Key services payments for the benefit of that source, and denies knowledge or information sufficient to form a belief as to the truth or falsity of the balance of the allegations contained in paragraph "15" of the Complaint.

      16.     Denies the allegations contained in paragraph "16" of the Complaint.

      17.     Admits that Key retained a consultant who has made contacts with the DOD, and denies the remaining allegations contained in paragraph "17" of the Complaint.

3

18.    Denies the allegations contained in paragraph "18" of the Complaint.

19.    Admits that Key has retained a consultant who has been in contact with the DOD, and denies the remaining allegations contained in paragraph "19" of the Complaint.

20.    Denies the allegations contained in paragraph "20" of the Complaint.

21.    Denies the allegations contained in paragraph "21" of the Complaint.

22.    Denies the allegations contained in paragraph "22" of the Complaint.

## AS TO COUNT I

23.    Key repeats and realleges its responses to paragraphs "1" through "22" of the Complaint as if more fully set forth herein.

24.    Denies the allegations contained in paragraph "24" of the Complaint.

25.    Denies the allegations contained in paragraph "25" of the Complaint.

26.    Denies the allegations contained in paragraph "26" of the Complaint.

27.    Denies the allegations contained in paragraph "27" of the Complaint.

28.    Denies the allegations contained in paragraph "28" of the Complaint and further states that the allegations contained in paragraph "28" call for a legal conclusion to which no response is required.

29.    Denies the allegations contained in paragraph "29" of the Complaint.

## AS TO COUNT II

30.    Key repeats and realleges its responses to paragraphs "1" through "29" of the Complaint as if more fully set forth herein.

31.    Denies the allegations contained in paragraph "31" of the Complaint.

32.    Denies the allegations contained in paragraph "32" of the Complaint.

4

## AS TO COUNT III

33.    Key repeats and realleges its responses to paragraphs "1" through "32" of the Complaint as if more fully set forth herein.

34.    Denies the allegations contained in paragraph "34" of the Complaint.

35.    Denies the allegations contained in paragraph "35" of the Complaint.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

36.    The Complaint fails to state a claim upon which relief may be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

37.    OLG's claims are barred, in whole or in part, by the doctrines of laches, estoppel or waiver, and to the extent that OLG consented to or acquiesced in any of the acts complained of in the Complaint.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

38.    OLG's claims are barred, in whole or in part, by the doctrine of unclean hands.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

39.    OLG's claims are barred, in whole or in part, by documentary evidence.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

40.    Any injury or damages alleged by OLG were in whole or in part the result of OLG's own culpable conduct.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

41.    Any injury or damages alleged by OLG were in whole or in part the result of OLG's breach of contract and/or its negligence, acts or omissions.

### AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

42.    The Complaint fails to set forth adequate and appropriate grounds for injunctive relief.

5

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE
## AND FIRST COUNTERCLAIM

43.      Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "42" as if more fully set forth herein.

44.      At the time that OLG presented the DOD Contract to Key for funding, OLG maintained an office and staff in Afghanistan and the Vehicles were arranged by OLG to be purchased from a dealer for delivery in Afghanistan.

45.      OLG was, and is, very familiar with the market for the Vehicles in Afghanistan and, as alleged in the Plaintiff's Complaint, OLG solely conducted all dealings with the DOD and jealously protected that arrangement.

46.      In contrast, Key has always been a Colorado corporation that, although it conducts financing activities in all 50 states and several countries, has never conducted business activities in Afghanistan, and is not familiar with that market. Accordingly, Key reasonably relied upon OLG's expertise in the Afghanistan market and the material representations made by OLG in its efforts to induce Key to fund the transaction subject of the DOD Contract, and both parties were aware of that reliance.

47.      In an effort to induce Key's agreement to fund the transaction subject of the DOD Contract, OLG made the following material representations to Key, among others:

a.      that the Vehicles consisting of "soft vehicles" had a fair market value in Afghanistan, at the time of the transaction, of $65,000.00 and a cost ranging between $73,740.00 and $95,688.00 per Vehicle, and that the Vehicles consisting of "armored vehicles" had a fair market value in Afghanistan, at the time of the transaction, ranging between $282,000.00 and $329,328.00 per Vehicle (although the precise number of Vehicles to be leased to the DOD would be determined at a later date);

6

b.      that, in the event that the DOD did not renew some or all of the Task Orders, the Vehicles would be returned to OLG and could readily be remarketed by OLG in the marketplace. It was implicit in that representation that the fair market value of the Vehicles at the time of the remarketing would be a reasonably depreciated value from the value as leased to the DOD.

48.      OLG's representation as to the fair market value of the Vehicles was a material inducement to Key in its decision to approve the transaction and Key approved the transaction for funding, in reliance upon those representations.

