UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
OVERSEAS LEASE GROUP, INC.,                    08 Civ. 01696 (SAS) (THK)

                              Plaintiff,
          -against-

KEY GOVERNMENT FINANCE, INC.,

                              Defendant.
-------------------------------------------------------------x

### AFFIRMATION OF DONNA M. ZERBO
### IN OPPOSTION TO MOTION
### FOR PARTIAL SUMMARY JUDGMENT

DONNA M. ZERBO affirms under penalty of perjury as follows:

1.       I am the Vice President and General Counsel of Overseas Lease Group, Inc. ("OLG").  As part of my responsibilities and duties at OLG, I was directly involved with officers and other personnel of defendant Key Government Finance, Inc. ("Key") in the negotiating and drafting of documents governing the financial transactions at issue in this case. I submit this affirmation in opposition to defendant's summary judgment motion as to Key's Fourth Amended Counterclaim.  I am an attorney admitted to practice in New York since 1980.  Except as otherwise specifically indicated, I have personal knowledge of the facts set forth in this affirmation.

### Introduction and Summary

2.       As will be shown in the balance of this affirmation and in the affirmation of E. George Badcock, plaintiff OLG's President and Chief Executive Officer, there are genuine issues of material fact to be tried as to Key's inaccurate contention that it is entitled

to possess and dispose of the vehicles. Among other things, the relevant agreements do <u>not</u> support Key's position. It was <u>never</u> the purpose of the agreements – and it was <u>not</u> the intention of the parties – that Key would be able to take possession of the vehicles and dispose of them after their return by the United States Defense Department (the "DOD"). In other words, Key is only entitled to the stream of lease revenue payments from the DOD. It is <u>not</u> entitled to the windfall of the proceeds of the sale or other disposition of the vehicles after their return to OLG by the DOD.

**<u>Factual Background</u>**

3.    OLG and the DOD entered into a contract, Contract No. W91B4M-06-D0001 dated as of February 5, 2006 (the "DOD Contract"), pursuant to which OLG leased to the DOD and the DOD leased from OLG both armored and "soft" vehicles for use in Afghanistan.

4.    As soon as OLG was awarded the DOD Contract in January 2006, OLG began to seek financing from various sources, particularly those with knowledge and experience of United States Government contracts, since these contracts are governed by the Federal Acquisition Regulations ("FARs") with payment procedures, assignment rules and performance rules which generally differ from normal commercial contracts. (Annexed as Exhibit 1 are copies of FARs relevant to the facts in this action.)

5.    One characteristic of U.S. Government contracts is that the term of a contract is generally stated as one base year (with guaranteed payments for such year) with additional years being "option" years, <u>i.e.</u>, the Government has the option to exercise the particular contract for each additional year.

6.     The typical business transaction involving a large Government contract is structured in a format under which the financing source purchases, on a discounted basis, the revenue stream from the contract. The only issue is how many years of revenue stream will be purchased by such a financing source. OLG had various financing sources interested in purchasing the lease revenue stream under its DOD Contract and chose Key because Key agreed to purchase all five years of lease revenue. This decision was Key's as proposed by Howard Ulep ("Ulep"), Director of Key Government Finance, Inc., at an initial meeting with Mr. Badcock and me and as subsequently confirmed by Key's credit committee. (See annexed Exhibit 2, Ulep email dated March 29, 2006.)

7.     The two officers of Key with whom I negotiated the transaction, Ulep and John Lekic ("Lekic"), a Vice-President of Key, were familiar with this "one base year with additional option years" format and so stated when we began negotiations of the specific transaction. Despite the "one base year, 4 option years" term, Key purchased, on a discounted basis, the revenue stream for all five years with respect to every vehicle ordered by the DOD. Both Ulep and Lekic stated to me that Key would take the risk of the DOD's not exercising an option year.

8.     As a result, Key paid for five years of lease revenue to be derived from the lease of vehicles to DOD under the first set of Task Orders.  Each of the approximately 22 subsequent Task Orders was submitted to Key and the purchase price of the five-year lease stream for each such Task Order was calculated by Key based upon its discount formula. Each such funding was accompanied by the April 1, 2006 agreement between OLG and Key

("OLG-Key Agreement") (see annexed Exhibit 3).[1] The OLG-Key Agreement is consistent with Key's purchase of the five year lease revenue, not the vehicles. Key continued to purchase the five-year lease revenue stream for almost 200 vehicles under the DOD Contract, without deviation to any extent.

9.    I negotiated changes to the Key Standard Assignment Agreement ("Std Key Assignment"), with Lekic. (Annexed as Exhibit 4 is a copy of the Std Key Assignment.) Lekic and I were the only persons involved in re-drafting the Std Key Assignment which occurred over a two-day period with Lekic and I speaking several times a day. The result was the OLG-Key Agreement dated as of April 1, 2006 executed by OLG and Key on April 4, 2006 which governed the transaction (see Exhibit 3) and which was reviewed by Ulep, the original Key representative who met with OLG for the purpose of gathering information and presenting the subject transaction to Key for approval and who continued as liaison between OLG and Key even after the transaction was approved.

10.    The OLG-Key Agreement is the sole document governing the entire transaction between Key and OLG regarding the DOD Contract. The form and structure of this transaction is not and never was intended to be a simple lending transaction enabling OLG to simply purchase vehicles. The funds provided by Key's purchase price for the discounted revenue stream were used by OLG to purchase the requisite vehicles and to support OLG's continuing obligations under the DOD Contract, including: (i) maintaining

---

[1] Key has created a source of factual confusion by attaching to the affidavit of David Karpel ("Karpel Aff.") and to its May 2, 2008 "Answer, Affirmative Defenses and Amended Counterclaims" copies of the OLG-Key Agreement that were not the original agreement, Each of the tranches by which payments have been made were accompanied by copies of the OLG-Key Agreement with different dollar amounts stated in Section 1. Key has attached to the Karpel Aff. and its actual Counterclaim a copy of the OLG-Key Agreement showing $460,502.46 in Section 1. In fact, as annexed Exhibit 3 reflects, the first was in the amount of $3,237,057.53 (see Exhibit 3).

vehicles for use when leased vehicles were being serviced; (ii) servicing of vehicles; and (iii) keeping OLG personnel in Kabul to service generally the needs of the DOD under the contract. Key was fully aware of the use of funds by OLG.

11.    It is imperative to contrast the Std Key Assignment (see Exhibit 4) with the actual OLG-Key Agreement (see Exhibit 3). Pursuant to Section 1 of the OLG-Key Agreement, OLG sold and Key purchased all of OLG's "right, title and interest in and to (but none of its obligations under) the Assigned Interest." (See Exhibit 3.) This language is the same in Section 1 of the Std Key Assignment (see Exhibit 4).

12.    The first change to the Std Key Assignment occurs in the definition of "Assigned Interest". In the Std Key Assignment version, "Assigned Interest" is defined in Section 2 as including: (i) the "Contract and all other amounts due…;" (ii) "all of Seller's right, title and interest in and to the Property [as described in the particular subject transaction, i.e., the vehicles in this transaction], together with all proceeds;" and (iii) all of "Seller's rights and remedies" under the contract.[2]

13.    However, in the OLG-Key Agreement, the term "Assigned Interest" was changed by deleting the reference to "Seller's right, title and interest in and to the Property" (as identified in the transaction) and adding, "and a first priority lien in favor of Purchaser

---

[2] The full definition of "Assigned Interest" in the Std Key Assignment is as follows:

> Section 2. Assigned Interest.  As used herein, the term "Assigned Interest" shall mean the Contract and all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by Buyer, and all of Seller's right, title and interest in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract, including (without limitation) the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller might otherwise take, save for this Agreement.  As used herein, "Contract" shall mean the Contract, with all documents executed in connection with the Contract, including, without limitation, all documents listed on attached Schedule A. [See Exhibit 4.]

[Key] in and to the Property" [i.e., the vehicles].  More specifically, the full definition of

"Assigned Interest" under the operative agreement is the following:

> Section 2. Assigned Interest.  As used herein, the term "Assigned Interest" shall mean the Contract and all amounts due and to become due under the Contract, including (without limitation), payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by User, and a first priority lien in favor of Purchaser in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract, including (without limitation) the right to initiate and conclude and all proceeding…As used herein, the term "Contract" shall mean the Contract, together with all documents executed in connection with the Contract, including, without limitation, all documents listed on attached Schedule A.  [See Exhibit 3.]

14.     Thus, Key merely has a lien on the vehicles to secure a portion of the

purchase price Key paid OLG for the stream of the lease payments under the DOD Contract.

(See Exhibit 3, Sections 1 and 12 of the OLG-Key Agreement.)

15.     New York Lien law does not afford Key, as a lienholder, the right to

possess and sell the subject "Property" (i.e., the vehicles) where there is no default on the

part of OLG.

16.     Section 12 of the Std Key Assignment clearly states that the Std Key

Assignment constitutes a sale of 100% ownership interest in the Assigned Interest (that is,

the contract, the lease stream and other moneys due and remedies available under the DOD

Contract), and "Seller" waives and releases any right, title and interest it may have in and to

any of the "Assigned Interest, the Contract, and/or the Property."

17.    Notably, Section 12 of the actual OLG-Key Agreement deletes the phrase "and/or the Property" because OLG did not sell the "Property" (vehicles) to Key. Neither OLG nor Key intended such a sale as evidenced by the OLG-Key Agreement and the absence of a purchase and sale agreement for the vehicles, and neither intended that OLG waive and release any of its right, title and interest in the vehicles. Rather, Lekic of Key deleted the clauses and phrases concerning Key's control over the vehicles in order to be consistent with intent of the parties.

18.    Section 8(e) of the Std Key Agreement states: "Seller will not, without Purchaser's prior written consent, repossess or consent to the return of any Property..." In contrast, Section 8(e) of the OLG-Key Agreement deletes this phrase, clearly indicating neither OLG nor Key ever intended to imbue Key with the right of possession and ability to sell vehicles upon return from the DOD. This is entirely consistent with the need of OLG to maintain its ownership rights of possession and control in order to continue to meet its obligation under the DOD Contract to provide vehicles.

19.    Further, under Section 8(h) of each of the Std Key Assignment and the OLG-Key Agreement, OLG irrevocably constitutes and appoints Key its lawful attorney for a variety of actions. However, conspicuously absent are the rights to possession and control of the vehicles or to sell, deal, handle, or negotiate the vehicles in any respect or to any extent.

20.    Pursuant to the DOD Contract, the DOD's Notice of Assignment and Instrument of Assignment, and the provisions of the Assignment of Claims Act of 1940, as amended (31 U.S.C. 3727, 41 U.S.C. 15), and the FARs, OLG could assign only its right, title and interest to all moneys due under the DOD Contract, including remedies, but not the

vehicles.[3] To do otherwise would jeopardize OLG's ability to perform its obligations under the DOD Contract. Moreover, neither OLG nor DOD ever contemplated Key or any financing source would become a third-party beneficiary of the DOD Contract.

21.     The DOD has first right to use the vehicles anywhere in Afghanistan for the life of the contract.  One group of DOD users may return the vehicles but another group may continue to need vehicles. OLG could not perform its obligations under the contract if Key were permitted, by a perverse reading of the agreement, to take immediate possession and have ability to sell vehicles. Certainly, the DOD Contract itself forbids any such abusive reading as the DOD would never permit a funding source to take possession of the subject property, thereby jeopardizing DOD operations. Permitting Key to take custody and control over the vehicles is not granted under the OLG-Key Agreement or the DOD Contract. Indeed, there are remedies under the DOD Contract for termination for convenience, permitting OLG – and Key as OLG's funding source – to seek monetary relief for losses due to termination for convenience. This remedy is available to Key, but because Key elected to settle outstanding claims with the DOD with respect to TO#31 and TO#25, Key has elected to forego pursuing such remedy. The DOD Contract does not give Key the right to foreclose on the vehicles and sell them. The DOD cannot give Key rights to the vehicles tantamount to legal ownership and thereby disenfranchise OLG's ownership rights.

22.     To state, as Karpel does in his affidavit, that Key financed OLG's lease of the vehicles grossly mischaracterizes the legal structure of the subject transaction contemplated by each of the parties and as documented in the OLG-Key Agreement. Section

---

[3] Significantly, the assignment by OLG of the stream of lease revenue to Key reflects that Key was assigned only money, not the vehicles (see Exhibit 5).

12 of the Std Key Assignment and the OLG-Key Agreement is clear: "This Agreement constitutes a sale of 100% ownership interest in the Assigned Interest [which in the subject transaction is defined as the Contract and the lease revenue stream thereunder, not the vehicles] and shall in no way be construed as an extension of credit by [Key] to [OLG]." Key purchased the revenue stream of lease payments to be derived from all vehicles leased to the DOD under the contract. The purchase price for the 5-year gross revenue of each Task Order's lease payment stream was calculated by Key based upon OLG's stated lease payment structure attributable to the vehicles under each Task Order, to which Key applied a discount rate and remitted the discounted amount to OLG. OLG used a portion of the discounted amount of funds from Key to purchase the vehicles from the manufacturer's distributor. This structure is consistent with the language of Section 12 of each assignment agreement.

23.     Key was fully aware of the gross purchase price of the vehicles for each Task Order and the gross revenue stream attributed to such Task Order, since Key did not relinquish funds unless such information was verified by it. Each vehicle's purchase price was itemized in the Key proceeds letter, yet Key paid OLG significantly more than the list price of the vehicles because Key purchased the lease revenue to be generated by the vehicles for the entire five-year period. If Key merely financed the vehicles in the traditional sense, – i.e., Key loaned OLG the funds to simply buy vehicles – it is highly unlikely Key would have paid OLG more than twice the vehicles' cost.