49.      In reliance upon OLG's representations, Key paid a total of $26,231,059.00 to OLG.

50.      Thereafter, on or about September 11, 2007, the DOD gave notice of non-renewal of Task Order #31 and indicated an intent to non-renew some or all of the other remaining Task Orders. As a part of its efforts to determine its alternatives to mitigate its resulting losses, Key obtained documents from OLG's files and retained an independent consultant in Afghanistan to, among other things, determine the market value for the Vehicles and to identify prospective buyers for the Vehicles.

51.      As a result of those efforts by Key, Key determined that OLG's material representations stated above were false in that:

a.      OLG charged Key for the Vehicles consisting of "soft vehicles" that were leased to the DOD for between $73,740.00 and $95,688.00 each but OLG had, in actuality, paid only between $23,212.00 and $32,334.00 per each Vehicle;

b.      OLG's lease pricing to the DOD for those same Vehicles, at approximately $95,000 per Vehicle, was far in excess of the market value pricing; and

7

c.    At the time of the DOD's notice of non-renewal, only 2 years after the date that the Vehicles were first leased to the DOD, the Vehicles had a fair market value of only $25,000.00.

52.    By reason of the foregoing, Key's losses arising out of this transaction are far in excess of that which was estimated by Key as a "worst case scenario" at the time that the Assignment Agreement was entered into based upon the information provided and material representations made by OLG to Key.

53.    Had Key been aware of the extent of its loss exposure at the time of the Assignment Agreement, it would not have entered into that Agreement.

54.    By reason of the foregoing, Key relied upon OLG's representations to its detriment and has suffered financial damages as a direct result thereof.

55.    Accordingly, Key requests rescission of the Assignment Agreement and a return of the full amount of the funding paid to OLG in reliance upon the stated material misrepresentation.

### AS AND FOR A NINTH AFFIRMATIVE DEFENSE
### AND SECOND COUNTERCLAIM

56.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "55" as if more fully set forth herein.

57.    Upon information and belief, OLG and the United States Department of Defense (the "DOD") entered into a certain contract, Contract No. W91B4M-06-D-0001 (the "DOD Contract") dated as of February 5, 2006, pursuant to which OLG leased to the DOD and the DOD leased from OLG, the property described therein and on certain "Task Orders" issued by the DOD consistent therewith (the "Vehicles").

8

58.    Pursuant to various Assignment of Proceeds Letters thereafter issued by OLG to Key in connection with the DOD Contract, OLG invoiced Key and Key funded the proceeds due under invoice for payment of the Vehicles leased by OLG to the DOD.

59.    By Assignment Agreement dated as of April 1, 2006 (the "Assignment Agreement") by and between OLG, as seller, and Key, as purchaser, OLG sold, assigned, transferred and set over unto Key all of OLG's "right, title and interest in and to (but none of its obligations under) the [DOD Contract]" and

> "all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by [the DOD], and a first priority lien in favor of Purchaser in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract, including (without limitation) the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement".

See Exhibit "A", attached hereto, at ¶ 2.

60.    In addition to obtaining assignment of all of OLG's rights and remedies under the DOD contract, pursuant to Section 6 of the Assignment Agreement, Key "shall have all of the rights of [OLG] under the [DOD] Contract, but none of [OLG's] obligations thereunder...".

61.    Upon information and belief, in accordance with the terms of the DOD Contract, the DOD provided OLG with, among others, Task Order #31, pursuant to which OLG leased to the DOD and the DOD leased from OLG seventy (70) Vehicles identified therein (the "TO #31 Vehicles").

62.    Upon information and belief, the DOD's lease of the TO #31 Vehicles expired on November 30, 2007.

9

63.    Upon information and belief, the DOD elected not to renew its lease of the TO #31 Vehicles which expired on November 30, 2007 and returned said Vehicles to OLG on or about December 1, 2007 in accordance with the DOD Contract.

64.    Upon the expiration of TO # 31, Key contacted OLG to confirm that OLG would cooperate and deliver title to the TO #31 Vehicles so that Key, as OLG's assignee, could dispose of the Vehicles in the event that Key found buyers through its own efforts, and OLG verbally agreed to do so.  Relying upon OLG's agreement, Key undertook efforts to sell or remarket the TO #31 Vehicles.

65.    In or about February 2008, Key successfully located a prospective buyer for seven (7) of the TO #31 Vehicles.

66.    In or about February 2008, Key informed OLG that it had located a prospective buyer for seven (7) of the TO #31 Vehicles.

67.    Key has since located a prospective buyer for seventy (70) Toyota Land Cruisers, which are comprised in part from TO #31 and Task Order #25 (which has also expired).

68.    Despite Key's demand therefor, and contrary to its prior verbal agreement, OLG has intentionally failed and refused to turn over the titles for the Vehicles, for which Key has located a prospective buyer.