24.     Moreover, the subject transaction is non-recourse to OLG which is consistent with Key's purchase of the contract's revenue stream. Consequently, OLG has no liability to repay any amount to Key. Consistent with the language of the Std Key

Assignment and OLG-Key Agreement, Key bought an asset, that is, the lease revenue stream under the DOD Contract. Thus, Key assumed all risk associated with that asset, including the DOD's non-renewal of Task Orders in each option year of the contract without regard to DOD's reason.  This risk assumption by Key is balanced by the fact that all remedies under the DOD Contract, including those related to termination for convenience, are available to Key in the event the DOD did not renew the vehicle leases. Moreover, although OLG is not obligated to repay any amount of the purchase price Key paid for the five-year revenue stream, and although Key cannot foreclose on the vehicles because there is no default by DOD or OLG, OLG cannot sell the vehicles and pass clean title to a third-party buyer without satisfying Key's first priority lien.

26.     The amount of Key's first priority lien, however, cannot exceed the fair market value price at the time of a sale. This is because OLG is not liable to repay Key any amount of the purchase price Key paid for the five-year discounted lease revenue under the DOD Contract.  As a result, any purported excess of Key's purchase price for the revenue stream over the vehicles' value is not OLG's liability. Rather, such amount is a diminution in value of the asset purchased by Key by reason of DOD's non-renewal, a risk which Key fully assumed.

26.     OLG's permitting Key to place a first priority lien on OLG's vehicles results in a portion of the purchase price Key paid for the DOD Contract revenue stream being capable of recapture, but only to the extent such funds were used to buy the vehicles necessary to generate the lease revenue stream over the five-year DOD Contract term.

27.     Key's lien on the vehicles could never have yielded full protection against the loss of the entire purchase price Key paid for the DOD Contract's revenue stream

because the lien could not be enforced by foreclosure since there were no event of default "triggers" in the transaction. This is because by the transaction's legal structure and nature neither the DOD nor OLG could "default" in the traditional sense since the transaction is not a traditional lending transaction with vehicles as security. Rather, Key purchased an asset and, by its non-renewal, the DOD caused that asset to diminish in value; the OLG-Key Agreement provides a remedy under the DOD Contract of which Key can take full advantage.

28.    In prior dealings with Key, OLG has paid Key a negotiated amount in order to release its lien on vehicles so that OLG could sell those vehicles with clear title after their formal return by the DOD. The transaction was not the purchase of the vehicles from Key, as Karpel states. The OLG documents and check sent to Key are clearly marked "release of lien". (See annexed Exhibit 6).

29.    OLG did not assign the "leases" to Key as stated by Karpel in his affidavit. No such assignment document exists and vehicle leases are not included in the definition of "Assigned Interest" in Section 2 of the OLG-Key Agreement. The DOD Contract is the only governing contract of lease between OLG and DOD.

30.    The DOD Contract does not grant ownership rights of possession and transfer of ownership to any third-party, since the DOD cannot grant rights it does not have. OLG, as owner of the vehicles, is the only entity with the rights of possession, custody and control, as well as transferability to a third-party. Lienholders like Key have no ownership rights absent a foreclosure action to achieve such rights.

31.    Section 6 of the OLG-Key Agreement does not grant to Key the right to possession, control and transferability of the vehicles. Key has all the rights of OLG under

- 11 -

the DOD Contract but not OLG's obligations. The DOD Contract does not give OLG the right of possession and control over the vehicles; rather, OLG's legal status as owner provides those rights to OLG. Key is entitled to all the lease payments and other money under the DOD Contract which Key purchased, and also has all remedies under the contract to mitigate loss of its asset – namely, the lease payment stream, not the vehicles. Key does not have any obligation under the DOD Contract to provide and service vehicles; therefore, it does not have any rights with respect to them. This is consistent with the legal structure of the transaction, Key's own Standard Assignment Agreement, and the assignment documents under the FARs which limit the assignment of only the lease and other monetary payments to the funding source. To interpret Section 6 with any other meaning is pure fiction.

32.    Having negotiated the OLG-Key Agreement and being generally involved in the subject transaction, I have personal knowledge of the extensive due diligence Key performed with respect to this contract. I transmitted all DOD forms to Lekic and arranged for telephone interviews by Key personnel of the DOD's contracting officers in Afghanistan. Key sent an employee for a week-long visit in Afghanistan to DOD personnel, OLG's office and the No Lemon facility (the subcontractor hired by OLG to service and repair the vehicles) during June 2006.

## **Conclusion**

33.    For all the foregoing reasons, I respectfully request that the Court deny Key's motion for summary judgment.

Dated: May 23, 2008

DONNA M. ZERBO

# EXHIBIT 1

## Subpart 16.5—Indefinite-Delivery Contracts

**16.500 Scope of subpart.**

(a) This subpart prescribes policies and procedures for making awards of indefinite-delivery contracts and establishes a preference for making multiple awards of indefinite-quantity contracts.

(b) This subpart does not limit the use of other than competitive procedures authorized by Part 6.

(c) Nothing in this subpart restricts the authority of the General Services Administration (GSA) to enter into schedule, multiple award, or task or delivery order contracts under any other provision of law. Therefore, GSA regulations and the coverage for the Federal Supply Schedule program in Subpart 8.4 and Part 38 take precedence over this subpart.

(d) The statutory multiple award preference implemented by this subpart does not apply to architect-engineer contracts subject to the procedures in Subpart 36.6. However, agencies are not precluded from making multiple awards for architect-engineer services using the procedures in this subpart, provided the selection of contractors and placement of orders are consistent with Subpart 36.6.

**16.501-1 Definitions.**

As used in this subpart—

"Delivery order contract" means a contract for supplies that does not procure or specify a firm quantity of supplies (other than a minimum or maximum quantity) and that provides for the issuance of orders for the delivery of supplies during the period of the contract.

"Task order contract" means a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract.

**16.501-2 General.**

(a) There are three types of indefinite-delivery contracts: definite-quantity contracts, requirements contracts, and indefinite-quantity contracts. The appropriate type of indefinite-delivery contract may be used to acquire supplies and/or services when the exact times and/or exact quantities of future deliveries are not known at the time of contract award. Pursuant to 10 U.S.C. 2304d and section 303K of the Federal Property and Administrative Services Act of 1949, requirements contracts and indefinite-quantity contracts are also known as delivery order contracts or task order contracts.

(b) The various types of indefinite-delivery contracts offer the following advantages:

(1) All three types permit—

(i) Government stocks to be maintained at minimum levels; and

(ii) Direct shipment to users.

(2) Indefinite-quantity contracts and requirements contracts also permit—

(i) Flexibility in both quantities and delivery scheduling; and

(ii) Ordering of supplies or services after requirements materialize.

(3) Indefinite-quantity contracts limit the Government's obligation to the minimum quantity specified in the contract.

(4) Requirements contracts may permit faster deliveries when production lead time is involved, because contractors are usually willing to maintain limited stocks when the Government will obtain all of its actual purchase requirements from the contractor.

(c) Indefinite-delivery contracts may provide for any appropriate cost or pricing arrangement under Part 16. Cost or pricing arrangements that provide for an estimated quantity of supplies or services (e.g., estimated number of labor hours) must comply with the appropriate procedures of this subpart.

**16.502 Definite-quantity contracts.**

(a) *Description.* A definite-quantity contract provides for delivery of a definite quantity of specific supplies or services for a fixed period, with deliveries or performance to be scheduled at designated locations upon order.

(b) *Application.* A definite-quantity contract may be used when it can be determined in advance that—

(1) A definite quantity of supplies or services will be required during the contract period; and

(2) The supplies or services are regularly available or will be available after a short lead time.

**16.503 Requirements contracts.**

(a) *Description.* A requirements contract provides for filling all actual purchase requirements of designated Government activities for supplies or services during a specified contract period, with deliveries or performance to be scheduled by placing orders with the contractor.

(1) For the information of offerors and contractors, the contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract. This estimate is not a representation to an offeror or contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available.

(2) The contract shall state, if feasible, the maximum limit of the contractor's obligation to deliver and the Government's obligation to order. The contract may also specify maximum or minimum quantities that the Government may order under each individual order and the maximum that it may order during a specified period of time.

05/28/2008   09:53    9736442245              OLG                        PAGE   15/22

# FAC 2005–13  SEPTEMBER 28, 2006

(b) *Application*. A requirements contract may be appropriate for acquiring any supplies or services when the Government anticipates recurring requirements but cannot predetermine the precise quantities of supplies or services that designated Government activities will need during a definite period.

(c) *Government property furnished for repair*. When a requirements contract is used to acquire work (*e.g.*, repair, modification, or overhaul) on existing items of Government property, the contracting officer shall specify in the Schedule that failure of the Government to furnish such items in the amounts or quantities described in the Schedule as "estimated" or "maximum" will not entitle the contractor to any equitable adjustment in price under the Government Property clause of the contract.

(d) *Limitations on use of requirements contracts for advisory and assistance services.* (1) Except as provided in paragraph (d)(2) of this section, no solicitation for a requirements contract for advisory and assistance services in excess of three years and $11.5 million (including all options) may be issued unless the contracting officer or other official designated by the head of the agency determines in writing that the services required are so unique or highly specialized that it is not practicable to make multiple awards using the procedures in 16.504.

(2) The limitation in paragraph (d)(1) of this section is not applicable to an acquisition of supplies or services that includes the acquisition of advisory and assistance services, if the contracting officer or other official designated by the head of the agency determines that the advisory and assistance services are necessarily incident to, and not a significant component of, the contract.

## 16.504  Indefinite-quantity contracts.

(a) *Description*. An indefinite-quantity contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period. The Government places orders for individual requirements. Quantity limits may be stated as number of units or as dollar values.

(1) The contract must require the Government to order and the contractor to furnish at least a stated minimum quantity of supplies or services. In addition, if ordered, the contractor must furnish any additional quantities, not to exceed the stated maximum. The contracting officer should establish a reasonable maximum quantity based on market research, trends on recent contracts for similar supplies or services, survey of potential users, or any other rational basis.

(2) To ensure that the contract is binding, the minimum quantity must be more than a nominal quantity, but it should not exceed the amount that the Government is fairly certain to order.

(3) The contract may also specify maximum or minimum quantities that the Government may order under each task or delivery order and the maximum that it may order during a specific period of time.

(4) A solicitation and contract for an indefinite quantity must—

(i) Specify the period of the contract, including the number of options and the period for which the Government may extend the contract under each option;

(ii) Specify the total minimum and maximum quantity of supplies or services the Government will acquire under the contract;

(iii) Include a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer;

(iv) State the procedures that the Government will use in issuing orders, including the ordering media, and, if multiple awards may be made, state the procedures and selection criteria that the Government will use to provide awardees a fair opportunity to be considered for each order (see 16.505(b)(1));

(v) Include the name, address, telephone number, facsimile number, and e-mail address of the agency task and delivery order ombudsman (see 16.505(b)(5)) if multiple awards may be made;

(vi) Include a description of the activities authorized to issue orders; and

(vii) Include authorization for placing oral orders, if appropriate, provided that the Government has established procedures for obligating funds and that oral orders are confirmed in writing.

(b) *Application*. Contracting officers may use an indefinite-quantity contract when the Government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that the Government will require during the contract period, and it is inadvisable for the Government to commit itself for more than a minimum quantity. The contracting officer should use an indefinite-quantity contract only when a recurring need is anticipated.

(c) *Multiple award preference*— (1) *Planning the acquisition*.   (i) Except for indefinite-quantity contracts for advisory and assistance services as provided in paragraph (c)(2) of this section, the contracting officer must, to the maximum extent practicable, give preference to making multiple awards of indefinite-quantity contracts under a single solicitation for the same or similar supplies or services to two or more sources.

(ii)(A) The contracting officer must determine whether multiple awards are appropriate as part of acquisition planning. The contracting officer must avoid situations in which awardees specialize exclusively in one or a few areas within the statement of work, thus creating the likelihood that

# FAC 2005–13 SEPTEMBER 28, 2006

orders in those areas will be awarded on a sole-source basis; however, each awardee need not be capable of performing every requirement as well as any other awardee under the contracts. The contracting officer should consider the following when determining the number of contracts to be awarded:

(1) The scope and complexity of the contract requirement.

(2) The expected duration and frequency of task or delivery orders.

(3) The mix of resources a contractor must have to perform expected task or delivery order requirements.

(4) The ability to maintain competition among the awardees throughout the contracts' period of performance.

(B) The contracting officer must not use the multiple award approach if—

(1) Only one contractor is capable of providing performance at the level of quality required because the supplies or services are unique or highly specialized;

(2) Based on the contracting officer's knowledge of the market, more favorable terms and conditions, including pricing, will be provided if a single award is made;

(3) The expected cost of administration of multiple contracts outweighs the expected benefits of making multiple awards;

(4) The projected task orders are so integrally related that only a single contractor can reasonably perform the work;

(5) The total estimated value of the contract is less than the simplified acquisition threshold; or

(6) Multiple awards would not be in the best interests of the Government.

(C) The contracting officer must document the decision whether or not to use multiple awards in the acquisition plan or contract file. The contracting officer may determine that a class of acquisitions is not appropriate for multiple awards (see Subpart 1.7).

(2) *Contracts for advisory and assistance services.* (i) Except as provided in paragraph (c)(2)(ii) of this section, if an indefinite-quantity contract for advisory and assistance services exceeds 3 years and $11.5 million, including all options, the contracting officer must make multiple awards unless—

(A) The contracting officer or other official designated by the head of the agency determines in writing, as part of acquisition planning, that multiple awards are not practicable. The contracting officer or other official must determine that only one contractor can reasonably perform the work because either the scope of work is unique or highly specialized or the tasks so integrally related;

(B) The contracting officer or other official designated by the head of the agency determines in writing, after

the evaluation of offers, that only one offeror is capable of providing the services required at the level of quality required; or

(C) Only one offer is received.