69.    OLG's failure and refusal to turn over the titles for the Vehicles is without cause or justification.

70.    OLG's failure and refusal to turn over the titles for the Vehicles is in breach of its verbal agreement and in derogation of Key's rights as OLG's assignee, as lienholder and/or as title owner.

71.    OLG's failure and refusal to turn over the titles for the Vehicles is in derogation of Key's rights under the Assignment Agreement to remarket the Vehicles.

10

72.    OLG's aforesaid conduct has interfered, and continues to interfere, with Key's contractual and business relations with the prospective buyer for the Vehicles.

73.    OLG's aforesaid conduct has caused and will continue to cause financial damage to Key.

74.    By reason of the foregoing, Key has sustained damages in an amount to be determined at trial, but in no event less than $1,925,000.00.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE
## AND THIRD COUNTERCLAIM

75.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "74" as if more fully set forth herein.

76.    OLG agreed that it would provide for the deinstallation and removal of the equipment in the event of early termination of the DOD Contract and that it would assist Key through a best efforts remarketing covenant.

77.    OLG's aforesaid conduct is in breach of its best efforts remarketing covenant to Key.

78.    By reason of the foregoing, Key has sustained damages in an amount to be determined at trial, but in no event less than $1,925,000.00.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE
## AND FOURTH COUNTERCLAIM

79.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "78" as if more fully set forth herein.

80.    Pursuant to Section 2 of the Assignment Agreement, OLG granted Key a "first priority lien in favor of [Key] in and to the [Vehicles]..."and assigned to Key "all of [OLG's] rights and remedies under the [DOD] Contract...".

11

81.    Pursuant to Section 6 of the Assignment Agreement, Key "shall have all of the rights of [OLG] under the [DOD] Contract, but none of [OLG's] obligations thereunder...".

82.    OLG also sold to Key "good and unencumbered title" to the Vehicles leased to the DOD under the DOD Contract.

83.    Upon information and belief, the DOD's lease of the TO #31 Vehicles expired on November 30, 2007 and the DOD did not exercise its option to renew TO #31.

84.    Upon information and belief, Task Orders pertaining to leases of over 200 additional Vehicles in which Key has a security interest and/or in which OLG sold and assigned title to Key are due to expire in the upcoming months and the DOD has indicated that it is not likely to exercise its options to renew those Task Orders for part or all of their remaining terms.

85.    Whether as OLG's assignee, lienholder and/or title owner, Key is entitled to possession of the Vehicles and to dispose of them.

86.    Despite's Key's request for the titles to the Vehicles from OLG (to facilitate the sale of the Vehicles), OLG has failed and refused to deliver the titles, and has asserted, in contravention of its contractual undertakings and as indicated in paragraphs 12 and 13 of the Complaint, that Key has no right to dispose of the Vehicles and OLG is not obligated to deliver the titles to Key.

87.    A justiciable controversy exists concerning Key's rights to possession of the Vehicles and its rights to dispose of those Vehicles, as OLG's assignee or title owner, upon the DOD's termination, non-renewal or default under the DOD Contract, and Key has no adequate remedy at law. Unless this Court issues the declaration requested herein, Key stands to suffer direct and immediate material financial loss as a result of OLG's failure and refusals to permit Key to dispose of the Vehicles and/or to deliver title to Key.

12

88.    By reason of the foregoing, Key hereby requests a declaration from this Court that Key, as OLG's assignee, has the right, as either assignee, lienholder or title owner, to recover possession of the Vehicles and to dispose of them, whenever OLG would have been entitled to recover possession of the Vehicles and to dispose of them.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE
## AND FIFTH COUNTERCLAIM

89.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "88" as if more fully set forth herein.

90.    Upon information and belief, upon the DOD's termination of the lease of the TO #31 Vehicles and its return of those Vehicles to OLG, OLG submitted a repair bill for the TO #31 Vehicles to the DOD in excess of $1 million.

91.    Upon information and belief, OLG deliberately concealed the repair bill from Key and Key obtained a copy of the repair bill from its outside consultant.

92.    Upon information and belief, the amount of the repair bill from OLG is woefully excessive and without cause or justification.  In fact, upon Key's information and belief, the true cost of the repairs for the TO #31 Vehicles is actually a few hundred dollars per vehicle, and totaling no more than $10,000.00.

93.    Upon information and belief, the DOD has disputed, and continues to dispute, the amount of the repair bill.  Upon information and belief, the DOD has seriously considered the option of purchasing some or all of the Vehicles.

94.    Upon information and belief, OLG has taken the position that the TO #31 Vehicles remain under lease by the DOD pursuant to the DOD Contract unless and until the full $1 million repair bill has been paid by the DOD.