(ii) The requirements of paragraph (c)(2)(i) of this section do not apply if the contracting officer or other official designated by the head of the agency determines that the advisory and assistance services are incidental and not a significant component of the contract.

## 16.505 Ordering.

(a) *General.* (1) The contracting officer does not synopsize orders under indefinite-delivery contracts.

(2) Individual orders shall clearly describe all services to be performed or supplies to be delivered so the full cost or price for the performance of the work can be established when the order is placed. Orders shall be within the scope, issued within the period of performance, and be within the maximum value of the contract.

(3) Performance-based acquisition methods must be used to the maximum extent practicable, if the contract or order is for services (see 37.102(a) and Subpart 37.6).

(4) When acquiring information technology and related services, consider the use of modular contracting to reduce program risk (see 39.103(a)).

(5) Orders may be placed by using any medium specified in the contract.

(6) Orders placed under indefinite-delivery contracts must contain the following information:

(i) Date of order.

(ii) Contract number and order number.

(iii) For supplies and services, contract item number and description, quantity, and unit price or estimated cost or fee.

(iv) Delivery or performance schedule.

(v) Place of delivery or performance (including consignee).

(vi) Any packaging, packing, and shipping instructions.

(vii) Accounting and appropriation data.

(viii) Method of payment and payment office, if not specified in the contract (see 32.1110(e)).

(7) Orders placed under a task-order contract or delivery-order contract awarded by another agency (*i.e.,* a Governmentwide acquisition contract, or multi-agency contract)—

(i) Are not exempt from the development of acquisition plans (see Subpart 7.1), and an information technology acquisition strategy (see Part 39);

(ii) May not be used to circumvent conditions and limitations imposed on the use of funds (*e.g.,* 31 U.S.C. 1501(a)(1)); and

(iii) Must comply with all FAR requirements for a bundled contract when the order meets the definition of "bundled contract" (see 2.101(b)).

## Subpart 16.7—Agreements

**16.701 Scope.**

This subpart prescribes policies and procedures for establishing and using basic agreements and basic ordering agreements. (See 13.303 for blanket purchase agreements (BPA's) and see 35.015(b) for additional coverage of basic agreements with educational institutions and nonprofit organizations.)

**16.702 Basic agreements.**

(a) *Description.* A basic agreement is a written instrument of understanding, negotiated between an agency or contracting activity and a contractor, that (1) contains contract clauses applying to future contracts between the parties during its term and (2) contemplates separate future contracts that will incorporate by reference or attachment the required and applicable clauses agreed upon in the basic agreement. A basic agreement is not a contract.

(b) *Application.* A basic agreement should be used when a substantial number of separate contracts may be awarded to a contractor during a particular period and significant recurring negotiating problems have been experienced with the contractor. Basic agreements may be used with negotiated fixed-price or cost-reimbursement contracts.

(1) Basic agreements shall contain—

(i) Clauses required for negotiated contracts by statute, executive order, and this regulation; and

(ii) Other clauses prescribed in this regulation or agency acquisition regulations that the parties agree to include in each contract as applicable.

(2) Each basic agreement shall provide for discontinuing its future applicability upon 30 days' written notice by either party.

(3) Each basic agreement shall be reviewed annually before the anniversary of its effective date and revised as necessary to conform to the requirements of this regulation. Basic agreements may need to be revised before the annual review due to mandatory statutory requirements. A basic agreement may be changed only by modifying the agreement itself and not by a contract incorporating the agreement.

(4) Discontinuing or modifying a basic agreement shall not affect any prior contract incorporating the basic agreement.

(5) Contracting officers of one agency should obtain and use existing basic agreements of another agency to the maximum practical extent.

(c) *Limitations.* A basic agreement shall not—

(1) Cite appropriations or obligate funds;

(2) State or imply any agreement by the Government to place future contracts or orders with the contractor; or

(3) Be used in any manner to restrict competition.

(d) *Contracts incorporating basic agreements.* (1) Each contract incorporating a basic agreement shall include a scope of work and price, delivery, and other appropriate terms that apply to the particular contract. The basic agreement shall be incorporated into the contract by specific reference (including reference to each amendment) or by attachment.

(2) The contracting officer shall include clauses pertaining to subjects not covered by the basic agreement, but applicable to the contract being negotiated, in the same manner as if there were no basic agreement.

(3) If an existing contract is modified to effect new acquisition, the modification shall incorporate the most recent basic agreement, which shall apply only to work added by the modification, except that this action is not mandatory if the contract or modification includes all clauses required by statute, executive order, and this regulation as of the date of the modification. However, if it is in the Government's interest and the contractor agrees, the modification may incorporate the most recent basic agreement for application to the entire contract as of the date of the modification.

**16.703 Basic ordering agreements.**

(a) *Description.* A basic ordering agreement is a written instrument of understanding, negotiated between an agency, contracting activity, or contracting office and a contractor, that contains (1) terms and clauses applying to future contracts (orders) between the parties during its term, (2) a description, as specific as practicable, of supplies or services to be provided, and (3) methods for pricing, issuing, and delivering future orders under the basic ordering agreement. A basic ordering agreement is not a contract.

(b) *Application.* A basic ordering agreement may be used to expedite contracting for uncertain requirements for supplies or services when specific items, quantities, and prices are not known at the time the agreement is executed, but a substantial number of requirements for the type of supplies or services covered by the agreement are anticipated to be purchased from the contractor. Under proper circumstances, the use of these procedures can result in economies in ordering parts for equipment support by reducing administrative lead-time, inventory investment, and inventory obsolescence due to design changes.

(c) *Limitations.* A basic ordering agreement shall not state or imply any agreement by the Government to place future contracts or orders with the contractor or be used in any manner to restrict competition.

(1) Each basic ordering agreement shall—

(i) Describe the method for determining prices to be paid to the contractor for the supplies or services;

(ii) Include delivery terms and conditions or specify how they will be determined;

(iii) List one or more Government activities authorized to issue orders under the agreement;

(iv) Specify the point at which each order becomes a binding contract (*e.g.,* issuance of the order, acceptance of

the order in a specified manner, or failure to reject the order within a specified number of days);

(v) Provide that failure to reach agreement on price for any order issued before its price is established (see paragraph (d)(3) of this section) is a dispute under the Disputes clause included in the basic ordering agreement; and

(vi) If fast payment procedures will apply to orders, include the special data required by 13.403.

(2) Each basic ordering agreement shall be reviewed annually before the anniversary of its effective date and revised as necessary to conform to the requirements of this regulation. Basic ordering agreements may need to be revised before the annual review due to mandatory statutory requirements. A basic ordering agreement shall be changed only by modifying the agreement itself and not by individual orders issued under it. Modifying a basic ordering agreement shall not retroactively affect orders previously issued under it.

(d) *Orders.* A contracting officer representing any Government activity listed in a basic ordering agreement may issue orders for required supplies or services covered by that agreement.

(1) Before issuing an order under a basic ordering agreement, the contracting officer shall—

(i) Obtain competition in accordance with Part 6;

(ii) If the order is being placed after competition, ensure that use of the basic ordering agreement is not prejudicial to other offerors; and

(iii) Sign or obtain any applicable justifications and approvals, and any determination and findings, and comply

with other requirements in accordance with 1.602-1(b), as if the order were a contract awarded independently of a basic ordering agreement.

(2) Contracting officers shall—

(i) Issue orders under basic ordering agreements on Optional Form (OF) 347, Order for Supplies or Services, or on any other appropriate contractual instrument;

(ii) Incorporate by reference the provisions of the basic ordering agreement;

(iii) If applicable, cite the authority under 6.302 in each order; and

(iv) Comply with 5.203 when synopsis is required by 5.201.

(3) The contracting officer shall neither make any final commitment nor authorize the contractor to begin work on an order under a basic ordering agreement until prices have been established, unless the order establishes a ceiling price limiting the Government's obligation and either—

(i) The basic ordering agreement provides adequate procedures for timely pricing of the order early in its performance period; or

(ii) The need for the supplies or services is compelling and unusually urgent (*i.e.*, when the Government would be seriously injured, financially or otherwise, if the requirement is not met sooner than would be possible if prices were established before the work began). The contracting officer shall proceed with pricing as soon as practical. In no event shall an entire order be priced retroactively.

*     *     *     *     *     *

**17.000 Scope of part.**

This part prescribes policies and procedures for the acquisition of supplies and services through special contracting methods, including—

(a) Multi-year contracting;

(b) Options; and

(c) Leader company contracting.

## Subpart 17.1—Multi-year Contracting

**17.101 Authority.**

This subpart implements Section 304B of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 254c) and 10 U.S.C. 2306b and provides policy and procedures for the use of multi-year contracting.

**17.102 Applicability.**

For DoD, NASA, and the Coast Guard, the authorities cited in 17.101 do not apply to contracts for the purchase of supplies to which 40 U.S.C. 759 applies (information resource management supply contracts).

**17.103 Definitions.**

As used in this subpart—

"Cancellation" means the cancellation (within a contractually specified time) of the total requirements of all remaining program years. Cancellation results when the contracting officer—

(1) Notifies the contractor of nonavailability of funds for contract performance for any subsequent program year; or

(2) Fails to notify the contractor that funds are available for performance of the succeeding program year requirement.

"Cancellation ceiling" means the maximum cancellation charge that the contractor can receive in the event of cancellation.

"Cancellation charge" means the amount of unrecovered costs which would have been recouped through amortization over the full term of the contract, including the term canceled.

"Multi-year contract" means a contract for the purchase of supplies or services for more than 1, but not more than 5, program years. A multi-year contract may provide that performance under the contract during the second and subsequent years of the contract is contingent upon the appropriation of funds, and (if it does so provide) may provide for a cancellation payment to be made to the contractor if appropriations are not made. The key distinguishing difference between multi-year contracts and multiple year contracts is that multi-year contracts, defined in the statutes cited at 17.101, buy more than 1 year's requirement (of a product or service) without establishing and having to exercise an option for each program year after the first.

"Nonrecurring costs" means those costs which are generally incurred on a one-time basis and include such costs as plant or equipment relocation, plant rearrangement, special tooling and special test equipment, preproduction engineering, initial spoilage and rework, and specialized work force training.

"Recurring costs" means costs that vary with the quantity being produced, such as labor and materials.

**17.104 General.**

(a) Multi-year contracting is a special contracting method to acquire known requirements in quantities and total cost not over planned requirements for up to 5 years unless otherwise authorized by statute, even though the total funds ultimately to be obligated may not be available at the time of contract award. This method may be used in sealed bidding or contracting by negotiation.

(b) Multi-year contracting is a flexible contracting method applicable to a wide range of acquisitions. The extent to which cancellation terms are used in multi-year contracts will depend on the unique circumstances of each contract. Accordingly, for multi-year contracts, the agency head may authorize modification of the requirements of this subpart and the clause at 52.217-2, Cancellation Under Multi-year Contracts.

(c) Agency funding of multi-year contracts shall conform to the policies in OMB Circulars A-11 (Preparation and Submission of Budget Estimates) and A-34 (Instructions on Budget Execution) and other applicable guidance regarding the funding of multi-year contracts. As provided by that guidance, the funds obligated for multi-year contracts must be sufficient to cover any potential cancellation and/or termination costs; and multi-year contracts for the acquisition of fixed assets should be fully funded or funded in stages that are economically or programmatically viable.

(d) The termination for convenience procedure may apply to any Government contract, including multiyear contracts. As contrasted with cancellation, termination can be effected at any time during the life of the contract (cancellation is effected between fiscal years) and can be for the total quantity or partial quantity (where as cancellation must be for all subsequent fiscal years' quantities).

**17.105 Policy.**

**17.105-1 Uses.**

(a) Except for DoD, NASA, and the Coast Guard, the contracting officer may enter into a multi-year contract if the head of the contracting activity determines that—

(1) The need for the supplies or services is reasonably firm and continuing over the period of the contract; and

(2) A multi-year contract will serve the best interests of the United States by encouraging full and open competition or promoting economy in administration, performance, and operation of the agency's programs.

## Subpart 17.2—Options

**17.200 Scope of subpart.**

This subpart prescribes policies and procedures for the use of option solicitation provisions and contract clauses. Except as provided in agency regulations, this subpart does not apply to contracts for (a) services involving the construction, alteration, or repair (including dredging, excavating, and painting) of buildings, bridges, roads, or other kinds of real property; (b) architect-engineer services; and (c) research and development services. However, it does not preclude the use of options in those contracts.

**17.201 [Reserved]**

**17.202 Use of options.**

(a) Subject to the limitations of paragraphs (b) and (c) of this section, for both sealed bidding and contracting by negotiation, the contracting officer may include options in contracts when it is in the Government's interest. When using sealed bidding, the contracting officer shall make a written determination that there is a reasonable likelihood that the options will be exercised before including the provision at 52.217-5, Evaluation of Options, in the solicitation. (See 17.207(f) with regard to the exercise of options.)

(b) Inclusion of an option is normally not in the Government's interest when, in the judgment of the contracting officer—

(1) The foreseeable requirements involve—

(i) Minimum economic quantities (*i.e.*, quantities large enough to permit the recovery of startup costs and the production of the required supplies at a reasonable price); and

(ii) Delivery requirements far enough into the future to permit competitive acquisition, production, and delivery.

(2) An indefinite quantity or requirements contract would be more appropriate than a contract with options. However, this does not preclude the use of an indefinite quantity contract or requirements contract with options.

(c) The contracting officer shall not employ options if—

(1) The contractor will incur undue risks; *e.g.*, the price or availability of necessary materials or labor is not reasonably foreseeable;

(2) Market prices for the supplies or services involved are likely to change substantially; or

(3) The option represents known firm requirements for which funds are available unless—

(i) The basic quantity is a learning or testing quantity; and

(ii) Competition for the option is impracticable once the initial contract is awarded.