13

95.    OLG's actions have unjustifiably and improperly prevented the DOD from purchasing the Vehicles, and interfered, and continue to interfere, with Key's rights to sell or remarket the TO #31 Vehicles.

96.    OLG's actions have caused and will continue to cause financial damage to Key.

97.    By reason of the foregoing, Key has sustained damages in an amount to be determined at trial, but in no event less than $1,925,000.00.

### AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE
### AND SIXTH COUNTERCLAIM

98.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "97" as if more fully set forth herein.

99.    Pursuant to Section 3(n) of the Assignment Agreement, OLG, as seller, among other things, represented and warranted to Key, as purchaser, that "Seller has done and shall do nothing and knows of no facts or circumstances which would (i) materially impair the validity or value of the Contract, any rights created thereby, the Property or this Agreement...".

100.    Pursuant to Section 8(e) of the Assignment Agreement, OLG, as seller, among other things, covenanted and agreed that "Seller will not, without Purchaser's consent, ... take any action which impairs the rights or interest of Purchaser with respect to the Contract".

101.    By reason of OLG's actions described in paragraphs 90-94 above, from December 2007 to date, Key has not received any lease payments attributable to the TO #31 Vehicles, to which lease payments Key is entitled pursuant to the DOD Contract and the Assignment Agreement. Upon information and belief, the monthly lease payment for the TO #31 Vehicles is in an amount ranging from $1,545.00 to $2,316.00 per month per Vehicle (depending upon the Vehicle make).

14

102.    By reason of OLG's aforesaid actions, OLG has interfered with Key's entitlements and rights under the DOD Contract and the Assignment Agreement.

103.    OLG's actions are in breach of its representations, warranties and covenants to Key.

104.    By reason of OLG's breach, Key has suffered damages in an amount to be determined at trial, but in no event less than $512,168.00.

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE
## AND SEVENTH COUNTERCLAIM

105.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "104" as if more fully set forth herein.

106.    Pursuant to Section 7 of the Assignment Agreement, OLG, as seller, agreed to indemnify and save Key, as purchaser, "harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of action and judgments of any nature arising out of, or resulting from, Seller's breach of the covenants, representations and warranties contained in this Agreement".

107.    By reason of the foregoing, Key is entitled to such costs and expenses, including attorneys' fees, as may be determined by this Court.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE
## AND EIGHTH COUNTERCLAIM

108.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "107" as if more fully set forth herein.

109.    Pursuant to Assignment of Proceeds letters, including but not limited to, letters dated May 30, 2006, May 31, 2006, June 14, 2006, and July 21, 2006, respectively, OLG invoiced Key and Key funded the proceeds due for payment of the Vehicles leased under the DOD Contract (the "Invoices").

15

110.    Pursuant to the Invoices, Key paid funding proceeds in the total amount of $26,231,059.00.

111.    In making payment of said funding proceeds, Key relied upon OLG with regard to OLG's representation to Key of the fair market value of the Vehicles, based upon OLG's expertise and experience in the leasing of vehicles for use in connection with the United States military, and in Afghanistan in particular.

112.    Key relied upon OLG's representations as a material inducement for entering into the Assignment Agreement and contracts related thereto.

113.    Upon information and belief, OLG's representations were false and misleading.

114.    Upon information and belief, OLG substantially overcharged Key for the Vehicles. Specifically, upon information and belief, OLG purchased the Vehicles consisting of "soft vehicles" for the following amounts and then invoiced Key as follows:

| Vehicle | Amount paid by OLG | Amount invoiced to Key |
|---|---|---|
| Toyota Hilux | $24,005.00 | $75,036.00 |
| Mitsubishi Minibus | $19,847.00 | $64,992.00 |
| Mitsubishi Pajero | $23,212.00 | $73,740.00 |
| Toyota Land Cruiser | $32,334.04 | $95,688.00 |

115.    The amounts that OLG paid for the Vehicles consisting of "armored vehicles" is presently unknown to Key. However, upon information and belief, Key believes that OLG substantially overcharged Key for those Vehicles as well.

116.    By reason of the foregoing, Key relied upon OLG's representations to its detriment and has suffered financial damages as a direct result thereof.

117.    Pursuant to the Assignment Agreement and contracts related thereto, OLG owed Key a fiduciary duty of good faith and fair dealing.

118.    By virtue of the aforesaid, OLG breached its fiduciary duty of good faith and fair dealing.

16

119.    By virtue of the aforesaid, Key has been damaged in an amount to be determined at trial, but in no event less than $26,231,059.00.

### AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE
### AND NINTH COUNTERCLAIM

120.    Key repeats, reiterates and realleges the responses and allegations set forth in paragraphs "1" through "119" as if more fully set forth herein.

121.    Upon information and belief, upon the expiration of the lease for the TO #31 Vehicles on November 30, 2007, OLG made attempts to remarket the TO #31 Vehicles.