(d) In recognition of—

(1) The Government's need in certain service contracts for continuity of operations; and

(2) The potential cost of disrupted support, options may be included in service contracts if there is an anticipated need for a similar service beyond the first contract period.

**17.203 Solicitations.**

(a) Solicitations shall include appropriate option provisions and clauses when resulting contracts will provide for the exercise of options (see 17.208).

(b) Solicitations containing option provisions shall state the basis of evaluation, either exclusive or inclusive of the option and, when appropriate, shall inform offerors that it is anticipated that the Government may exercise the option at time of award.

(c) Solicitations normally should allow option quantities to be offered without limitation as to price, and there shall be no limitation as to price if the option quantity is to be considered in the evaluation for award (see 17.206).

(d) Solicitations that allow the offer of options at unit prices which differ from the unit prices for the basic requirement shall state that offerors may offer varying prices for options, depending on the quantities actually ordered and the dates when ordered.

(e) If it is anticipated that the Government may exercise an option at the time of award and if the condition specified in paragraph (d) of this section applies, solicitations shall specify the price at which the Government will evaluate the option (highest option price offered or option price for specified requirements).

(f) Solicitations may, in unusual circumstances, require that options be offered at prices no higher than those for the initial requirement; *e.g.*, when—

(1) The option cannot be evaluated under 17.206; or;

(2) Future competition for the option is impracticable.

(g) Solicitations that require the offering of an option at prices no higher than those for the initial requirement shall—

(1) Specify that the Government will accept an offer containing an option price higher than the base price only if the acceptance does not prejudice any other offeror; and

(2) Limit option quantities for additional supplies to not more than 50 percent of the initial quantity of the same contract line item. In unusual circumstances, an authorized person at a level above the contracting officer may approve a greater percentage of quantity.

(h) Include the value of options in determining if the acquisition will exceed the World Trade Organization Government Procurement Agreement or Free Trade Agreement thresholds.

**17.204 Contracts.**

(a) The contract shall specify limits on the purchase of additional supplies or services, or the overall duration of the term of the contract, including any extension.

(b) The contract shall state the period within which the option may be exercised.

(c) The period shall be set so as to provide the contractor adequate lead time to ensure continuous production.

(d) The period may extend beyond the contract completion date for service contracts. This is necessary for situations when exercise of the option would result in the obligation of funds that are not available in the fiscal year in which the contract would otherwise be completed.

(e) Unless otherwise approved in accordance with agency procedures, the total of the basic and option periods shall not exceed 5 years in the case of services, and the total of the basic and option quantities shall not exceed the requirement for 5 years in the case of supplies. These limitations do not apply to information technology contracts. However, statutes applicable to various classes of contracts, for example, the Service Contract Act (see 22.1002-1), may place additional restrictions on the length of contracts.

(f) Contracts may express options for increased quantities of supplies or services in terms of—

    (1) Percentage of specific line items;

    (2) Increase in specific line items; or

    (3) Additional numbered line items identified as the option.

(g) Contracts may express extensions of the term of the contract as an amended completion date or as additional time for performance; e.g., days, weeks, or months.

## 17.205 Documentation.

(a) The contracting officer shall justify in writing the quantities or the term under option, the notification period for exercising the option, and any limitation on option price under 17.203(g); and shall include the justification document in the contract file.

(b) Any justifications and approvals and any determination and findings required by Part 6 shall specify both the basic requirement and the increase permitted by the option.

## 17.206 Evaluation.

(a) In awarding the basic contract, the contracting officer shall, except as provided in paragraph (b) of this section, evaluate offers for any option quantities or periods contained in a solicitation when it has been determined prior to soliciting offers that the Government is likely to exercise the options. (See 17.208.)

(b) The contracting officer need not evaluate offers for any option quantities when it is determined that evaluation would not be in the best interests of the Government and this determination is approved at a level above the contracting officer. An example of a circumstance that may support a determination not to evaluate offers for option quantities is when there is a reasonable certainty that funds will be unavailable to permit exercise of the option.

## 17.207 Exercise of options.

(a) When exercising an option, the contracting officer shall provide written notice to the contractor within the time period specified in the contract.

(b) When the contract provides for economic price adjustment and the contractor requests a revision of the price, the contracting officer shall determine the effect of the adjustment on prices under the option before the option is exercised.

(c) The contracting officer may exercise options only after determining that—

    (1) Funds are available;

    (2) The requirement covered by the option fulfills an existing Government need;

    (3) The exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors (see paragraphs (d) and (e) of this section) considered; and

    (4) The option was synopsized in accordance with Part 5 unless exempted by 5.202(a)(11) or other appropriate exemptions in 5.202.

(d) The contracting officer, after considering price and other factors, shall make the determination on the basis of one of the following:

    (1) A new solicitation fails to produce a better price or a more advantageous offer than that offered by the option. If it is anticipated that the best price available is the option price or that this is the more advantageous offer, the contracting officer should not use this method of testing the market.

    (2) An informal analysis of prices or an examination of the market indicates that the option price is better than prices available in the market or that the option is the more advantageous offer.

    (3) The time between the award of the contract containing the option and the exercise of the option is so short that it indicates the option price is the lowest price obtainable or the more advantageous offer. The contracting officer shall take into consideration such factors as market stability and comparison of the time since award with the usual duration of contracts for such supplies or services.

(e) The determination of other factors under (c)(3) of this section should take into account the Government's need for continuity of operations and potential costs of disrupting operations.

(f) Before exercising an option, the contracting officer shall make a written determination for the contract file that exercise is in accordance with the terms of the option, the requirements of this section, and Part 6. To satisfy requirements of Part 6 regarding full and open competition, the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract, e.g.—

    (1) A specific dollar amount;

(2) An amount to be determined by applying provisions (or a formula) provided in the basic contract, but not including renegotiation of the price for work in a fixed-price type contract;

(3) In the case of a cost-type contract, if—

(i) The option contains a fixed or maximum fee; or

(ii) The fixed or maximum fee amount is determinable by applying a formula contained in the basic contract (but see 16.102(c));

(4) A specific price that is subject to an economic price adjustment provision; or

(5) A specific price that is subject to change as the result of changes to prevailing labor rates provided by the Secretary of Labor.

(g) The contract modification or other written document which notifies the contractor of the exercise of the option shall cite the option clause as authority.

**17.208 Solicitation provisions and contract clauses.**

(a) Insert a provision substantially the same as the provision at 52.217-3, Evaluation Exclusive of Options, in solicitations when the solicitation includes an option clause and does not include one of the provisions prescribed in paragraph (b) or (c) of this section.

(b) Insert a provision substantially the same as the provision at 52.217-4, Evaluation of Options Exercised at Time of Contract Award, in solicitations when the solicitation includes an option clause, the contracting officer has determined that there is a reasonable likelihood that the option will be exercised, and the option may be exercised at the time of contract award.

(c) Insert a provision substantially the same as the provision at 52.217-5, Evaluation of Options, in solicitations when—

(1) The solicitation contains an option clause;

(2) An option is not to be exercised at the time of contract award;

(3) A firm-fixed-price contract, a fixed-price contract with economic price adjustment, or other type of contract approved under agency procedures is contemplated; and

(4) The contracting officer has determined that there is a reasonable likelihood that the option will be exercised. For sealed bids, the determination shall be in writing.

(d) Insert a clause substantially the same as the clause at 52.217-6, Option for Increased Quantity, in solicitations and contracts, other than those for services, when the inclusion of an option is appropriate (see 17.200 and 17.202) and the option quantity is expressed as a percentage of the basic contract quantity or as an additional quantity of a specific line item.

(e) Insert a clause substantially the same as the clause at 52.217-7, Option for Increased Quantity—Separately Priced Line Item, in solicitations and contracts, other than those for services, when the inclusion of an option is appropriate (see 17.200 and 17.202) and the option quantity is identified as a separately priced line item having the same nomenclature as a corresponding basic contract line item.

(f) Insert a clause substantially the same as the clause at 52.217-8, Option to Extend Services, in solicitations and contracts for services when the inclusion of an option is appropriate. (See 17.200, 17.202, and 37.111.)

(g) Insert a clause substantially the same as the clause at 52.217-9, Option to Extend the Term of the Contract, in solicitations and contracts when the inclusion of an option is appropriate (see 17.200 and 17.202) and it is necessary to include in the contract any or all of the following:

(1) A requirement that the Government must give the contractor a preliminary written notice of its intent to extend the contract.

(2) A statement that an extension of the contract includes an extension of the option.

(3) A specified limitation on the total duration of the contract.

## Subpart 32.8—Assignment of Claims

### 32.800  Scope of subpart.

This subpart prescribes policies and procedures for the assignment of claims under the Assignment of Claims Act of 1940, as amended, 31 U.S.C. 3727, 41 U.S.C. 15 (hereafter referred to as "the Act").

### 32.801  Definitions.

"Designated agency," as used in this subpart, means any department or agency of the executive branch of the United States Government (see 32.803(d)).

"No-setoff commitment," as used in this subpart, means a contractual undertaking that, to the extent permitted by the Act, payments by the designated agency to the assignee under an assignment of claims will not be reduced to liquidate the indebtedness of the contractor to the Government.

### 32.802  Conditions.

Under the Assignment of Claims Act, a contractor may assign moneys due or to become due under a contract if all the following conditions are met:

(a) The contract specifies payments aggregating $1,000 or more.

(b) The assignment is made to a bank, trust company, or other financing institution, including any Federal lending agency.

(c) The contract does not prohibit the assignment.

(d) Unless otherwise expressly permitted in the contract, the assignment—

(1) Covers all unpaid amounts payable under the contract;

(2) Is made only to one party, except that any assignment may be made to one party as agent or trustee for two or more parties participating in the financing of the contract; and

(3) Is not subject to further assignment.

(e) The assignee sends a written notice of assignment together with a true copy of the assignment instrument to the—

(1) Contracting officer or the agency head;

(2) Surety on any bond applicable to the contract; and

(3) Disbursing officer designated in the contract to make payment.

### 32.803  Policies.

(a) Any assignment of claims that has been made under the Act to any type of financing institution listed in 32.802(b) may thereafter be further assigned and reassigned to any such institution if the conditions in 32.802(d) and (e) continue to be met.

(b) A contract may prohibit the assignment of claims if the agency determines the prohibition to be in the Government's interest.

(c) Under a requirements or indefinite quantity type contract that authorizes ordering and payment by multiple Government activities, amounts due for individual orders for $1,000 or more may be assigned.

(d) Any contract of a designated agency (see FAR 32.801), except a contract under which full payment has been made, may include a no-setoff commitment only when a determination of need is made by the head of the agency, in accordance with the Presidential delegation of authority dated October 3, 1995, and after such determination has been published in the *Federal Register*. The Presidential delegation makes such determinations of need subject to further guidance issued by the Office of Federal Procurement Policy. The following guidance has been provided:

> Use of the no-setoff provision may be appropriate to facilitate the national defense; in the event of a national emergency or natural disaster; or when the use of the no-setoff provision may facilitate private financing of contract performance. However, in the event an offeror is significantly indebted to the United States, the contracting officer should consider whether the inclusion of the no-setoff commitment in a particular contract is in the best interests of the United States. In such an event, the contracting officer should consult with the Government officer(s) responsible for collecting the debt(s).

(e) When an assigned contract does not include a no-setoff commitment, the Government may apply against payments to the assignee any liability of the contractor to the Government arising independently of the assigned contract if the liability existed at the time notice of the assignment was received even though that liability had not yet matured so as to be due and payable.

### 32.804  Extent of assignee's protection.

(a) No payments made by the Government to the assignee under any contract assigned in accordance with the Act may be recovered on account of any liability of the contractor to the Government. This immunity of the assignee is effective whether the contractor's liability arises from or independently of the assigned contract.

(b) Except as provided in paragraph (c) of this section, the inclusion of a no-setoff commitment in an assigned contract entitles the assignee to receive contract payments free of reduction or setoff for—

(1) Any liability of the contractor to the Government arising independently of the contract; and

(2) Any of the following liabilities of the contractor to the Government arising from the assigned contract:

(i) Renegotiation under any statute or contract clause.

(ii) Fines.

(iii) Penalties, exclusive of amounts that may be collected or withheld from the contractor under, or for failure to comply with, the terms of the contract.

32.805                                                         FEDERAL ACQUISITION REGULATION

(iv) Taxes or social security contributions.

(v) Withholding or nonwithholding of taxes or social security contributions.

(c) In some circumstances, a setoff may be appropriate even though the assigned contract includes a no-setoff commitment; e.g.—

(1) When the assignee has neither made a loan under the assignment nor made a commitment to do so; or

(2) To the extent that the amount due on the contract exceeds the amount of any loans made or expected to be made under a firm commitment for financing.

32.805  Procedure.

(a) Assignments. (i) Assignments by corporations shall be—

(i) Executed by an authorized representative;

(ii) Attested by the secretary or the assistant secretary of the corporation; and

(iii) Impressed with the corporate seal or accompanied by a true copy of the resolution of the corporation's board of directors authorizing the signing representative to execute the assignment.

(2) Assignments by a partnership may be signed by one partner, if the assignment is accompanied by adequate evidence that the signer is a general partner of the partnership and is authorized to execute assignments on behalf of the partnership.

(3) Assignments by an individual shall be signed by that individual and the signature acknowledged before a notary public or other person authorized to administer oaths.

(b) Filing. The assignee shall forward to each party specified in 32.802(e) an original and three copies of the notice of assignment, together with one true copy of the instrument of assignment. The true copy shall be a certified duplicate or photostat copy of the original assignment.

(c) Format for notice of assignment. The following is a suggested format for use by an assignee in providing the notice of assignment required by 32.802(e).