122.    In connection with OLG's attempts to remarket the TO #31 Vehicles, OLG presented Key with offers from prospective buyers to purchase all or some of the TO #31 Vehicles.

123.    Upon information and belief, the offers presented to Key by OLG were far below market value.

124.    Upon information and belief, OLG presented Key with offers from prospective buyers that were far below market value with the intention of then re-selling or re-leasing the Vehicles to other prospective buyers or lessees at a much higher price for OLG's own benefit.

125.    Upon the expiration of the leases for thirteen (13) Vehicles subject of Task Order Nos. 2, 5, 8, 10 and 12, OLG purchased those Vehicles from Key for the total sum of $185,762.00 (the "Additional Vehicles").

126.    OLG purchased the Additional Vehicles from Key for the total sum of $185,762.00, based upon OLG's representations to Key as to the fair market value of the Additional Vehicles.

17

127.    Upon information and belief, OLG then re-leased the Additional Vehicles for a substantial profit to OLG that was far in excess of the alleged fair market value represented to Key and paid by OLG to Key for the Additional Vehicles.

128.    By virtue of the aforesaid, OLG breached its fiduciary duty to Key of good faith and fair dealing under the Assignment Agreement and contracts related thereto.

129.    By virtue of the aforesaid, Key has been damaged in an amount to be determined at trial.

WHEREFORE, Defendant prays for judgment as follows:

A.      dismissing the Complaint in its entirety with prejudice;

B.      on its First Counterclaim, granting rescission of the Assignment Agreement and awarding a return of the full amount of funding paid by Defendant to Plaintiff;

C.      on its Second Counterclaim, awarding Defendant damages in an amount to be determined at trial, but in no event less than $1,925,000.00;

D.      on its Third Counterclaim, awarding Defendant damages in an amount to be determined at trial, but in no event less than $1,925,000.00;

E.      on its Fourth Counterclaim, declaring that Defendant, as Plaintiff's assignee, has the right, as either lienholder or title owner, to recover possession of the Vehicles and to dispose of them, whenever Plaintiff would be entitled to recover possession of the Vehicles and to dispose of them;

F.      on its Fifth Counterclaim, awarding Defendant damages in an amount to be determined at trial, but in no event less than $1,925,000.00;

G.      on its Sixth Counterclaim, awarding Defendant damages in an amount to be determined at trial, but in no event less than $512,168.00;

18

H.    on its Seventh Counterclaim, awarding such costs and expenses, including

attorneys' fees, as may be determined by this Court;

I.    on its Eighth Counterclaim, awarding damages in an amount to be determined at

trial, but in no even less than $26,231,059.00;

J.    on its Ninth Counterclaim, awarding damages in an amount to be determined at

trial; and

K.    for such other and further relief as this Court may deem just and proper.

Dated: Garden City, New York
       May 2, 2008

                          MORITT HOCK HAMROFF & HOROWITZ LLP
                          Attorneys for Defendant


                          By: _____
                              Marc L. Hamroff, Esq. (MH-9283)
                              Terese L. Arenth, Esq. (TA-5167)
                          400 Garden City Plaza
                          Garden City, New York 11530
                          (516) 873-2000

F:\Key Equipment Finance\Overseas\Docs\Answer with Amended Counterclaims.doc

**Exhibit A**

## ASSIGNMENT AGREEMENT

**THIS ASSIGNMENT AGREEMENT** (this "Agreement") is made as of April 1, 2006 by and between Overseas Lease Group, Inc., a Delaware corporation with its principal office at 31 Dehart Street, Morristown, NJ 07960-5211 ("Seller") and **KEY GOVERNMENT FINANCE, INC.,** with its principal office at 1000 South McCaslin Blvd. Superior, CO 80027, its successors and assigns ("Purchaser").

## INTRODUCTION:

Seller, and United States Department of Defense (the "User") have entered into that certain Contract (Contract No. W91B4M-06-D-0001), dated as of February 05, 2006 (the "Contract"), pursuant to which Seller has leased to the User, and the User has leased from Seller, the property described therein (the "Property"). Seller desires to sell, and Purchaser is willing to purchase, the Assigned Interest (as hereinafter defined).

**Section 1.    Assignment.** NOW, THEREFORE, in consideration of the covenants, warranties and representations hereinafter set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser agree as follows: FOR VALUE RECEIVED, including the payment by Purchaser of $460,502.46 due at closing (the "Purchase Price"). Seller does hereby sell, assign, transfer and set over unto Purchaser all of Seller's right, title and interest in and to (but none of its obligations under) the Assigned Interest.