NOTICE OF ASSIGNMENT

TO: _____ [Address to one of the parties specified in 32.802(e)].

This has reference to Contract No. _____ dated _____, entered into between _____ [Contractor's name and address] and _____ [Government agency, name of office, and address], for _____ [Describe nature of the contract].

Moneys due or to become due under the contract described above have been assigned to the undersigned under the provisions of the Assignment of Claims Act of 1940, as amended, 31 U.S.C. 3727, 41 U.S.C. 15.

A true copy of the instrument of assignment executed by the Contractor on _____ [Date], is attached to the original notice.

Payments due or to become due under this contract should be made to the undersigned assignee.

Please return to the undersigned the three enclosed copies of this notice with appropriate notations showing the date and hour of receipt, and signed by the person acknowledging receipt on behalf of the addressee.

Very truly yours,

_____
[Name of Assignee]

By _____
[Signature of Signing Officer]

_____
[Title of Signing Officer]

_____
[ADDRESS OF ASSIGNEE]

ACKNOWLEDGEMENT

Receipt is acknowledged of the above notice and of a copy of the instrument of assignment. They were received _____ (a.m.) (p.m.) on _____, 20___.

_____
[Signature]

_____
[Title]

_____
On behalf of

_____
[Name of Addressee of this Notice]

(d) Examination by the Government. In examining and processing notices of assignment and before acknowledging their receipt, contracting officers should assure that the following conditions and any additional conditions specified in agency regulations, have been met:

(1) The contract has been properly approved and executed.

(2) The contract is one under which claims may be assigned.

(3) The assignment covers only money due or to become due under the contract.

(4) The assignee is registered separately in the Central Contractor Registration unless one of the exceptions in 4.1102 applies.

(e) Release of assignment. (1) A release of an assignment is required whenever—

(i) There has been a further assignment or reassignment under the Act; or

(ii) The contractor wishes to reestablish its right to receive further payments after the contractor's obligations to

32.8-2

the assignee have been satisfied and a balance remains due under the contract.

(2) The assignee, under a further assignment or reassignment, in order to establish a right to receive payment from the Government, must file with the addressees listed in 32.802(e) a—

(i) Written notice of release of the contractor by the assigning financing institution;

(ii) Copy of the release instrument;

(iii) Written notice of the further assignment or reassignment; and

(iv) Copy of the further assignment or reassignment instrument.

(3) If the assignee releases the contractor from an assignment of claims under a contract, the contractor, in order to establish a right to receive payment of the balance due under the contract, must file a written notice of release together with a true copy of the release of assignment instrument with the addressees noted in 32.802(e).

(4) The addressee of a notice of release of assignment or the official acting on behalf of that addressee shall acknowledge receipt of the notice.

**32.806 Contract clauses.**

(a)(1) The contracting officer shall insert the clause at 52.232-23, Assignment of Claims, in solicitations and contracts expected to exceed the micro-purchase threshold, unless the contract will prohibit the assignment of claims (see 32.803(b)). The use of the clause is not required for purchase orders. However, the clause may be used in purchase orders expected to exceed the micro-purchase threshold, that are accepted in writing by the contractor, if such use is consistent with agency policies and regulations.

(2) If a no-setoff commitment has been authorized (see 32.803(d)), the contracting officer shall use the clause with its Alternate I.

(b) The contracting officer shall insert the clause at 52.232-24, Prohibition of Assignment of Claims, in solicitations and contracts for which a determination has been made under agency regulations that the prohibition of assignment of claims is in the Government's interest.

is not obligated to reimburse the Contractor for any costs in excess of the total amount allotted by the Government to this contract, whether incurred during the course of the contract or as a result of termination.

(i) When and to the extent that the amount allotted by the Government to the contract is increased, any costs the Contractor incurs before the increase that are in excess of—

(1) The amount previously allotted by the Government or;

(2) If this is a cost-sharing contract, the amount previously allotted by the Government to the contract plus the Contractor's corresponding share, shall be allowable to the same extent as if incurred afterward, unless the Contracting Officer issues a termination or other notice and directs that the increase is solely to cover termination or other specified expenses.

(j) Change orders shall not be considered an authorization to exceed the amount allotted by the Government specified in the Schedule, unless they contain a statement increasing the amount allotted.

(k) Nothing in this clause shall affect the right of the Government to terminate this contract. If this contract is terminated, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract, based upon the share of costs incurred by each.

(l) If the Government does not allot sufficient funds to allow completion of the work, the Contractor is entitled to a percentage of the fee specified in the Schedule equalling the percentage of completion of the work contemplated by this contract.

(End of clause)

**52.232-23 Assignment of Claims.**

As prescribed in 32.806(a)(1), insert the following clause:

ASSIGNMENT OF CLAIMS (JAN 1986)

(a) The Contractor, under the Assignment of Claims Act, as amended, 31 U.S.C. 3727, 41 U.S.C. 15 (hereafter referred to as "the Act"), may assign its rights to be paid amounts due or to become due as a result of the performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency. The assignee under such an assignment may thereafter further assign or reassign its right under the original assignment to any type of financing institution described in the preceding sentence.

(b) Any assignment or reassignment authorized under the Act and this clause shall cover all unpaid amounts payable under this contract, and shall not be made to more than one party, except that an assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in the financing of this contract.

(c) The Contractor shall not furnish or disclose to any assignee under this contract any classified document (including this contract) or information related to work under this contract until the Contracting Officer authorizes such action in writing.

(End of clause)

*Alternate I (Apr 1984).* If a no-setoff commitment is to be included in the contract (see 32.801 and 32.803(d)), add the following sentence at the end of paragraph (a) of the basic clause:

Unless otherwise stated in this contract, payments to an assignee of any amounts due or to become due under this contract shall not, to the extent specified in the Act, be subject to reduction or setoff.



**52.232-24 Prohibition of Assignment of Claims.**

As prescribed in 32.806(b), insert the following clause:

PROHIBITION OF ASSIGNMENT OF CLAIMS (JAN 1986)

The assignment of claims under the Assignment of Claims Act of 1940, as amended, 31 U.S.C. 3727, 41 U.S.C. 15, is prohibited for this contract.

(End of clause)

**52.232-25 Prompt Payment.**

As prescribed in 32.908(c), insert the following clause:

PROMPT PAYMENT (OCT 2003)

Notwithstanding any other payment clause in this contract, the Government will make invoice payments under the terms and conditions specified in this clause. The Government considers payment as being made on the day a check is dated or the date of an electronic funds transfer (EFT). Definitions of pertinent terms are set forth in sections 2.101, 32.001, and 32.902 of the Federal Acquisition Regulation. All days referred to in this clause are calendar days, unless otherwise specified. (However, see paragraph (a)(4) of this clause concerning payments due on Saturdays, Sundays, and legal holidays.)

(a) *Invoice payments—* (1) *Due date.* (i) Except as indicated in paragraphs (a)(2) and (c) of this clause, the due date for making invoice payments by the designated payment office is the later of the following two events:

(A) The 30th day after the designated billing office receives a proper invoice from the Contractor (except as provided in paragraph (a)(1)(ii) of this clause).

(B) The 30th day after Government acceptance of supplies delivered or services performed. For a final invoice, when the payment amount is subject to contract settlement actions, acceptance is deemed to occur on the effective date of the contract settlement.

# EXHIBIT 2

## Doug Schoffstall

| | |
|---|---|
| **From:** | HOWARD.ULEP@KEY.COM |
| **Sent:** | Wednesday, March 29, 2006 8:39 AM |
| **To:** | hq@corpfleetlease.com |
| **Subject:** | Re: OLG/DOD Lease Contract |
| **Importance:** | High |
| **Attachments:** | Camp Eggers Vehicle Lease Proposal 032906.doc; Short form MPA-Assignment.doc; Federal Lease Process Flow.xls; Essential Use Questionnaire 062405.xls |

George

It is highly likely that we will support this opportunity. I am confirming whether we will go the full 60 months, which I am recommending or just the base period of 24 months with funding on subsequent option year exercises (or somewhere in between). You will see both in the attached proposal, which I will finalize when final determination has been made.*(See attached file: Camp Eggers Vehicle Lease Proposal 032906.doc)*

I would appreciate confirmation of the monthly payment amounts which I picked up from your task order spreadsheet. Funding to OLG is titled, Equipment Cost. Please review the proposal and the attached Assignment Agreement. I have also attached a process flow chart. *(See attached file: Short form MPA-Assignment.doc)(See attached file: Federal Lease Process Flow.xls)*

Also I anticipate need to complete the Essential Use form attached. Simple, straightforward actions, with acknowledgement by a cognizant Government official is requested.*(See attached file: Essential Use Questionnaire 062405.xls)*

And finally, please forward preferably in electronic form, two years Financial Statements (Audited) for OLG.

I will let you know if we can fund by the 31st or wait until actual acceptance.

Thanks so much for the opportunity.

Howard

Howard G. Ulep
Director, Federal Programs
Key Government Finance, Inc.
928 Melvin Road
Annapolis, Maryland 21403

Mobile: (443) 994-2720
Fax: (410) 263-4657

Howard.Ulep@key.com
www.key.com
hq@corpfleetlease.com

| hq@corpfleetlease.com | Tohoward.ulep@key.com |
|---|---|
| | cc |
| 03/28/2006 03:48 PM | SubjectOLG/DOD Lease Contract |

Howard,

It was good talking to you. As stated on the phone, we have 10 executed task orders in-house representing 177 units, 85 of which are on the way to Afghanistan with the initial 49 vehicles due in Kabul by 10 April (latest), and the balance of the 85 due in by 25 April.

I have enclosed the following for your review:

- Overview of OLG
- Overview of lease contract
- Lease contract:
  - Pages 1-3
  - SOW (part of Task Order #2)
  - Contract Modification
  - Task Oder #1
  - Task Order Summary
- Scheduled Maintenance Contract – No Lemon Ltd.


The above should give you a good idea of the size of the project.

I look forward to talking to you after your review.


Regards,
George Badcock
President
Overseas Lease Group, Inc.[attachment "OLG - Information Package - 02-06.doc" deleted by Howard Ulep/RM/KCL/KeyCorp] [attachment "IDIQ Modification Conformed - 3 pages.pdf" deleted by Howard Ulep/RM/KCL/KeyCorp] [attachment "IDIQ Modification.pdf" deleted by Howard Ulep/RM/KCL/KeyCorp] [attachment "Task Order#2 - 5 Pajeros.pdf" deleted by Howard Ulep/RM/KCL/KeyCorp] [attachment "Task Order#1 OSC-A Vehicles.pdf" deleted by Howard Ulep/RM/KCL/KeyCorp] [attachment "Task Orders.xls" deleted by Howard Ulep/RM/KCL/KeyCorp] [attachment "Service Contract - OLG - Corrected - 03-07-06.pdf" deleted by Howard Ulep/RM/KCL/KeyCorp] [attachment "Overview of DOD Contract - 03-28-06.doc" deleted by Howard Ulep/RM/KCL/KeyCorp]


*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*
This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide the services for which you are receiving the information.

127 Public Square, Cleveland, OH 44114
****************************************************************************

If you prefer not to receive future e-mail offers for products or services from
Key send an e-mail to DNERequests@key.com with 'No Promotional E-mails' in the
SUBJECT line.

# EXHIBIT 3

## ASSIGNMENT AGREEMENT

**THIS ASSIGNMENT AGREEMENT** (this "Agreement") is made as of April 1, 2006 by and between Overseas Lease Group, Inc., a Delaware corporation with its principal office at 110 East Broward Blvd., Suite 1700, Fort Lauderdale, FL 33301 ("Seller") and **KEY GOVERNMENT FINANCE, INC.**, with its principal office at 1000 South McCaslin Blvd. Superior, CO 80027, its successors and assigns ("Purchaser").

### INTRODUCTION:

Seller, and United States Department of Defense (the "User") have entered into that certain Contract (Contract No. W91B4M-06-D-0001), dated as of February 05, 2006 (the "Contract"), pursuant to which Seller has leased to the User, and the User has leased from Seller, the property described therein (the "Property"). Seller desires to sell, and Purchaser is willing to purchase, the Assigned Interest (as hereinafter defined).

**Section 1.    Assignment.  NOW, THEREFORE,** in consideration of the covenants, warranties and representations hereinafter set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser agree as follows: FOR VALUE RECEIVED, including the payment by Purchaser of $3,237,057.53 due at closing (the "Purchase Price"). Seller does hereby sell, assign, transfer and set over unto Purchaser all of Seller's right, title and interest in and to (but none of its obligations under) the Assigned Interest.

**Section 2.    Assigned Interest.** As used herein, the term "Assigned Interest" shall mean the Contract and all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by User, and a first priority lien in favor of Purchaser in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract, including (without limitation) the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement. As used herein, the term "Contract" shall mean the Contract, together with all documents executed in connection with the Contract, including, without limitation, all documents listed on attached Schedule A.