**Section 2.    Assigned Interest.** As used herein, the term "Assigned Interest" shall mean the Contract and all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by User, and a first priority lien in favor of Purchaser in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract , including (without limitation) the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement. As used herein, the term "Contract" shall mean the Contract, together with all documents executed in connection with the Contract, including, without limitation, all documents listed on attached Schedule A.

**Section 3.    Representations and Warranties.** In order to induce Purchaser to enter into this Agreement and to accept the sale of the Assigned Interest, and security interest in the Property, Seller hereby represents and warrants to Purchaser that:

(a)  the Contract was duly authorized and properly executed and delivered by the Seller and this Agreement was duly authorized and properly executed and delivered by Seller, and each is in full force and effect and represents a valid and enforceable obligation of Seller in accordance with its terms, subject to bankruptcy, insolvency or similar laws then in effect;

(b)  the number and amount of the unpaid payments due under the Contract as of the date hereof are as stated in Exhibit 1 attached hereto;

(c)  no security deposit or prepayment of payments has been paid to Seller by the User or any third party in connection with the Contract, and Seller has not granted, and will not grant, to the User any allowance, credit memo, adjustment, or enter into any settlement, modification or amendment of the Contract;

(d)  attached hereto is a true, correct, and complete copy of the Contract, and the Contract is the sole and entire understanding and agreement between the User and Seller and there are no other agreements between them with respect to the Contract or the Property;

(e)  all original counterparts of the Contract have been delivered to Purchaser;

(f)  to the best of Seller's knowledge all of the Property has been accepted by the User in a condition satisfactory to the User in all respects and the Property is in possession of the User and, Seller has no knowledge of any casualty loss with respect to the Property;

(g)  to the best of Seller's knowledge the Contract is free of any setoffs, counterclaims and defenses of any kind whatsoever;

(h)  to the best of Seller's knowledge no event of default or event of non-appropriation has occurred and is continuing under the Contract , and no event has occurred which, with the lapse of time or the giving of notice, or both, would constitute an event of default or event of non-appropriation under the Contract;

(i)  all representations and duties of Seller intended to induce the User to enter into the Contract, whether required by the Contract or otherwise, have been fulfilled and Seller is not in default with respect to any of its obligations under the Contract, nor has any event occurred and continued which with the passing of time or the giving of notice would constitute such a default by Seller;

(j)  Seller has fully complied with all applicable federal and state laws, rules and regulations and has made all disclosures required by law in connection with the transactions contemplated by the Contract, prior to the consummation of the Contract;

(k)  to the best of Seller's knowledge after due inquiry, all credit data submitted to Purchaser and all information set forth in the User's application for entry into the Contract is true and correct in all material respects;

(l) Seller shall use proceeds hereof to pay supplier the purchase price the Property and all taxes required to be paid in connection with the acquisition of the Property, and Seller is the sole owner of and has good and marketable title to the Property and Assigned Interest, free and clear of all liens and encumbrances of any nature whatsoever, other than the interest of the User under the Contract;

(m) no prohibition exists, in the Contract or otherwise, and no consent of the User or any other party is required (other than consent which has already been provided), to the making of this Assignment;

(n) Seller has done and shall do nothing and knows of no facts or circumstances which would (i) materially impair the validity or value of the Contract, any rights created thereby, the Property or this Agreement, or (ii) materially impair the ability of Seller to perform its obligations under the Contract or this Agreement;

(o) all taxes due and payable by Seller as of the date hereof with respect to the Property and Assigned Interest have been, or will be paid;

(p) this Assignment vest in Purchaser full right, title and interest and legal title of Seller in and to the Assigned Interest, free and clear of all claims, liens, security interests and encumbrances of any kind or character, except the right of User under the Contract, and the same shall be and remain free of all claims, liens, security interests and encumbrances arising through any act or omission of Seller or any person claiming by, through or under it;

(q) the execution by Seller of this Agreement and of the Contract to which it is a party, and its participation in the transaction specified herein, is in its ordinary course of business and within the scope of its existing corporate authority and Seller has full power and authority to enter into, and has taken all necessary action to authorize the execution and delivery of the Contract and, this Agreement and to perform the terms and conditions hereof and thereof;

(r) neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby will conflict with or result in a breach of any of the terms, conditions or provisions of the organizational documents of Seller, or of any law or regulation, order, writ, injunction or decree of any court or government instrumentality, or of any agreement or instrument to which Seller is a party or by which it or to which it or its assets is subject;

(s) intentionally left blank

(t) the Contract constitutes a separate instrument of lease, enforceable by Purchaser without regard to other equipment schedules executed pursuant to the Contract.

Seller's representations and warranties under this Section shall be continuing representations and warranties made as of the date of this Agreement and shall survive the assignment of the Assigned Interest to Purchaser.