**Section 3.    Representations and Warranties.** In order to induce Purchaser to enter into this Agreement and to accept the sale of the Assigned Interest, and security interest in the Property, Seller hereby represents and warrants to Purchaser that:

(a)  the Contract was duly authorized and properly executed and delivered by the Seller and this Agreement was duly authorized and properly executed and delivered by Seller, and each is in full force and effect and represents a valid and enforceable obligation of Seller in accordance with its terms, subject to bankruptcy, insolvency or similar laws then in effect;

(b)  the number and amount of the unpaid payments due under the Contract as of the date hereof are as stated in Exhibit 1 attached hereto;

(c)  no security deposit or prepayment of payments has been paid to Seller by the User or any third party in connection with the Contract, and Seller has not granted, and will not grant, to the User any allowance, credit memo, adjustment, or enter into any settlement, modification or amendment of the Contract;

(d)  attached hereto is a true, correct, and complete copy of the Contract, and the Contract is the sole and entire understanding and agreement between the User and Seller and there are no other agreements between them with respect to the Contract or the Property;

(e)  all original counterparts of the Contract have been delivered to Purchaser;

(f)  to the best of Seller's knowledge all of the Property has been accepted by the User in a condition satisfactory to the User in all respects and the Property is in possession of the User and, Seller has no knowledge of any casualty loss with respect to the Property;

(g)  to the best of Seller's knowledge the Contract is free of any setoffs, counterclaims and defenses of any kind whatsoever;

(h)  to the best of Seller's knowledge no event of default or event of non-appropriation has occurred and is continuing under the Contract , and no event has occurred which, with the lapse of time or the giving of notice, or both, would constitute an event of default or event of non-appropriation under the Contract;

(i)  all representations and duties of Seller intended to induce the User to enter into the Contract, whether required by the Contract or otherwise, have been fulfilled and Seller is not in default with respect to any of its obligations under the Contract, nor has any event occurred and continued which with the passing of time or the giving of notice would constitute such a default by Seller;

(j)  Seller has fully complied with all applicable federal and state laws, rules and regulations and has made all disclosures required by law in connection with the transactions contemplated by the Contract, prior to the consummation of the Contract;

(k)  to the best of Seller's knowledge after due inquiry, all credit data submitted to Purchaser and all information set forth in the User's application for entry into the Contract is true and correct in all material respects;

(l)    Seller shall use proceeds hereof to pay supplier the purchase price for the Property and all taxes required to be paid in connection with the acquisition of the Property, and Seller is the sole owner of and has good and marketable title to the Property and Assigned Interest, free and clear of all liens and encumbrances of any nature whatsoever, other than the interest of the User under the Contract;

(m)    no prohibition exists, in the Contract or otherwise, and no consent of the User or any other party is required (other than consent which has already been provided), to the making of this Assignment;

(n)    Seller has done and shall do nothing and knows of no facts or circumstances which would (i) materially impair the validity or value of the Contract, any rights created thereby, the Property or this Agreement, or (ii) materially impair the ability of Seller to perform its obligations under the Contract or this Agreement;

(o)    all taxes due and payable by Seller as of the date hereof with respect to the Property and Assigned Interest have been, or will be paid;

(p)    this Assignment vest in Purchaser full right, title and interest and legal title of Seller in and to the Assigned Interest, free and clear of all claims, liens, security interests and encumbrances of any kind or character, except the right of User under the Contract, and the same shall be and remain free of all claims, liens, security interests and encumbrances arising through any act or omission of Seller or any person claiming by, through or under it;

(q)    the execution by Seller of this Agreement and of the Contract to which it is a party, and its participation in the transaction specified herein, is in its ordinary course of business and within the scope of its existing corporate authority and Seller has full power and authority to enter into, and has taken all necessary action to authorize the execution and delivery of the Contract and, this Agreement and to perform the terms and conditions hereof and thereof;

(r)    neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby will conflict with or result in a breach of any of the terms, conditions or provisions of the organizational documents of Seller, or of any law or regulation, order, writ, injunction or decree of any court or government instrumentality, or of any agreement or instrument to which Seller is a party or by which it or to which it or its assets is subject;

(s)    intentionally left blank

(t)    the Contract constitutes a separate instrument of lease, enforceable by Purchaser without regard to other equipment schedules executed pursuant to the Contract.

Seller's representations and warranties under this Section shall be continuing representations and warranties made as of the date of this Agreement and shall survive the assignment of the Assigned Interest to Purchaser.

**Section 4.    Intentionally left blank.**

**Section 5.    Duties of Seller at Closing.** Seller shall deliver to Purchaser, unless waived in writing by Purchaser: (a) all original counterparts of the Contract, duly executed by the User thereunder, and the completion, installation or acceptance certificate by whatever name executed by such User with respect to the Property leased under the Contract; (b) a duly executed notice of assignment; (c) such other documents and certificates as Purchaser may reasonably request; and (i) such documents and instruments (if any) as reasonably may be required by Purchaser to effect the grant of security interest by Seller to Purchaser in the Property and assignment by Seller to Purchaser of any warranties solely to the extent applicable to the Property.

**Section 6.    Seller's Obligations Under the Contract.** Purchaser shall have all of the rights of the Seller under the Contract, but none of Seller's obligations thereunder. This Agreement (and the assignment of such rights) shall not relieve Seller of any of its obligations under the Contract and Seller shall continue to perform all such obligations. Purchaser shall not be obligated to assume, and by its acceptance of this assignment shall not be deemed to have assumed, any of Seller's obligations under the Contract.

**Section 7.    Indemnification.** Seller hereby agrees to indemnify and save Purchaser harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Seller's breach of the covenants, representations and warranties contained in this Agreement. Purchaser will indemnify and save Seller harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Purchaser's actions or failure to act in connection with the Assigned Interests. The indemnity set forth in this Section shall survive the expiration or earlier termination of this Agreement or the Contract with respect to acts or events occurring or alleged to have occurred prior to such expiration or early termination.

**Section 8.    Covenants and Agreements.** Seller hereby covenants and agrees with Purchaser as follows:

(a)    Purchaser may endorse Seller's name on any remittances received from the User with respect to the Contract and/or the Property.

(b)   Seller shall pay or cause to be paid by the User all personal property taxes, including tangible and intangible personal property, license, privilege, documentary, sales and other like taxes or charges or taxes in lieu thereof, applicable to any of the transactions contemplated by this Agreement, and which have been imposed, assessed or accrued at or prior to the time of assignment against the Property, this Agreement, the Contract or Purchaser, except for taxes measured or imposed on the net income of Purchaser.

(c)   Seller shall, from time to time at the request of Purchaser, execute and deliver such further acknowledgments, agreements and instruments of assignment, transfer and assurance, and do all such further acts and things as may be necessary or appropriate in the reasonable opinion of Purchaser to give effect to the provisions hereof and to more perfectly confirm the rights, titles and interests hereby assigned and transferred to Purchaser.

(d)   Seller shall notify Purchaser promptly upon obtaining knowledge of any default in the performance of the User's obligation under the Contract, including, without limitation, the payment of sums due under the Contract.

(e)   Seller will not, without Purchaser's prior written consent:  solicit or accept collection of any installment payments due under the Contract; modify, amend or terminate the Contract; waive any of Purchaser's rights thereunder; or take any action which impairs the rights or interest of Purchaser with respect to the Contract.

(f)   If any payments under the Contract are made to Seller after the effective date of this Agreement, Seller agrees to promptly transmit such payment(s) to Purchaser in the same form as they are received, except that Seller will endorse, to the order of Purchaser, checks so received which are made payable to it, or otherwise pay such amount to Purchaser.

(g)   Seller shall allow Purchaser and its representatives free access and right of inspection at all times to any Equipment at its location, subject, however, to the rights of the User under the Contract.

(h)   Seller irrevocably constitutes and appoints Purchaser and any present or future officer or agent of Purchaser, or its successors or assigns, as its lawful attorney with full power of substitution and re-substitution, and in the name of Seller or otherwise, to collect and to sue in any court for payments due or to become due under the Contract, to withdraw or settle any claims, suits or proceedings pertaining to or arising out of the Contract, upon such terms as Purchaser in its discretion may deem to be in its best interest, all without notice to or assent of Seller and, further, to take possession and to endorse in the name of Seller any instrument for the payment of money received on account of the payments due under the Contract.

Section 9.   Miscellaneous.  This Agreement shall be governed by, and interpreted and enforced under, the internal laws of the State of Utah (without regard to the conflict of laws principles of such state).  All references herein to any agreements shall be to such agreement as amended or modified to the date of reference. The words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement. All notices hereunder shall be in writing and hand delivered, sent by facsimile (with confirmation of receipt) or sent by overnight courier service or by certified mail, addressed to the parties at the address specified above, or to such other address as either party may specify hereunder; and shall be effective upon receipt.

Section 10.   Entire Agreement; No Assignment.  This Agreement is the entire agreement between Purchaser and Seller with respect to the subject matter hereof and it may not be supplemented or amended except by a writing, which is signed by both parties. This Agreement shall inure to the benefit of and be binding on Seller and Purchaser, and their respective successors and assigns. Notwithstanding the foregoing, Seller may not assign it rights, or delegate its obligations, under this Agreement without the express prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder, in whole or in part, at any time.

Section 11.   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all such counterparts shall constitute but one and the same instrument.

Section 12.   Not an Extension of Credit.  This Agreement constitutes a sale of 100% ownership interest in the Assigned Interest and shall in no way be construed as an extension of credit by Purchaser to Seller. Seller waives and releases any right, title or interest that it may have (whether pursuant to a "cross-collateralization" provision or otherwise) in and to any of the Assigned Interest, and/or the Contract.

Section 13.   Waiver of Jury Trial.  THE PARTIES HEREBY UNCONDITIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of the day and year first above written.

Seller: Overseas Lease Group, Inc.                          Purchaser: KEY GOVERNMENT FINANCE, INC.

By: _____                                 By: _____

Name:  E.G Badcock                                          Name: _____

Title: ___President_____                          Title: _____

## EXHIBIT 1

SPECIFICATION OF ASSIGNED SCHEDULE

Executed pursuant to that certain Assignment Agreement dated as of April 1, 2006 (the "Agreement"), by and between Overseas Lease Group, Inc. as Seller, and KEY GOVERNMENT FINANCE, INC. as Purchaser.

This Specification is dated and effective as of the date set forth below and incorporates the terms and conditions of the Agreement.

1.  User: United States Department of Defense, under Contract No. W91B4M-06-D-0001-P00001, including all Modifications and Dellivery Orders issued under said Contract.

2.  Date of Contract: January 19, 2006

3.  Total Invoice Cost: $3,237,057.53. (See Assignment of Proceeds Letter for break-out of payment)

4.  Remaining payments due under the Contract: 60 monthly payments in arrears. 1-12 @ $87,270.00; 13-24 @ $87,758.00; 25-36 @ $67,254.00; 37-48 @ $45,613.00; 49-60 @ $40,645.00.

5.  Consideration: $3,237,057.53

Date of Execution: 11 April 2006

**Seller:**

Overseas Lease Group, Inc.

By: _____

Name: E.G Badcock

Title: ___President_____

**Purchaser:**

KEY GOVERNMENT FINANCE, INC.

By: _____

Name: _____

Title: _____

### SCHEDULE A TO SPECIFICATION
### OF ASSIGNED SCHEDULE

Attached to and made a part of Specification of Assigned Schedule dated as of April 1, 2006.

The Contract Documents are as follows:

1. Contract No. W91B4M-06-D-0001-P00001, including all Modifications and Delivery Orders under said Contract
2. Exhibit A – Form of Instrument of Assignment
3. Exhibit B – Form of Certificate of Acceptance
4. Exhibit C – Form of Notice and Acknowledgement of Assignment

(b) Seller shall pay or cause to be paid by the User all personal property taxes, including tangible and intangible personal property, license, privilege, documentary, sales and other like taxes or charges or taxes in lieu thereof, applicable to any of the transactions contemplated by this Agreement, and which have been imposed, assessed or accrued at or prior to the time of assignment against the Property, this Agreement, the Contract or Purchaser, except for taxes measured or imposed on the net income of Purchaser.

(c) Seller shall, from time to time at the request of Purchaser, execute and deliver such further acknowledgments, agreements and instruments of assignment, transfer and assurance, and do all such further acts and things as may be necessary or appropriate in the reasonable opinion of Purchaser to give effect to the provisions hereof and to more perfectly confirm the rights, titles and interests hereby assigned and transferred to Purchaser.

(d) Seller shall notify Purchaser promptly upon obtaining knowledge of any default in the performance of the User's obligation under the Contract, including, without limitation, the payment of sums due under the Contract.

(e) Seller will not, without Purchaser's prior written consent: solicit or accept collection of any installment payments due under the Contract; modify, amend or terminate the Contract; waive any of Purchaser's rights thereunder; or take any action which impairs the rights or interest of Purchaser with respect to the Contract.

(f) If any payments under the Contract are made to Seller after the effective date of this Agreement, Seller agrees to promptly transmit such payment(s) to Purchaser in the same form as they are received, except that Seller will endorse, to the order of Purchaser, checks so received which are made payable to it, or otherwise pay such amount to Purchaser.

(g) Seller shall allow Purchaser and its representatives free access and right of inspection at all times to any Equipment at its location, subject, however, to the rights of the User under the Contract.

(h) Seller irrevocably constitutes and appoints Purchaser and any present or future officer or agent of Purchaser, or its successors or assigns, as its lawful attorney with full power of substitution and re-substitution, and in the name of Seller or otherwise, to collect and to sue in any court for payments due or to become due under the Contract, to withdraw or settle any claims, suits or proceedings pertaining to or arising out of the Contract, upon such terms as Purchaser in its discretion may deem to be in its best interest, all without notice to or assent of Seller and, further, to take possession and to endorse in the name of Seller any instrument for the payment of money received on account of the payments due under the Contract.

**Section 9. Miscellaneous.** This Agreement shall be governed by, and interpreted and enforced under, the internal laws of the State of Utah (without regard to the conflicts of laws principles of such state). All references herein to any agreements shall be to such agreement as amended or modified to the date of reference. The words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement. All notices hereunder shall be in writing and hand delivered, sent by facsimile (with confirmation of receipt) or sent by overnight courier service or by certified mail, addressed to the parties at the address specified above, or to such other address as either party may specify hereunder; and shall be effective upon receipt.