**Section 4.    Intentionally left blank.**

**Section 5.    Duties of Seller at Closing.** Seller shall deliver to Purchaser, unless waived in writing by Purchaser: (a) all original counterparts of the Contract, duly executed by the User thereunder, and the completion, installation or acceptance certificate by whatever name executed by such User with respect to the Property leased under the Contract; (b) a duly executed notice of assignment; (c) such other documents and certificates as Purchaser may reasonably request; and (i) such documents and instruments (if any) as reasonably may be required by Purchaser to effect the grant of security interest by Seller to Purchaser in the Property and assignment by Seller to Purchaser of any warranties solely to the extent applicable to the Property.

**Section 6.    Seller's Obligations Under the Contract.** Purchaser shall have all of the rights of the Seller under the Contract, but none of Seller's obligations thereunder. This Agreement (and the assignment of such rights) shall not relieve Seller of any of its obligations under the Contract and Seller shall continue to perform all such obligations. Purchaser shall not be obligated to assume, and by its acceptance of this assignment shall not be deemed to have assumed, any of Seller's obligations under the Contract.

**Section 7.    Indemnification.** Seller hereby agrees to indemnify and save Purchaser harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Seller's breach of the covenants, representations and warranties contained in this Agreement. Purchaser will indemnify and save Seller harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Purchaser's actions or failure to act in connection with the Assigned Interests. The indemnity set forth in this Section shall survive the expiration or earlier termination of this Agreement or the Contract with respect to acts or events occurring or alleged to have occurred prior to such expiration or early termination.

**Section 8.    Covenants and Agreements.** Seller hereby covenants and agrees with Purchaser as follows:

(a) Purchaser may endorse Seller's name on any remittances received from the User with respect to the Contract and/or the Property.

(b) Seller shall pay or cause to be paid by the User all personal property ... es, including tangible and intangible personal property, license, privilege, documentary, sales and other like taxes or charges or taxes in lieu thereof, applicable to any of the transactions contemplated by this Agreement, and which have been imposed, assessed or accrued at or prior to the time of assignment against the Property, this Contract or Purchaser, except for taxes measured or imposed on the net income of Purchaser.

(c) Seller shall, from time to time at the request of Purchaser, execute and deliver such further acknowledgments, agreements and instruments of assignment, transfer and assurance, and do all such further acts and things as may be necessary or appropriate in the reasonable opinion of Purchaser to give effect to the provisions hereof and to more perfectly confirm the rights, titles and interests hereby assigned and transferred to Purchaser.

(d) Seller shall notify Purchaser promptly upon obtaining knowledge of any default in the performance of the User's obligation under the Contract, including, without limitation, the payment of sums due under the Contract.

(e) Seller will not, without Purchaser's prior written consent: solicit or accept collection of any installment payments due under the Contract; modify, amend or terminate the Contract; waive any of Purchaser's rights thereunder; or take any action which impairs the rights or interest of Purchaser with respect to the Contract.

(f) If any payments under the Contract are made to Seller after the effective date of this Agreement, Seller agrees to promptly transmit such payment(s) to Purchaser in the same form as they are received, except that Seller will endorse, to the order of Purchaser, checks so received which are made payable to it, or otherwise pay such amount to Purchaser.

(g) Seller shall allow Purchaser and its representatives free access and right of inspection at all times to any Equipment at its location, subject, however, to the rights of the User under the Contract.

(h) Seller irrevocably constitutes and appoints Purchaser and any present or future officer or agent of Purchaser, or its successors or assigns, as its lawful attorney with full power of substitution and re-substitution, and in the name of Seller or otherwise, to collect and to sue in any court for payments due or to become due under the Contract, to withdraw or settle any claims, suits or proceedings pertaining to or arising out of the Contract, upon such terms as Purchaser in its discretion may deem to be in its best interest, all without notice to or assent of Seller and, further, to take possession and to endorse in the name of Seller any instrument for the payment of money received on account of the payments due under the Contract.

**Section 9.    Miscellaneous.** This Agreement shall be governed by, and interpreted and enforced under, the internal laws of the State of Utah (without regard to the conflict of laws principles of such state). All references herein to any agreements shall be to such agreement as amended or modified to the date of reference. The words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement. All notices hereunder shall be in writing and hand delivered, sent by facsimile (with confirmation of receipt) or sent by overnight courier service or by certified mail, addressed to the parties at the address specified above, or to such other address as either party may specify hereunder; and shall be effective upon receipt.

**Section 10.    Entire Agreement; No Assignment.** This Agreement is the entire agreement between Purchaser and Seller with respect to the subject matter hereof and it may not be supplemented or amended except by a writing, which is signed by both parties. This Agreement shall inure to the benefit of and be binding on Seller and Purchaser, and their respective successors and assigns. Notwithstanding the foregoing, Seller may not assign it rights, or delegate its obligations, under this Agreement without the express prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder, in whole or in part, at any time.