**Section 10. Entire Agreement; No Assignment.** This Agreement is the entire agreement between Purchaser and Seller with respect to the subject matter hereof and it may not be supplemented or amended except by a writing, which is signed by both parties. This Agreement shall inure to the benefit of and be binding on Seller and Purchaser, and their respective successors and assigns. Notwithstanding the foregoing, Seller may not assign its rights, or delegate its obligations, under this Agreement without the express prior written consent of Purchaser. Purchaser may assign its rights and obligations hereunder, in whole or in part, at any time.

**Section 11. Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all such counterparts shall constitute but one and the same instrument.

**Section 12. Not an Extension of Credit.** This Agreement constitutes a sale of 100% ownership interest in the Assigned Interest and shall in no way be construed as an extension of credit by Purchaser to Seller. Seller waives and releases any right, title or interest that it may have (whether pursuant to a "cross-collateralization" provision or otherwise) in and to any of the Assigned Interest, and/or the Contract.

**Section 13. Waiver of Jury Trial.** THE PARTIES HEREBY UNCONDITIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

IN WITNESS WHEREOF, the parties have executed this Assignment Agreement as of the day and year first above written.

Seller: Oversold Lease Group, Inc.

By: _____

Name: E.G. Badcock

Title: President _____

Purchaser: KEY GOVERNMENT FINANCE, INC.

By: _____

Name: _____

Title: _____

04/12/2006 12:12PM

**EXHIBIT C**

FORM OF

**NOTICE OF ASSIGNMENT**

Date: April 11, 2006

Contract No.: W91B4M-06-D-0001-P00001, including all Modifications and Delivery Orders under said Contract.

TO:     Gary Funkhouser
        Purchasing and Contracting
        Contracting Office
        Wazir Akbar Khan Area, Street #10
        Camp Eggers, Afghanistan

This has reference to Contract Number W91B4M-06-D-0001-P0001, including all Modifications and Delivery Orders under said Contract dated January 19, 2006 (the "Contract"), entered into between United States Department of Defense, ("User") and Overseas Lease Group, Inc. ("Contractor") for vehicles.

Monies due or to become due under the Contract described above have been assigned by the Contractor to Key Government Finance, Inc. ("Assignee") under the provisions of the Assignment of Claims Act of 1940, as amended, 31 U.S.C. 3727, 41 U.S.C. 15.

A true copy of the Instrument of Assignment executed by the Contractor on April 11, 2006, is attached to this original Notice.

Payments due, or to become due, under the Contract should be made payable to the Assignee, at the following address:

        Key Government Finance, Inc.
        1000 South McCaslin Blbd.
        Superior, CO  80027
        Attn:  John Lekic

Please return to the undersigned two of the three enclosed copies of this Notice with the appropriate notations showing the date and hour of receipt, and signed by the person acknowledging receipt on behalf of the addressee.

VERY TRULY YOURS,

Overseas Lease Group, Inc.

BY: _____          ADDRESS:
            (signature)                       110 East Broward Blvd.
                                              Suite 1700
PRINTED:    E.G.Badcock                       Fort Lauderdale, FL 33301

TITLE:      President
            (title)

**EXHIBIT A**

FORM OF

**INSTRUMENT OF ASSIGNMENT**

RE: CONTRACT ORDER NO: W91B4M-06-D-001-P00001 dated January 19, 2006, including all Modifications and Delivery Orders under said Contract. (collectively, the "Prime Contract")

KNOW ALL MEN BY THESE PRESENTS: For value received, and in accordance with the Assignment of Claims Act of 1940, as amended (31 U.S.C. 3727, 41 U.S.C. 15), the undersigned Contractor as Assignor does hereby assign, set over, and transfer unto **KEY GOVERNMENT FINANCE, INC.**, or its assigns as Assignee, all of Assignor's rights and interests in and to all monies due and to become due from United States Department of Defense or from any agency or department thereof accruing under the above-referenced Prime Contract.

The Assignee shall not be held responsible for the performance of any obligations of the Assignor under the Prime Contract.

Overseas Lease Group, Inc.
("Assignor")

By: _____

Name: EG BADCOCK

Title: PRESIDENT

(SEAL)

ATTESTOR: _____
Secretary of Contractor

Date: 11 April 2006

**ACCEPTANCE OF ASSIGNMENT**

Assignment of monies due or to become due to Assignor under the Contract is hereby accepted:

**KEY GOVERNMENT FINANCE, INC.**
("Assignee")

By: _____

Name: JOHN L. LEKIC

Title: VP Originations & Syndications

Date: 4/11/06

## ACKNOWLEDGEMENT

Receipt is acknowledged of the above Notice of Assignment dated 11 April 2006 and a copy of the Instrument of Assignment. They were received at ___11 00___ (am) (pm), on ___13 Apr___ 200_06_.

_____
(signature)

___Contracting Officer___
(title)

ON BEHALF OF:         Gary Funkhouser
                      U.S. Department of Defense
                      Wazir Akbar Khan Area, Street #10
                      Camp Eggers, Afghanistan

CONTRACT NO.          W91B4M-06-D-0001-P00001


PLEASE RETURN TO:     KEY GOVERNMENT FINANCE, INC.
                      1000 South McCaslin Boulevard
                      Superior, Colorado 80027 USA
                      Attn: Federal Leasing Program Manager

# EXHIBIT 4

## ASSIGNMENT AGREEMENT

**THIS ASSIGNMENT AGREEMENT** (this "Agreement") is made as of _____, 2006 by and between [Prime Contractor], a _____ corporation with its principal office at _____ ("Seller") and **KEY GOVERNMENT FINANCE, INC.**, with its principal office at 1000 South McCaslin Blvd. Superior, CO 80027, its successors and assigns ("Purchaser").

I N T R O D U C T I O N:

Seller, and ____[Agency Name]____ (the "Buyer") have entered into that certain Contract for Software (Contract No. _____), dated as of _____, 2006 (the "Contract"), pursuant to which Seller has sold to the Buyer, and the Buyer has purchased from Seller, the property described therein (the "Property"). Seller desires to sell, and Purchaser is willing to purchase, the Assigned Interest (as hereinafter defined).

**Section 1.    Assignment. NOW, THEREFORE**, in consideration of the covenants, warranties and representations hereinafter set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser agree as follows: FOR VALUE RECEIVED, including the payment by Purchaser of $103,541.48 due at closing (the "Purchase Price"). Seller does hereby sell, assign, transfer and set over unto Purchaser all of Seller's right, title and interest in and to (but none of its obligations under) the Assigned Interest.

**Section 2.    Assigned Interest.** As used herein, the term "Assigned Interest" shall mean the Contract and all amounts due and to become due under the Contract, including (without limitation) payments, insurance proceeds, and all monies payable or recoverable following a default or non-appropriation by Buyer, and all of Seller's right, title and interest in and to the Property, together with all proceeds (cash and non-cash, including insurance proceeds) of the foregoing and all of Seller's rights and remedies under the Contract , including (without limitation) the right to initiate and conclude any and all proceedings, legal, equitable or otherwise, that Seller otherwise might take, save for this Agreement. As used herein, the term "Contract" shall mean the Contract, together with all documents executed in connection with the Contract, including, without limitation, all documents listed on attached Schedule A.

**Section 3.    Representations and Warranties.** In order to induce Purchaser to enter into this Agreement and to accept the sale of the Assigned Interest, Seller hereby represents and warrants to Purchaser that:

**(a)** the Contract was duly authorized and properly executed and delivered by the Seller and this Agreement was duly authorized and properly executed and delivered by Seller, and each is in full force and effect and represents a valid and enforceable obligation of Seller in accordance with its terms, subject to bankruptcy, insolvency or similar laws then in effect;

**(b)** the number and amount of the unpaid payments due under the Contract as of the date hereof are as stated in Exhibit 1 attached hereto;

**(c)** no security deposit or prepayment of payments has been paid to Seller by the Buyer or any third party in connection with the Contract, and Seller has not granted, and will not grant, to the Buyer any allowance, credit memo, adjustment, or enter into any settlement, modification or amendment of the Contract;

**(d)** attached hereto is a true, correct, and complete copy of the Contract, and the Contract is the sole and entire understanding and agreement between the Buyer and Seller and there are no other agreements between them with respect to the Contract or the Property;

**(e)** all original counterparts of the Contract have been delivered to Purchaser;

**(f)** to the best of Seller's knowledge all of the Property has been accepted by the Buyer in a condition satisfactory to the Buyer in all respects and the Property is in possession of the Buyer and, Seller has no knowledge of any casualty loss with respect to the Property;

**(g)** to the best of Seller's knowledge the Contract is free of any setoffs, counterclaims and defenses of any kind whatsoever;

**(h)** to the best of Seller's knowledge no event of default or event of non-appropriation has occurred and is continuing under the Contract , and no event has occurred which, with the lapse of time or the giving of notice, or both, would constitute an event of default or event of non-appropriation under the Contract;

**(i)** all representations and duties of Seller intended to induce the Buyer to enter into the Contract, whether required by the Contract or otherwise, have been fulfilled and Seller is not in default with respect to any of its obligations under the Contract, nor has any event occurred and continued which with the passing of time or the giving of notice would constitute such a default by Seller;

**(j)** Seller has fully complied with all applicable federal and state laws, rules and regulations and has made all disclosures required by law in connection with the transactions contemplated by the Contract, prior to the consummation of the Contract;

**(k)** to the best of Seller's knowledge after due inquiry, all credit data submitted to Purchaser and all information set forth in the Buyer's application for entry into the Contract is true and correct in all material respects;

(l)  to the best of Seller's knowledge the purchase price for the Property has been paid in full, and all taxes required to be paid in connection with the acquisition of the Property have been paid in full, and Seller is the sole owner of and has good and marketable title to the Assigned Interest, free and clear of all liens and encumbrances of any nature whatsoever, other than the interest of the Buyer under the Contract;

(m)  no prohibition exists, in the Contract or otherwise, and no consent of the Buyer or any other party is required (other than consent which has already been provided), to the making of this Assignment;

(n)  Seller has done and shall do nothing and knows of no facts or circumstances which would (i) materially impair the validity or value of the Contract, any rights created thereby, the Property or this Agreement, or (ii) materially impair the ability of Seller to perform its obligations under the Contract or this Agreement;

(o)  all taxes due and payable by Seller as of the date hereof with respect to the Assigned Interest have been paid;

(p)  this Assignment vest in Purchaser full right, title and interest and legal title of Seller in and to the Assigned Interest, free and clear of all claims, liens, security interests and encumbrances of any kind or character, except the right of Buyer under the Contract, and the same shall be and remain free of all claims, liens, security interests and encumbrances arising through any act or omission of Seller or any person claiming by, through or under it;

(q)  the execution by Seller of this Agreement and of the Contract to which it is a party, and its participation in the transaction specified herein, is in its ordinary course of business and within the scope of its existing corporate authority and Seller has full power and authority to enter into, and has taken all necessary action to authorize the execution and delivery of the Contract and, this Agreement and to perform the terms and conditions hereof and thereof;

(r)  neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby will conflict with or result in a breach of any of the terms, conditions or provisions of the organizational documents of Seller, or of any law or regulation, order, writ, injunction or decree of any court or government instrumentality, or of any agreement or instrument to which Seller is a party or by which it or to which it or its assets is subject;

(s)  Seller has not claimed and does not expect to claim any exclusions, deductions, credits or other benefits (such as depreciation) under the federal tax laws as "owner" of the Property for federal tax purposes; and

(t)  the Contract constitutes a separate instrument of purchase, enforceable by Purchaser without regard to other equipment schedules executed pursuant to the Contract.

Seller's representations and warranties under this Section shall be continuing representations and warranties made as of the date of this Agreement and shall survive the assignment of the Assigned Interest to Purchaser.

**Section 4.    Intentionally left blank.**

**Section 5.    Duties of Seller at Closing.** Seller shall deliver to Purchaser, unless waived in writing by Purchaser:  (a) all original counterparts of the Contract, duly executed by the Buyer thereunder, and the completion, installation or acceptance certificate by whatever name executed by such Buyer with respect to the Property purchased under the Contract; (b) a duly executed notice of assignment; (c) such other documents and certificates as Purchaser may reasonably request; and (i) such documents and instruments (if any) as reasonably may be required by Purchaser to effect the assignment by Seller to Purchaser of any warranties solely to the extent applicable to the Property.

**Section 6. Seller's Obligations Under the Contract.** Purchaser shall have all of the rights of the Seller under the Contract, but none of Seller's obligations thereunder. This Agreement (and the assignment of such rights) shall not relieve Seller of any of its obligations under the Contract and Seller shall continue to perform all such obligations. Purchaser shall not be obligated to assume, and by its acceptance of this assignment shall not be deemed to have assumed, any of Seller's obligations under the Contract.

**Section 7.    Indemnification.** Seller hereby agrees to indemnify and save Purchaser harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Seller's breach of the covenants, representations and warranties contained in this Agreement. Purchaser will indemnify and save Seller harmless from and against any and all costs, losses, expenses (including attorneys' fees), damages, claims, demands, actions, causes of actions and judgments of any nature arising out of, or resulting from, Purchaser's actions or failure to act in connection with the Assigned Interests. The indemnity set forth in this Section shall survive the expiration or earlier termination of this Agreement or the Contract with respect to acts or events occurring or alleged to have occurred prior to such expiration or early termination.

**Section 8.    Covenants and Agreements.** Seller hereby covenants and agrees with Purchaser as follows:

(a)  Purchaser may endorse Seller's name on any remittances received from the Buyer with respect to the Contract and/or the Property.

(b)  Seller shall pay or cause to be paid by the Buyer all personal property taxes, including tangible and intangible

transactions contemplated by this Agreement, and which have been imposed, assessed or accrued at or prior to the time of assignment against the Property, this Agreement, the Contract or Purchaser, except for taxes measured or imposed on the net income of Purchaser.