**Section 11.    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all such counterparts shall constitute but one and the same instrument.

**Section 12.    Not an Extension of Credit.** This Agreement constitutes a sale of 100% ownership interest in the Assigned Interest and shall in no way be construed as an extension of credit by Purchaser to Seller. Seller waives and releases any right, title or interest that it may have (whether pursuant to a "cross-collateralization" provision or otherwise) in and to any of the Assigned Interest, and/or the Contract.

**Section 13.    Waiver of Jury Trial.** THE PARTIES HEREBY UNCONDITIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of the day and year first above written.

Seller: Overseas Lease Group, Inc.

By: _____

Name: E G BADCOCK

Title: President

Purchaser: KEY GOVERNMENT FINANCE, INC.

By: _____

Name: _____

Title: _____

## EXHIBIT 1

### SPECIFICATION OF ASSIGNED SCHEDULE

Executed pursuant to that certain Assignment Agreement dated as of April 1, 2006 (the "Agreement"), by and between Overseas Lease Group, Inc. as Seller, and KEY GOVERNMENT FINANCE, INC. as Purchaser.

This Specification is dated and effective as of the date set forth below and incorporates the terms and conditions of the Agreement.

1. User:  United States Department of Defense, under Contract No. W91B4M-06-D-0001-P00001, including all Modifications and Delivery Orders issued under said Contract.

2. Date of Contract:  January 19, 2006

3. Total Invoice Cost: $460,502.46.  (See Assignment of Proceeds Letter for break-out of payment)

4. Remaining payments due under the Contract:  59 monthly payments in arrears.  1-11 @ $13,896.00; 13-24 @ $13,248.00; 25-36 @ $9,480.00; 37-48 @ $5,910.00; 49-60 @ $5,310.00.

5. Consideration:  $460,502.46

Date of Execution: _27 April 2006_

| Seller: | Purchaser: |
|---|---|
| Overseas Lease Group, Inc. | KEY GOVERNMENT FINANCE, INC. |
| By: _[signature]_ | By:_____ |
| Name: _E G BADCOCK_ | Name:_____ |
| Title: _president_ | Title:_____ |

## **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK    )
                           ) ss.:

COUNTY OF NASSAU    )

MARYANNE VOGEL, being duly sworn deposes and say:

I am not a party to the action, am over 18 years of age and reside in Farmingdale, New York.

On the 2nd day of May, 2008, I served true copies of the within ANSWER, AFFIRMATIVE DEFENSES AND AMENDED COUNTERCLAIMs. via first class mail, in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

PAUL BATISTA, P.C.
26 Broadway - Suite 1900
New York, New York  10004
Attn:  Paul Batista, Esq.

_____
MARYANNE VOGEL

Sworn to before me this
2nd day of May, 2008

_____
Notary Public

DAGMAR E. ROWINSKY
NOTARY PUBLIC, State of New York
No. 4789327
Qualified in Nassau County
Commission Expires 10-31-09

F:\Key Equipment Finance\Overseas\Docs\AOS Answer 5 2 08.doc

08 Civ. 01696

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OVERSEAS LEASE GROUP, INC.

                    Plaintiff,

      - against -

KEY GOVERNMENT FINANCE, INC.

                    Defendant.

---

## ANSWER, AFFIRMATIVE DEFENSES AND
## AMENDED COUNTERCLAIMS

---

### MORITT HOCK HAMROFF & HOROWITZ LLP
*Attorneys for Defendant*
400 GARDEN CITY PLAZA, SUITE 202
GARDEN CITY, NEW YORK 11530
(516) 873-2000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

OVERSEAS LEASE GROUP, INC.,                          08 Civ. 01696

                              Plaintiff,

         - against -

KEY GOVERNMENT FINANCE, INC.,

                              Defendant.
-------------------------------------------------------------x

### AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

         MARYANNE VOGEL, being duly sworn deposes and say:

         I am not a party to the action, am over 18 years of age and reside in Farmingdale, New York.

         On the 2nd day of May, 2008, I served true copies of the within NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND OTHER RELIEF, KARPEL AFFIDAVIT WITH EXHIBITS, ARENTH AFFIRMATION WITH EXHIBITS AND R.56 STATEMENT via first class mail, in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

         PAUL BATISTA, P.C.
         26 Broadway - Suite 1900
         New York, New York  10004
         Attn:  Paul Batista, Esq.

                                                    _____
                                                           MARYANNE VOGEL

Sworn to before me this
2nd day of May, 2008

_____
        Notary Public

DAGMAR E. ROWINSKY
NOTARY PUBLIC, State of New York
No. 4789327
Qualified in Nassau County
Commission Expires  10-31-09

F:\Key Equipment Finance\Overseas\Docs\AOS NOM 5 2 08.doc