(c)  Seller shall, from time to time at the request of Purchaser, execute and deliver such further acknowledgments, agreements and instruments of assignment, transfer and assurance, and do all such further acts and things as may be necessary or appropriate in the reasonable opinion of Purchaser to give effect to the provisions hereof and to more perfectly confirm the rights, titles and interests hereby assigned and transferred to Purchaser.

(d)  Seller shall notify Purchaser promptly upon obtaining knowledge of any default in the performance of the Buyer's obligation under the Contract, including, without limitation, the payment of sums due under the Contract.

(e)  Seller will not, without Purchaser's prior written consent: solicit or accept collection of any installment payments due under the Contract; repossess or consent to the return of any Property; modify, amend or terminate the Contract; waive any of Purchaser's rights thereunder; or take any action which impairs the rights or interest of Purchaser with respect to the Contract.

(f)  If any payments under the Contract are made to Seller after the effective date of this Agreement, Seller agrees to promptly transmit such payment(s) to Purchaser in the same form as they are received, except that Seller will endorse, to the order of Purchaser, checks so received which are made payable to it, or otherwise pay such amount to Purchaser.

(g)  Seller shall allow Purchaser and its representatives free access and right of inspection at all times to any Equipment at its location, subject, however, to the rights of the Buyer under the Contract.

(h)  Seller irrevocably constitutes and appoints Purchaser and any present or future officer or agent of Purchaser, or its successors or assigns, as its lawful attorney with full power of substitution and re-substitution, and in the name of Seller or otherwise, to collect and to sue in any court for payments due or to become due under the Contract, to withdraw or settle any claims, suits or proceedings pertaining to or arising out of the Contract, upon such terms as Purchaser in its discretion may deem to be in its best interest, all without notice to or assent of Seller and, further, to take possession and to endorse in the name of Seller any instrument for the payment of money received on account of the payments due under the Contract.

**Section 9.    Miscellaneous.**  This Agreement shall be governed by, and interpreted and enforced under, the internal laws of the State of Utah (without regard to the conflict of laws principles of such state).  All references herein to any agreements shall be to such agreement as amended or modified to the date of reference.  The words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement.  All notices hereunder shall be in writing and hand delivered, sent by facsimile (with confirmation of receipt) or sent by overnight courier service or by certified mail, addressed to the parties at the address specified above, or to such other address as either party may specify hereunder; and shall be effective upon receipt.

**Section 10.    Entire Agreement; No Assignment.**  This Agreement is the entire agreement between Purchaser and Seller with respect to the subject matter hereof and it may not be supplemented or amended except by a writing, which is signed by both parties.  This Agreement shall inure to the benefit of and be binding on Seller and Purchaser, and their respective successors and assigns.  Notwithstanding the foregoing, Seller may not assign it rights, or delegate its obligations, under this Agreement without the express prior written consent of Purchaser.  Purchaser may assign its rights and obligations hereunder, in whole or in part, at any time.

**Section 11.    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all such counterparts shall constitute but one and the same instrument.

**Section 12.    Not an Extension of Credit.**  This Agreement constitutes a sale of 100% ownership interest in the Assigned Interest and shall in no way be construed as an extension of credit by Purchaser to Seller.  Seller waives and releases any right, title or interest that it may have (whether pursuant to a "cross-collateralization" provision or otherwise) in and to any of the Assigned Interest, the Contract and/or the Property.

**Section 13.    Waiver of Jury Trial.**  THE PARTIES HEREBY UNCONDITIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

**IN WITNESS WHEREOF**, the parties have executed this Assignment Agreement as of the day and year first above written.

Seller: [Prime Contractor]                           Purchaser:  KEY GOVERNMENT FINANCE, INC.

By:_____                     By:_____

Name:_____                     Name:_____

Title:_____                    Title:_____

<u>**EXHIBIT 1**</u>

SPECIFICATION OF ASSIGNED SCHEDULE

Executed pursuant to that certain Assignment Agreement dated as of _____, 2006 (the "Agreement"), by and between [Prime Contractor] as Seller, and KEY GOVERNMENT FINANCE, INC. as Purchaser.

This Specification is dated and effective as of the date set forth below and incorporates the terms and conditions of the Agreement.

1.    Buyer:

2.    Date of Contract:

3.    Total Invoice Cost: $

4.    Remaining payments due under the Contract:

5.    Consideration:  $

Date of Execution: _____

**Seller:**                                          **Purchaser:**

[Prime Contractor]                          KEY GOVERNMENT FINANCE, INC.


By:_____      By:_____

Name:_____      Name:_____

Title:_____      Title:_____

## SCHEDULE A TO SPECIFICATION
## OF ASSIGNED SCHEDULE

Attached to and made a part of Specification of Assigned Schedule dated as of _____, 2006.

The Contract Documents are as follows:

1. Order No.
2. Exhibit A – Form of Instrument of Assignment
3. Exhibit B – Form of Certificate of Acceptance
4. Exhibit C – Form of Notice and Acknowledgement of Assignment

# EXHIBIT 5

# EXHIBIT C

FORM OF

## NOTICE OF ASSIGNMENT

Date: April 11, 2006            Contract No.:  W91B4M-06-D-0001-P00001, including all Modifications and
                               Delivery Orders under said Contract.

TO:    Gary Funkhouser
       Purchasing and Contracting
       Contracting Office
       Wazir Akbar Khan Area, Street #10
       Camp Eggers, Afghanistan

This has reference to Contract Number W91B4M-06-D-0001-P0001; including all Modifications and Delivery Orders
under said Contract dated January 19, 2006 (the "Contract"), entered into between United States Department of
Defense, ("User") and Overseas Lease Group, Inc. ("Contractor") for vehicles.

Monies due or to become due under the Contract described above have been assigned by the Contractor to Key
Government Finance, Inc. ("Assignee") under the provisions of the Assignment of Claims Act of 1940, as amended,
31 U.S.C. 3727, 41 U.S.C. 15.

A true copy of the Instrument of Assignment executed by the Contractor on April 11, 2006, is attached to this
original Notice.

Payments due, or to become due, under the Contract should be made payable to the Assignee, at the following
address:

       Key Government Finance, Inc.
       1000 South McCaslin Blbd.
       Superior, CO  80027
       Attn:  John Lekic

Please return to the undersigned two of the three enclosed copies of this Notice with the appropriate notations
showing the date and hour of receipt, and signed by the person acknowledging receipt on behalf of the addressee.

VERY TRULY YOURS,

Overseas Lease Group, Inc.

BY: _____            ADDRESS:
          (signature)                              110 East Broward Blvd.
                                                   Suite 1700
PRINTED:    E.G.Badcock                            Fort Lauderdale, FL 33301

TITLE:       President
                (title)

2

<u>EXHIBIT A</u>

FORM OF

INSTRUMENT OF ASSIGNMENT

RE:   CONTRACT ORDER NO:   W91B4M-06-D-001-P00001 dated January 19, 2006, including all
Modifications and Delivery Orders under said Contract.
(collectively, the "<u>Prime Contract</u>")

KNOW ALL MEN BY THESE PRESENTS: For value received, and in accordance with the Assignment of Claims
Act of 1940, as amended (31 U.S.C. 3727, 41 U.S.C. 15), the undersigned Contractor as Assignor does hereby
assign, set over, and transfer unto **KEY GOVERNMENT FINANCE, INC.**, or its assigns as Assignee, all of
Assignor's rights and interests in and to all monies due and to become due from United States Department of
Defense or from any agency or department thereof accruing under the above-referenced Prime Contract.

The Assignee shall not be held responsible for the performance of any obligations of the Assignor under the Prime
Contract.

Overseas Lease Group, Inc.
("<u>Assignor</u>")

By: _____

(SEAL)
Name: _E Gr BADCOCK_

ATTESTOR: _____   Title: _PRESIDENT_
Secretary of Contractor   Date: _11 April 2006_

ACCEPTANCE OF ASSIGNMENT

Assignment of monies due or to become due to Assignor under the Contract is hereby accepted:

KEY GOVERNMENT FINANCE, INC.
("<u>Assignee</u>")

By: _____

Name: ~~JOHN L. LEKIC~~

Title: ~~VP Originations & Syndications~~

Date: _4/11/06_

1

04/11/2006   07:29PM

## ACKNOWLEDGEMENT

Receipt is acknowledged of the above Notice of Assignment dated 11 April 2006 and a copy of the Instrument of Assignment. They were received at _11 00_ (am) (pm), on _13 Apr_ 200 _06_.

_(signature)_

Contracting Officer
(title)

ON BEHALF OF:        Gary Funkhouser
                     U.S. Department of Defense
                     Wazir Akbar Khan Area, Street #10
                     Camp Eggers, Afghanistan

CONTRACT NO.         W91B4M-06-D-0001-P00001


PLEASE RETURN TO:    KEY GOVERNMENT FINANCE, INC.
                     1000 South McCaslin Boulevard
                     Superior, Colorado 80027 USA
                     Attn: Federal Leasing Program Manager

# EXHIBIT 6

# *Overseas Lease Group, Inc.*

September 11, 2007

Key Government Finance, Inc.
1000 South McCaslin Blvd.
Superior, Colorado 80027

Attention:  John Lekic

RE: DOD Contract #W91B4M-06-D-0001 dated February 5, 2006 as amended

Dear Sirs:

As discussed during the past several weeks, the DOD has not renewed its lease for the following vehicles:

| Lease # | VIN | Task Order | Tranche |
|---|---|---|---|
| 06-1010 | JMYLNV76W5J001342 | 2 | 1 |
| 06-1011 | JMYLNV76W5J001343 | 2 | 1 |
| 06-1015 | JMYLNV76W5J001585 | 2 | 1 |
| 06-1018 | JMYLNV76W5J001590 | 2 | 1 |
| 06-1026 | JMYLNV76W5J001603 | 2 | 1 |
| 06-1101 | JMYHNP16W5A001451 | 5 | 6 |
| 06-1104 | MR0FX22G161003019 | 5 | 5 |
| 06-1105 | MR0FX22G161003070 | 5 | 5 |
| 06-1107 | JMYLRV73W6J709571 | 5 | 5 |
| 06-1135 | JTGCB09JX65002405 | 12 | 5 |
| 06-1136 | JTGCB09JX65002484 | 12 | 5 |
| 06-1176 | JMYLNV76W6J001911 | 8 | 8 |
| 06-1177 | JMYLNV76W6J001912 | 10 | 8 |

Pursuant to that certain Assignment Agreement dated as of April 1, 2006 entered into by and between Overseas Lease Group, Inc. ("OLG") as Seller and Key Government Finance, Inc. ("Key") as Purchaser, OLG sold, assigned, transferred and set over to Key all of OLG's right, title and interest in an to the Assigned Interest, defined in such Agreement as the DOD contract referenced above and granted Key a first priority interest in and to among other things, the vehicles purchased by OLG for the purpose of leasing such vehicles to the DOD under the above referenced contract.

**USA**
110 East Broward Blvd.
Suite 1700
Fort Lauderdale, FL 33301 USA
Phone:    (800) 331-0599
Fax:       (954) 315-3884
E-Mail: hq@overseaslease.com

**Afghanistan**
Wazir Akbar Khan
Street 15, Lane 15, House 327
Kabul, Afghanistan
Phone:    93 (0) 799707501
E-Mail:  donlansean@yahoo.com

# *Overseas Lease Group, Inc.*

As indicated above, the lease of the vehicles identified herein has been terminated by the DOD, resulting in the termination of lease payments due to OLG which were previously assigned to Key under the April 1, 2006 Assignment Agreement. By this letter, Key acknowledges and agrees to accept the amount of $185,762.32 (evidenced by our check #0469 drawn on Commerce Bank) as a full and total payment and in total satisfaction of Key's first priority lien on those vehicles listed herein (See Exhibit A for detailed computation of payment amount). Further, Key hereby agrees that acceptance of such payment constitutes a full, complete and entire release of its first priority lien with respect to such vehicles and thereby releases OLG from its responsibility to market those vehicles listed herein for and on behalf of Key.

Very truly yours,

Donna M. Zerbo
Vice President & General Counsel

Page 1 of 1



**OVERSEAS LEASE GROUP, INC.**
110 E. BROWARD BLVD., SUITE 1700
FT. LAUDERDALE, FL 33301

COMMERCE BANK

0469

8/11/2007

PAY TO THE
ORDER OF    Key Government Finance, Inc.

**185,762.32

One Hundred Eighty-Five Thousand Seven Hundred Sixty-Two and 32/100****    $

DOLLARS

Key Government Finance, Inc.
1000 South McCaslin Blvd.
Superior, CO 80027

AUTHORIZED SIGNATURE

MEMO  RELEASE OF LIEN ON VEHICLES
PURSUANT TO SEPT. 11, 2007 LETTER

⑈⑈0004690⑈ ⑈067014822⑈  6860119772⑈  ⑈00185762322⑈

Account:6860119772  Check#:469  Amount:$185,762.32  Date Presented:09-19-2007

OVERSEAS LEASE GROUP, INC.
Key Government Finance, Inc.



**OVERSEAS LEASE GROUP, INC.**
110 E. BROWARD BLVD., SUITE 1700
FT. LAUDERDALE, FL 33301

COMMERCE BANK

0469

9/11/2007

PAY TO THE
ORDER OF    Key Government Finance, Inc.

$ **185,762.32

One Hundred Eighty-Five Thousand Seven Hundred Sixty-Two and 32/100********************************************** DOLLARS

Key Government Finance, Inc.
1000 South McCaslin Blvd.
Superior, CO 80027

MEMO RELEASE OF LIEN ON VEHICLES
PURSUANT TO SEPT. 11, 2007 LETTER.

AUTHORIZED SIGNATURE

⑈000469⑈ ⑈067014822⑈ 6860119772⑈ ⑈00185762322⑈

Account:6860119772  Check#:469  Amount:$185,762.32  Date Presented:09-19-2007